UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

THE NEW YORK TIMES COMPANY,          :
CHARLIE SAVAGE, and SCOTT SHANE,     :
                                     :
            Plaintiffs,              :
                                     :
      v.                             :        11 Civ. 9336 (CM)
                                     :
UNITED STATES DEPARTMENT OF          :
JUSTICE,                             :
                                     :
            Defendant.               :
------------------------------------------------------------ x
AMERICAN CIVIL LIBERTIES UNION and   :
THE AMERICAN CIVIL LIBERTIES UNION   :
FOUNDATION,                          :
                                     :
            Plaintiffs,              :
                                     :
      v.                             :
                                     :        12 Civ. 794 (CM)
                                     :
U.S. DEPARTMENT OF JUSTICE, including its :
component the Office of Legal Counsel, U.S. :
DEPARTMENT OF DEFENSE, including     :
its component U.S. Special Operations Command, :
and CENTRAL INTELLIGENCE AGENCY,     :
                                     :
            Defendants.              :
------------------------------------------------------------ x


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The *New York Times* FOIA Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The ACLU FOIA Request. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    These Lawsuits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.    Subsequent Developments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT I       The Agencies Searches Were Reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

POINT II      Although the Agencies Possess Some Responsive Records, They Have
Properly Withheld Records, and Details About Such Records, That Would
Tend to Reveal Classified and Statutorily Protected Information. . . . . . . . . . . . 14

    A.    The Agencies Properly Withheld Classified Responsive Records,
and Details Concerning Such Records, Pursuant to Exemption 1. . . . . . . . . . . 15

    B.    The CIA and DOJ Properly Withheld Responsive Records, and Details
Concerning Such Records, Pursuant to Exemption 3. . . . . . . . . . . . . . . . . . . . 22

        1.    The NSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    The CIA Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    C.    The Agencies Properly Provided a Glomar Response to Requests
for OLC Opinions Pertaining to Agencies Other Than DOD, Pursuant
to Exemptions 1 and 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    D.    The Executive Branch Has Not Officially Disclosed Any Records or
Information Withheld by the Agencies in These Cases. . . . . . . . . . . . . . . . . . . 27

        1.    The Strict Test for Waiver Through Official Disclosure. . . . . . . . . . . . 28

        2.    Plaintiffs Cannot Demonstrate Any Waiver Through
Official Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

POINT III.    The Agencies Properly Withheld Privileged Records Pursuant to
              Exemption 5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       A.     Exemption 5 and Applicable Privileges.. . . . . . . . . . . . . . . . . . . . . . . . . . . 34

              1.     The Deliberative Process Privilege. . . . . . . . . . . . . . . . . . . . . . . . . 34

              2.     The Attorney-Client Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

              3.     The Presidential Communications Privilege. . . . . . . . . . . . . . . . . . . 37

       B.     Legal Analysis by OLC, Including an Opinion Pertaining to DOD,
              and Interagency Deliberations Regarding Such Analysis.. . . . . . . . . . . . . . . 38

       C.     Internal DOD Legal Memoranda.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

       D.     Deliberations Leading up to Public Statements by Executive Branch
              Officials.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

       E.     Talking Points for the Attorney General in Preparation for a Meeting with
              the President.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       F.     Briefing Materials Prepared for the Attorney General in Preparation for a
              Congressional Hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

POINT IV.    The Agencies Properly Withheld the Names and Other Identifying Information
              of Intelligence Community Personnel Pursuant to Exemption 6.. . . . . . . . . . . 46

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

**CASES**                                                            **PAGE**

*ACLU v. DHS*,
    738 F. Supp. 2d 93 (D.D.C. 2010). ............................................. 44

*ACLU v. DOD*,
    628 F.3d 612 (D.C. Cir. 2011). ................................................ 33

*ACLU v. DOD*,
    752 F. Supp. 2d 361 (S.D.N.Y. 2010)......................................... 32

*ACLU v. DOJ*,
    808 F. Supp. 2d 280 (D.D.C. 2011). ...................................... 25, 33

*ACLU v. DOJ*,
    2012 __ F.3d __, 2012 WL 1829579 (2d Cir. May 21, 2012). ............... *passim*

*Access Reports v. DOJ*,
    926 F.2d 1192 (D.C. Cir. 1991). .............................................. 44

*Amnesty International USA v. CIA*,
    728 F. Supp. 2d 479 (S.D.N.Y. 2010).......................... 11, 37-38, 45

*Associated Press v. DOJ*,
    549 F.3d 62 (2d Cir. 2008)............................................... 46, 47

*Baker v. CIA*,
    580 F.2d 664 (D.C. Cir. 1978). ............................................... 24

*Baldrige v. Shapiro*,
    455  U.S. 345 (1982)........................................................... 9

*Bassiouni v. CIA*,
    392 F.3d 244 (7th Cir. 2004). ................................................. 14

*Bibles v. Oregon Natural Desert Association*,
    519 U.S. 355 (1997)........................................................... 47

*Brinton v. Department of State*,
    636 F.2d 600 (D.C. Cir. 1980). ............................................... 35

*CIA v. Sims,*
    471 U.S. 159 (1985)..................................................................................... 15, 22

*Carney v. DOJ,*
    19 F.3d 807 (2d Cir. 1994)..................................................................... 9, 10, 29

*Center for National Security Studies v. DOJ,*
    331 F.3d 918 (D.C. Cir. 2003). ..................................................................... 9, 10

*Citizens for Responsibility & Ethics in Washington ("CREW") v. DHS,*
    2008 WL 2872133 (D.D.C. July 22, 2008)...................................................... 45

*In re County of Erie,*
    473 F.3d 413 (2d Cir. 2007)..................................................................... 36, 40

*Davy v. CIA,*
    357 F. Supp. 2d 76 (D.D.C. 2004). ................................................................. 47

*Department of State v. Washington Post Co.,*
    456 U.S. 595 (1982)........................................................................................ 46

*Department of the Interior v. Klamath Water Users Protective Association,*
    532 U.S. 1 (2001)............................................................................................. 9

*Diamond v. FBI,*
    707 F.2d 75 (2d Cir. 1983).............................................................................. 10

*Ferguson v. FBI,*
    1995 WL 329307 (S.D.N.Y. June 1, 1995). ...................................................... 9

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990). ................................................................. 10, 28

*Frugone v. CIA,*
    169 F.3d 772 (D.C. Cir. 1999). ...................................................................... 10

*Gardels v. CIA,*
    689 F.2d 1100 (D.C. Cir. 1982). .................................................................... 26

*Goland v. CIA,*
    607 F.2d 339 (D.C. Cir. 1978). ................................................................. 24-25

*Grand Central Partnership, Inc. v. Cuomo,*
    166 F.3d 473 (2d Cir. 1999)..................................................................... *passim*

*In re Grand Jury Investigation*,
    399 F.3d 527 (2d Cir. 2005)................................................................................................. 36

*Halperin v. CIA*,
    629 F.2d 144 (D.C. Cir. 1980). .................................................................................. 10, 23

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999)............................................................................................... 28

*Hayden v. NSA*,
    608 F.2d 1381 (D.C. Cir. 1979). ....................................................................................... 15

*Hopkins v. HUD*,
    929 F.2d 81 (2d Cir. 1991)......................................................................................... *passim*

*Hudson River Sloop Clearwater, Inc. v. Department of the Navy*,
    891 F.2d 414 (2d Cir. 1989)........................................................................................ 28, 33

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989)........................................................................................................... 9

*Judicial Watch, Inc. v. Comm'n on U.S.-Pac. Trade & Investment Policy*,
    1999 WL 33944413 (D.D.C. Sept. 30,1999). .................................................................. 46

*Judicial Watch, Inc. v. FDA*,
    449 F.3d 141 (D.C. Cir. 2006). ........................................................................................ 46

*Krikorian v. Department of State*,
    984 F.2d 461 (D.C. Cir. 1993). ........................................................................................ 22

*Larson v. Department of State*,
    565 F.3d 857 (D.C. Cir. 2009). ................................................................................. *passim*

*Massey v. FBI*,
    3 F.3d 620 (2d Cir. 1993)................................................................................................... 46

*Milner v. Dep't of Navy*, 131 S. Ct. 1259 (2011)                                    47

*Miscavige v. IRS*,
    2 F.3d 366 (11th Cir. 1993). .............................................................................................. 9

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)................................................................................................... *passim*

*National Council of La Raza v. DOJ,*
    411 F.3d 350 (2d Cir. 2005)............................................................ *passim*

*National Council of La Raza v. DOJ,*
    339 F. Supp. 2d 572 (S.D.N.Y. 2004)............................................... 45

*New York Times Co. v. DOJ,*
    2012 WL 1869396 (S.D.N.Y. May 12, 2012)...................................... 14

*Nixon v. Administrator of General Services,*
    433 U.S. 425 (1997)......................................................................... 37

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C. Cir. 1976). ...................................................... 25

*Public Citizen v. Department of State,*
    11 F.3d 198 (D.C. Cir. 2003). ......................................................... 28

*Renegotiation Board v. Grumman Aircraft Engineering Corp.,*
    421 U.S.168 (1975).............................................................. 34, 35, 41

*Riquelme v. CIA,*
    453 F. Supp. 2d 103 (D.D.C. 2006). ...................................... 21, 24, 25

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997). ....................................................... 37

*Sierra Club v. U.S. Department of the Interior,*
    384 F. Supp. 2d 1 (D.D.C. 2004). ................................................ 44-45

*Tigue v. DOJ,*
    312 F.3d 70 (2d Cir. 2002)........................................................ *passim*

*Upjohn v. United States,*
    449 U.S. 383 (1981)......................................................................... 36

*Weisberg v. DOJ,*
    705 F.2d 1344 (D.C. Cir. 1983). ...................................................... 11

*Williams v. DOJ,*
    556 F. Supp. 63 (D.D.C. 1982). ...................................................... 46

*Wilner v. NSA,*
    592 F.3d 60 (2d Cir. 2009)....................................................... *passim*

*Wilson v. CIA*,
 586 F.3d 171 (2d Cir. 2009) ................................................................. *passim*

*Wolf v. CIA*,
 473 F.3d 370 (D.C. Cir. 2007) ............................................................. *passim*

*Wood v. FBI*,
 432 F.3d 78 (2d Cir. 2005) .................................................................. 39, 46

## STATUTES AND RULES

50 U.S.C. § 403g ........................................................................................... 24

5 U.S.C. § 552 ......................................................................................... *passim*

50 U.S.C. § 403-1(i)(1) ............................................................................... 23

Fed. R. Civ. P. 56(a) ...................................................................................... 9

## EXECUTIVE ORDERS

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ......................... 16, 17, 22

## PRELIMINARY STATEMENT

This matter involves the government's significant efforts to be open and transparent on the one hand, and to protect against the release of information harmful to national security on the other hand.  The Freedom of Information Act represents a balance struck by Congress between the right of the public to know and the need of the government to keep sensitive information in confidence.  Thus, while FOIA generally requires disclosure of agency records, the statute recognizes that public disclosure is not in the public interest when disclosing the requested records – or even revealing whether such documents exist – would disclose classified information or reveal intelligence sources and methods.  In that instance, disclosure is not required.

Those principles dispose of these cases.  The consolidated FOIA requests at issue here seek multiple categories of records relating to the alleged U.S. government use of targeted lethal force against U.S. citizens and other persons associated with al-Qaida and other terrorist groups.  The issues surrounding the U.S. government's use of lethal force are undoubtedly of the utmost public concern.  And for that reason, officials at the highest levels of the Executive Branch have carefully analyzed the various interests at stake.  One result of that analysis has been a series of speeches by the State Department Legal Adviser, by the Department of Defense General Counsel, by the Attorney General, and by the Assistant to the President for Homeland Security and Counterterrorism that have set forth for the American people the legal analysis and process involved in the determination whether to use lethal force.

At the same time, the Executive Branch deliberations reflect the reality that plaintiffs' requests implicate highly sensitive records.  For example, to enumerate and describe the records responsive to the FOIA requests would tend to reveal whether or not the Central Intelligence

Agency ("CIA") is authorized to, and does in fact, directly participate in targeted lethal operations, and whether or not the U.S. government possesses specific intelligence information about particular individuals.  Yet, Congress has made the judgment in the CIA Act and the National Security Act that information concerning such intelligence sources and methods should be exempt from public disclosure.

Moreover, the requests involve highly classified information.  For example, whether or not the United States government conducted the particular operations that led to the deaths of Anwar al-Aulaki and the other individuals named in the FOIA requests remains classified.  Likewise, whether or not the CIA has the authority to be, or is in fact, directly involved in targeted lethal operations remains classified.  And that is so notwithstanding the unsourced, unofficial statements and media reports that plaintiffs have identified.  None of those statements or reports constitutes an official disclosure that could vitiate agencies' ability to safeguard the classified and other statutorily protected information at issue here, and none eliminates the national security harms that could result from disclosure of such information.

In light of all of the interests at stake, the Executive Branch has carefully considered where to strike that balance, based on its unique expertise to evaluate matters of national security and foreign policy.  The Executive Branch has determined that, while the government can acknowledge the existence of some documents responsive to the FOIA requests that form the basis of this lawsuit, for the most part it cannot provide public details regarding the classified documents that are withheld; even to describe the numbers and details of most of these documents would reveal information that could damage the government's counterterrorism efforts.  The Executive Branch has supported these judgments with detailed public and classified

2

declarations that explain the harms that could result from further disclosure, and that do so taking into account the media reports that plaintiffs have identified.  Case law makes clear that substantial deference must be accorded to the Executive's logical and plausible judgments in this regard.

In short, although the defendant agencies (the "Agencies") have admitted the existence of at least some documents responsive to the request, the number and descriptive details of the responsive classified records are themselves classified and protected from disclosure under FOIA.  The declarations submitted by the Agencies, including multiple classified declarations submitted for the Court's *ex parte* and *in camera* review, demonstrate that the Agencies have properly withheld records and information responsive to the FOIA requests, pursuant to FOIA's Exemption 1, which protects classified national security information, *see* 5 U.S.C. § 552(b)(1), and Exemption 3, which protects information the disclosure of which is prohibited by statute, *id.* § 552(b)(3).  In addition, certain material is also protected by Exemption 5, which protects privileged information, *id.* § 552(b)(5); and Exemption 6, which protects certain personal information, *id.* § 552(b)(6).  Accordingly, the government's motion for summary judgment dismissing both complaints should be granted.

## STATEMENT OF FACTS

**A.    The *New York Times* FOIA Requests**

On or about June 11, 2010, *New York Times* reporter Scott Shane submitted a request to the Office of Legal Counsel ("OLC") within the Department of Justice ("DOJ") , seeking

> copies of all Office of Legal Counsel opinions or memoranda since 2001 that
> address the legal status of targeted killing, assassination, or killing of people
> suspected of ties to Al Qaeda or other terrorist groups by employees or contractors

of the United States government.  This would include legal advice on these topics
to the military, the Central Intelligence Agency or other intelligence agencies.  It
would include the legal status of killing with missiles fired from drone aircraft or
any other means.

Declaration of John Bies dated June 20, 2012 ("Bies Decl."), Exh. A (the "Shane Request").

OLC responded to the Shane Request on October 27, 2011.  *Id.*, Exh. B.  Insofar as the

Shane Request pertains to the Department of Defense, OLC responded that it had searched its

files and processed responsive records, and was withholding all such records pursuant to

Exemptions 1, 3 and 5.  *Id.*  OLC further responded that, insofar as the Shane Request pertains to

any other agencies of the United States government, pursuant to FOIA Exemptions 1, 3 and 5,

OLC neither confirmed nor denied the existence of the documents described in the request,

because "the very fact of the existence or nonexistence of such documents is itself classified,

protected from disclosure by statute, and privileged."  *Id.*

On or about October 7, 2011, Charlie Savage of the *New York Times* submitted a request

to OLC for "a copy of all Office of Legal Counsel memorandums analyzing the circumstances

under which it would be lawful for United States armed forces or intelligence community assets

to target for killing a United States citizen who is deemed to be a terrorist."  Bies Decl., Exh. C

(the "Savage Request").  The Savage Request asserted that "this matter is of pressing public

interest because of the recent death in Yemen of Anwar Al-Awlaki, a United States citizen who

has been accused of being an 'operational' terrorist with the group Al Qaeda in the Arabian

Peninsula."  *Id.*

OLC responded to the Savage Request on October 27, 2011.  Bies Decl., Exh. D.

Interpreting the request as seeking OLC opinions pertaining to Aulaki, OLC neither confirmed

4

nor denied the existence of such documents, pursuant to FOIA Exemptions 1, 3 and 5, because "the very fact of the existence or nonexistence of such documents is itself classified, protected from disclosure by statute, and privileged." *Id.*

**B.    The ACLU FOIA Request**

On October 19, 2011, the American Civil Liberties Union Foundation (the "ACLU") sent a single request to various offices within the Department of Justice[1] and the Department of Defense ("DOD")[2] and to the Central Intelligence Agency. Bies Decl., Exh. E (the "ACLU Request"). As described by the ACLU, the request seeks "records pertaining to the legal authority and factual basis for the targeted killing of [Aulaki] and two other U.S. citizens by the United States Government." *Id.* at 2.

The ACLU Request seeks several categories of records. Part 1 of the request seeks records created after September 11, 2001, pertaining to "the legal basis in domestic, foreign and international law upon which U.S. citizens can be subjected to targeted killings, whether using unmanned aerial vehicles ('UAVs' or 'drones') or by other means." ACLU Request at 5, No. 1.[3] Part 2 of the request seeks records created after September 11, 2001, pertaining to "the process

---

[1]  Within DOJ, the ACLU request was directed to OLC and the Office of Information Policy ("OIP"). It was also sent to the Office of Public Affairs for purposes of assessing the request for expedition. Declaration of Douglas R. Hibbard dated June 20, 2012 ("Hibbard Decl.") ¶¶ 3, 5; Bies Decl. ¶ 14.

[2]  The ACLU request was sent both to DOD headquarters and to its component, the United States Special Operations Command. Declaration of Robert R. Neller dated June 20, 2012 ("Neller Decl.") ¶ 3.

[3]  The ACLU subsequently agreed to exclude from this category of its request "all draft legal analyses," but not "internal communications, including emails." Declaration of Sarah S. Normand dated June 20, 2012 ("Normand Decl."), Exh. C.

by which U.S. citizens can be designated for targeted killing, including who is authorized to make such determinations and what evidence is needed to support them." *Id.* at 5, No. 2. Parts 3 through 6 of the ACLU Request seek a variety of records pertaining to specific U.S. citizens allegedly targeted for lethal operations. With regard to Aulaki, the ACLU Request seeks (a) "memoranda, opinions, drafts, correspondence, and other records produced by the OLC after September 11, 2001, pertaining to the legal basis in domestic, foreign and international law upon which" the alleged targeted killing of Aulaki was authorized and upon which Aulaki allegedly was killed, *id.* at 5-6, No. 3, and (b) "[a]ll documents and records pertaining to the factual basis for" the alleged targeted killing of Aulaki, *id.* at 6, No. 4. The ACLU Request also seeks several categories of records pertaining to the factual basis for the alleged use of targeted lethal force against two other U.S. citizens: Samir Khan, who allegedly "was killed in the same attack" as Aulaki, and Abdulrahman al-Aulaki, the son of Aulaki, who allegedly "was killed in a drone strike in southern Yemen" on or about October 14, 2011. *Id.* at 2-3, 6, Nos. 5-6.

OLC responded to the ACLU Request on November 14, 2011. Bies Decl., Exh. F. OLC explained that, pursuant to FOIA Exemptions 1, 3 and 5, it "neither confirms nor denies the existence of the documents" described in the ACLU Request "because the very fact of the existence or nonexistence of such documents is itself classified, protected from disclosure by statute, and privileged." *Id.*

The CIA responded to the ACLU request on November 17, 2011. Declaration of John Bennett dated June 20, 2012 ("Bennett Decl."), Exh. C. The CIA determined that it could "neither confirm nor deny the existence or nonexistence of records responsive to the request," as "[t]he fact of the existence or nonexistence of [the] requested records is currently and properly

6

classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended, and section 102A(i)(1) of the National Security Act, as amended." *Id.*[4]

## C.      These Lawsuits

Mr. Shane, Mr. Savage and the *New York Times* (collectively, the "*New York Times*") filed a lawsuit on December 20, 2011, and the ACLU filed a lawsuit on February 1, 2012, seeking to compel the release of documents in response to their respective FOIA requests. Normand Decl., Exhs. A-B.  This Court accepted the cases as related and directed that they be briefed in coordinated fashion.  Normand Decl. ¶ 5.

## D.      Subsequent Developments

Since the filing of these cases, senior U.S. officials have publicly addressed significant legal and policy issues pertaining to U.S. counterterrorism operations and the potential use of lethal force against U.S. citizens who are senior operational leaders of al-Qaida or associated forces.  Bennett Decl. ¶ 17.  These include speeches by Attorney General Eric Holder on March 5, 2012, and by Assistant to the President for Homeland Security and Counterterrorism John Brennan on April 30, 2012, addressing the circumstances in which it would be lawful to use lethal force against such U.S. citizens, and the process employed by the government in making decisions to employ targeted lethal force, respectively.  *See* Normand Decl., Exhs. D-E.

In light of these recent speeches, the CIA conducted a search for records responsive to the ACLU Request, and based on that search, determined that it could now publicly acknowledge

---

[4]  As of the filing of the ACLU's lawsuit, DOJ's Office of Information Policy was processing the ACLU Request.  Hibbard Decl. ¶ 7.  DOD was processing an appeal of the ACLU's fee waiver and expedition denial when the ACLU sued.  Neller Decl. ¶¶ 5-6.

that it possesses some records responsive to the ACLU Request.  Bennett Decl. ¶¶ 17, 27.  As an

example, the CIA has determined that it can acknowledge, without harming national security,

that it possesses some responsive records reflecting a general U.S. government interest in two

broad topics addressed by the ACLU Request – the "legal basis" for the use of legal force against

U.S. citizens and the "process by which U.S. citizens can be designated" for targeted lethal force.

*Id.* ¶ 27.  Such records would include the Attorney General's March 5, 2012, speech, in which he

explained that under certain circumstances, the use of lethal force against U.S. citizens who are

senior operational leaders of al-Qaida or associated forces would be lawful when, among other

things, "the U.S. government . . . determined, after a thorough and careful review, that the

individual pose[d] an imminent threat of violent attack."  *Id.*  They would also include the April

30, 2012, speech of Assistant to the President for Homeland Security and Counterterrorism John

Brennan, in which he also discussed such matters and the U.S. government's use of drones.

Because the CIA is a critical component of the national security apparatus of the United States,

and because the speeches covered a wide variety of issues relating to U.S. counterterrorism

efforts, it does not harm national security to reveal that copies of the Attorney General's and Mr.

Brennan's speeches exist in the CIA's files.  *Id.*

As explained more fully below, however, the CIA cannot further describe, categorize, or

even enumerate the number, types, dates or other descriptive information about such responsive

records without revealing classified and statutorily protected information about the nature and

extent of the U.S. government's interest in those broad topics.  *Id.* ¶¶ 17, 28.  DOD and DOJ

similarly cannot identify or describe such records without revealing classified and protected

information.  Neller Decl. ¶¶ 25-26; Declaration of John F. Hackett dated June 20, 2012

("Hackett Decl.") ¶¶ 21-28.

**ARGUMENT**

FOIA represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423); *accord Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003). Thus, while FOIA generally requires disclosure of agency records, the statute recognizes "that public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982); *accord ACLU v. DOJ*, 2012 __ F.3d __, 2012 WL 1829579, at *4 (2d Cir. May 21, 2012), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001).

Most FOIA actions are resolved through summary judgment. *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993); *see, e.g.*, *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney*, 19 F.3d at 812 (footnote omitted). The agency's declarations in support of its determinations are "accorded a presumption of good

9

faith." *Id.* (quotation marks omitted).[5]

Moreover, courts must accord "substantial weight" to agencies' affidavits regarding national security. *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009); *accord ACLU*, __ F.3d at __, 2012 WL 1829579, at *5; *Diamond v. FBI*, 707 F.2d 75, 79 (2d Cir. 1983); *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). In FOIA cases involving matters of national security, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *see also ACLU*, __ F.3d at __, 2012 WL 1829579, at *6 ("Recognizing the relative competencies of the executive and the judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments made by government's intelligence agencies regarding whether disclosure of the [withheld information] would pose a threat to national security." (quoting *Wilner*, 592 F.3d at 76) (internal quotation marks omitted)); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 (courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("courts have little expertise in either international diplomacy or counterintelligence operations"); *accord Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009); *Fitzgibbon v.*

---

[5] Because agency affidavits alone will support a grant of summary judgment in a FOIA case, Local Rule 56.1 statements are unnecessary, *see Ferguson v. FBI*, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995) (noting "the general rule in this Circuit"), *aff'd*, 83 F.3d 41 (2d Cir. 1996), and discovery is generally inappropriate, *see Carney*, 19 F.3d at 812 ("In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." (citation omitted)).

*CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990).  Rather, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'"  *Wilner*, 592 F.3d at 73 (quoting *Larson*, 565 F.3d at 862); *accord ACLU*, __ F.3d at __, 2012 WL 1829579, at *5; *Wolf*, 473 F.3d at 374-75.

Applying this deferential standard, the Agencies' declarations demonstrate that they conducted reasonable searches for records responsive to plaintiffs' FOIA requests, and properly withheld responsive records and information pursuant to FOIA's Exemptions 1, 3, 5 and 6.  The Agencies are therefore entitled to summary judgment dismissing their complaints.

## I.      The Agencies' Searches Were Reasonable

An agency can show that it has conducted an adequate search for records responsive to a FOIA request by demonstrating, through affidavits or declarations, that it has conducted "a search reasonably calculated to uncover all relevant documents."  *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (adequacy of search turns on "whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant" (internal quotation marks omitted)).  The agency is not required to search every record system, but need search only those systems in which it believes responsive records are likely to be located.  *See Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010).

The declarations submitted by DOJ and DOD establish that those agencies conducted reasonable searches in response to the *New York Times* and ACLU Requests.[6]

---

[6]  Although the CIA acknowledges its possession of some records responsive to the FOIA requests, information concerning the depth and breadth of that interest, including the number of documents, is classified.  *See infra* Point II; Bennett Decl. ¶¶ 27-28.  We therefore do not

In November 2011, OLC initiated a thorough search in response to plaintiffs' FOIA requests. *See* Bies Decl. ¶¶ 18-28. An attorney within OLC searched for responsive records, including any final legal advice provided by OLC. Bies Decl. ¶ 23. OLC's search included its unclassified and classified email systems, as well as the hard copy files of individual attorneys. *Id.* ¶¶ 24, 26-27. Because OLC is a small office, it was able to identify the specific individuals, files and databases likely to have potentially responsive records. *Id.* ¶ 25. A paralegal performed a keyword search on OLC's electronic databases, using precise terms and phrases, without connectors joining them. *Id.* ¶ 24. An OLC attorney also discussed with each identified custodian whether there were other secure locations or individual safes where potentially responsive documents might be stored. *Id.* ¶ 26. A paralegal also reviewed any individual paper files left by four departed OLC employees, and a paralegal or attorney conducted keyword searches of those departed employees' email accounts. *Id.* ¶¶ 26-27. The Bies Declaration establishes that OLC searched all files where responsive records were likely to be found. *Id.* ¶ 23.

OIP conducted a similarly thorough search of DOJ's leadership offices, also commencing in November 2011, and focusing on locations likely to contain responsive documents. *See* Hibbard Decl. ¶¶ 7-34. The Office of the Attorney General (OAG) identified five officials (including one former OAG official still with the Department) who might have responsive electronic records, and some individuals with paper files, both classified and unclassified. *Id.* ¶¶ 11, 29. The Office of the Deputy Attorney General (ODAG) also identified five officials who

---

describe the CIA's search on the public record; it is described in the Classified Declaration of John Bennett.

might have responsive electronic records, some of whom also might have unclassified paper

files, unclassified computer files, and classified paper files.  *Id.* ¶ 18.  In addition, ODAG

provided potentially responsive paper material for OIP to review.  *Id.* ¶ 18.  All of the records

systems identified by OAG and ODAG were searched, including classified and unclassified

paper and electronic files, and OIP reviewed potentially responsive records.  *Id.* ¶¶ 11-16, 18-21,

24-26, 29.  OIP also reviewed potentially responsive records provided by the Office of the

Associate Attorney General (OASG), and conducted searches of the Departmental Executive

Secretariat (the official records repository for OAG, ODAG and OASG) and the indices of

departed OAG, ODAG and OASG employees' files.  *Id.* ¶¶ 27-31.  The Hibbard Declaration

establishes that OIP and the relevant leadership offices within DOJ searched all files where

responsive records were likely to be found.  *Id*. ¶¶ 9, 29.

     DOD also conducted a reasonable search in response to the FOIA requests.  Based on the

knowledge of officials familiar with the legal bases and procedures for military operations, DOD

initiated searches of four component offices:  the DOD Office of the General Counsel, the Office

of the Legal Counsel to the Chairman of the Joint Chiefs of Staff, the Office of the Staff Judge

Advocate for United States Special Operations, and the Office of the Staff Judge Advocate for

United States Central Command.  *See* Neller Decl. ¶ 9.  Within the Office of General Counsel,

DOD determined that four components may possess responsive records:  the Front Office, Legal

Counsel, International Affairs, and Intelligence.  *Id.*  Within each office, relevant paper files and

electronic records, including emails, individual hard drives and shared drives were searched.  *Id*.

¶ 10.  Those conducting the search were directed to search for documents responsive to the

requests, including key word searches using relevant search terms.  *Id*.  The searches included all

13

levels of classification, and encompassed classified records in both electronic and paper form.

*Id.* The Neller Declaration establishes that DOD searched all files where responsive records

were likely to be found. *Id.* ¶ 9.

## II. Although the Agencies Possess Some Responsive Records, They Have Properly Withheld Records, and Details About Such Records, That Would Tend to Reveal Classified and Statutorily Protected Information

The Agencies acknowledge that they possess some records responsive to plaintiffs' FOIA

requests for documents concerning the use of targeted lethal force against U.S. citizens and

others associated with al-Qaida and other terrorist groups.  These records include legal analysis –

including an OLC opinion pertaining to the operations of DOD – and intra- and inter-agency

deliberations regarding such analysis, and pre-decisional, deliberative documents pertaining to

potential public statements by the Attorney General and other senior officials of the Executive

Branch.  Bennett Decl. ¶ 27; Hackett Decl. ¶ 21; Neller Decl. ¶ 14.

Whether or not the United States government conducted the particular operations that led

to the deaths of Aulaki and the other individuals named in the FOIA requests, and whether or not

the CIA has authority to or does in fact conduct targeted lethal operations, however, remain

classified and protected from disclosure by statute.  Because of this, the Agencies cannot provide

a Vaughn index for the responsive records they possess or otherwise describe them publicly,

because doing so would tend to reveal information that is classified and statutorily protected.  *See*

*Bassiouni v. CIA*, 392 F.3d 244, 246-47 (7th Cir. 2004) (agency may acknowledge the existence

of responsive documents but withhold information about the number or volume of responsive

documents or their content, where such descriptive information is itself, or would tend to reveal,

classified or otherwise protected information); *Jarvik v. CIA*, 741 F. Supp. 2d 106, 123 (D.D.C.

14

2010) (upholding CIA's "no number, no list" response to FOIA request).  This is consistent with the well-established principle that an agency need not publicly disclose exempt information, in its declarations or Vaughn index, in order to justify its withholdings under FOIA.  *See, e.g.*, *New York Times Co. v. DOJ*, 2012 WL 1869396, at *3 (S.D.N.Y. May 12, 2012) ("declarations in FOIA cases need not contain 'factual descriptions that if made public would compromise the secret nature of the information'" (quoting *Hayden v. NSA*, 608 F.2d 1381, 1384-85 (D.C. Cir. 1979)); *see also CIA v. Sims*, 471 U.S. 159, 179 (1985) ("It is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency.").

Although the Agencies cannot describe the responsive records in detail on the public record, they are described in the classified declarations submitted by the Agencies.  Those classified declarations, together with the unclassified declarations submitted by the Agencies, demonstrate that the classified records responsive to plaintiffs' requests, and details about those records, are exempt from public disclosure under Exemptions 1 and 3.[7]

## A.     The Agencies Properly Withheld Classified Responsive Records, and Details Concerning Such Records, Pursuant to Exemption 1

The Agencies have properly withheld the number of classified records responsive to the FOIA requests, as well as descriptive information about those records, such as the kinds of records, their number or volume, dates, authors, recipients or subject matter.

With respect to the CIA, it has withheld the number and details of such records because the number of documents and descriptive information about the nature of those records are

---

[7]  To the extent the responsive records are privileged, they are also withheld under Exemption 5. *See infra* Point III.

themselves classified facts that are exempt from disclosure under Exemption 1. Among other things, providing the volume of the responsive records would tend to reveal whether or not the CIA has been granted authority to participate directly in lethal operations that could potentially target U.S. citizens who are senior operational leaders of al-Qaida (based on the framework discussed in the Attorney General's speech). Bennett Decl. ¶ 29. Enumerating and describing responsive records would also tend to reveal the significance of the CIA's intelligence interest in, and the depth and breadth of the CIA's intelligence collection activities directed at, the more limited subset of terrorists who might meet those criteria. *Id.* In addition, being required to provide a categorization that confirms whether or not the CIA possesses responsive records specifically about Aulaki, Khan and Aulaki's son would reveal whether or not the CIA was involved in the events that led to their deaths (*e.g.*, by providing supporting intelligence or technical assistance). *Id.* All of these facts are currently and properly classified, and therefore exempt from disclosure under Exemption 1. *Id.* DOD and DOJ have similarly withheld the number of classified records and information about them pursuant to Exemption 1. Hackett Decl. ¶ 13; Neller Decl. ¶¶ 17, 25-26.

Exemption 1 exempts from public disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The current standard for classification is set forth in Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526"). Section 1.1 of the Executive Order lists four requirements for the classification of national security information: (1) an "original classification authority" must classify the information; (2) the information must be

16

"owned by, produced by or for, or [] under the control of the United States Government;" (3) the information must fall within one or more of eight protected categories of information listed in section 1.4 of the E.O.; and (4) an original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage."  E.O. 13526 § 1.1(a)(1)-(4).

The withheld classified records and details about such records, all of which are owned and controlled by the United States, satisfy all the criteria for withholding under Exemption 1. An original classifying authority has determined that the number and nature of the records themselves, and descriptive information about them, are currently and properly classified. Bennett Decl. ¶¶ 2, 28; Hackett Decl. ¶¶ 2, 14; Neller Decl. ¶ 22.  Further, an original classifying authority has determined, and has articulated with reasonable specificity, that the withheld information about the classified records, including descriptive information about the number and nature of such records, falls within the categories of information set forth in sections 1.4 of E.O. 13526.

Specifically, the records and information pertain to "intelligence activities (including covert action) [and] intelligence sources or methods" protected by section 1.4(c) of the Executive Order.  Bennett Decl. ¶¶ 20, 36, 40-56 (explaining why disclosure of the number, nature or a categorization of responsive records would tend to expose intelligence sources, methods and activities).  Indeed, the ACLU Request on its face seeks specific intelligence related to particular individuals.  *See, e.g.*, ACLU Request at 6, No. 4(A) (seeking "[f]acts supporting a belief that al-Awlaki could not be captured or brought to justice using nonlethal means").

17

As the CIA has explained by way of hypothetical, if it were to publicly acknowledge that it possessed several hundred records responsive to the ACLU Request, that fact would tend to indicate that the CIA had a significant interest in either actual or contemplated operations against U.S. citizens who are senior operational leaders of al-Qaida, which in turn would tend to reveal that the CIA was actively involved in these activities or that the CIA itself has the authority to participate directly in the use of lethal force against such individuals.  Bennett Decl. ¶ 31.  At a minimum, it would tend to reveal a substantial intelligence interest in the more limited number of individual terrorists who meet the criteria discussed in the Attorney General's speech.  *Id.* Conversely, if the CIA possessed only a handful of responsive documents, that would tend to indicate that the CIA had only a minimal interest, which in turn would tend to reveal that the Agency was not actively involved in these actual or contemplated activities, that it did not have the authority to carry them out, or that it had been able to collect only a small amount of intelligence about this limited number of individuals.  *Id.*  This concern would be magnified if the CIA were required to also reveal the nature, dates and other descriptive information about the responsive classified records, *id.* ¶ 32, or to identify the specific types of records (such as OLC opinions or other formal legal analysis), *id.* ¶ 33.  For similar reasons, the CIA cannot provide a categorization of its responsive records that would reveal whether or not the CIA possesses documents specifically responsive to the portions of the ACLU Request seeking documents about the factual or legal basis for the alleged targeted killing of Aulaki, Khan or Aulaki's son. *Id.* ¶¶ 34-35.

Similarly, the Neller Declaration confirms that identification and description of documents in DOD's possession responsive to the ACLU Request would tend to reveal classified

18

facts such as the focus of military operational planning and the extent of DOD's knowledge of the enemy's internal structures.  Neller Decl. ¶ 26.  ODNI has also demonstrated that the classified records that the *New York Times* and ACLU have sought from DOJ, and details about such records, would reveal intelligence activities, sources and methods.  *See* Hackett Decl. ¶¶ 21-28.

Identifying the number and nature of classified responsive documents would also reveal information regarding "foreign relations and foreign activities of the United States, including confidential sources," within the meaning of section 1.4(a) of the Executive Order.  As the CIA explains, a descriptive response by the CIA would implicate foreign activities because CIA's operations are "conducted overseas or otherwise concern foreign intelligence matters," and therefore are "U.S. 'foreign' activities by definition."  Bennett Decl. ¶ 57; *see also* Hackett Decl. ¶ 27; Neller Decl. ¶ 26.

To identify and describe the number and nature of responsive records would also reveal whether or not they related to information about "military plans, weapons systems, or operations" protected by section 1.4(a) of the Executive Order.  On their face, the requests seek information about alleged military operations.  Neller Decl. ¶ 22; *see* Savage Request (requesting OLC memorandums analyzing circumstances under which it would be lawful for, *inter alia*, "United States armed forces" to target a U.S. citizen deemed to be a terrorist); ACLU Request at 2 (seeking records pertaining to legal authority and factual basis for alleged targeted killing of Aulaki by CIA "and/or Joint Special Operations Command (JSOC)").

Finally, the public and classified declarations provided by the Agencies establish that disclosure of the number of responsive records, or descriptive information about them, could

reasonably be expected to result in harm to national security.  Bennett Decl. ¶¶ 36-37; Neller

Decl. ¶¶ 17, 26; Hackett Decl. ¶¶ 21-22.  The Bennett Declaration describes in substantial detail

how disclosure of such information could cause national security harm by revealing a CIA

intelligence interest or lack of interest in particular individuals, intelligence activities related to

those individuals, or lack thereof, and sources and methods used or not used to collect relevant

intelligence, including liaison relationships or lack of such relationships with particular foreign

governments.  Bennett Declaration ¶¶ 40-56.

Moreover, "[w]e know that terrorist organizations and other hostile groups have the

capacity and ability to gather information from myriad sources, analyze it, and deduce means and

methods from disparate details in order to defeat the CIA's collection efforts."  *Id*. ¶ 50.

Accordingly, disclosure of "even seemingly innocuous" information, when "juxtaposed with

other publicly available data," could have significant adverse effects.  *Id*.;  *accord ACLU*, __ F.3d

at __, 2012 WL 1829579, at *7 ("even if the redacted information seems innocuous in the

context of what is already known by the public, minor details of intelligence information may

reveal more information than their apparent insignificance suggests because, much like a piece of

jigsaw puzzle, each detail may aid in piecing together other bits of information even when the

individual piece is not of obvious importance in itself" (citation, internal quotation marks and

alteration omitted)).

Revealing the information protected by the CIA's "no number no list" response could

endanger sources, *id*. ¶ 41, undermine the ability to recruit future sources, *id*. ¶¶ 42, provide

terrorist organizations with valuable information on how to disrupt or avoid intelligence

activities, *id*. ¶¶ 43, 55, and disrupt foreign cooperation, *id*. ¶ 44-45.[8]  As the Bennett Declaration

explains, the CIA's foreign liaison relationships – *i.e.*, cooperative and secret relationships

between the CIA and entities of foreign governments – "are critical and extremely sensitive."  *Id.*

¶ 44.  Official acknowledgment of foreign liaison information, or the existence of such a

relationship, "can undermine a foreign government's trust in the CIA's ability to protect their

sensitive intelligence information," and in some cases "reasonably could be

expected to reduce or eliminate the information-sharing relationship with the CIA," thereby

damaging national security.  *Id.* ¶¶ 44-45.  Revelation of descriptive information about the

responsive records in the CIA's possession would "provide valuable insight into the CIA's

authorities, capabilities, and resources that our enemies could use to reduce the effectiveness of

CIA's intelligence operations."  *Id*. ¶ 56.

Furthermore, enumerating and describing the responsive records "reasonably could be

expected to cause damage to U.S. relations with affected or interested nations."  *Id.* ¶ 58.  Even

though it is generally known that the CIA conducts clandestine intelligence operations, official

acknowledgment of a particular intelligence interest or activity or the lack of such interest or

activity, could cause other governments to respond in ways that would damage U.S. national

interests in that country.  *Id*. ¶¶ 58-59; *see also Wilson v. CIA*, 586 F.3d 171, 192-96 (2d Cir.

2009) (concluding that CIA had advanced good reason for continued classification of information

that had been publicly disclosed, and noting the "importance of . . . 'lingering doubts' to

---

[8]  To the extent the ACLU Request seeks records specifically about the CIA's use of unmanned aerial vehicles, to confirm or deny the existence of responsive records would also reveal whether the CIA possessed a particular "advanced technological platform."  Bennett Decl ¶ 53.  This in turn would "provide valuable insight into the CIA's capabilities, interests, and resources that our enemies could use to reduce the effectiveness of CIA intelligence operations."  *Id.* ¶ 54.

maintaining the secrecy of CIA sources and methods . . . and to preserving the options of deniability and professed ignorance that remain important niceties of international relations"); *Riquelme v. CIA*, 453 F. Supp. 2d 103, 109 (D.D.C. 2006) (upholding CIA's Glomar response under Exemption 1 because "officially acknowledging that the CIA has recruited or collected intelligence information on a foreign national, or conducted clandestine activities in a foreign country, may also qualify for classification on the ground that it could hamper future foreign relations with the government of that country," and a "denial that the CIA has records . . . could serve to damage national security by alerting certain individuals that they are not CIA intelligence targets" (internal quotation marks omitted)).

For similar reasons, DOD and ODNI, on behalf of DOJ, have also established that identifying and describing responsive classified records would cause harm to national security by endangering human sources, disrupting intelligence efforts, and harming foreign relations. Hackett Decl. ¶¶ 25-26; Neller Decl. ¶ 26. The Agencies have therefore satisfied all of the criteria for classification under E.O. 13526, and the responsive classified records and related descriptive information are exempt from disclosure under Exemption 1.

**B.     The CIA and DOJ Properly Withheld Responsive Records, and Details Concerning Such Records, Pursuant to Exemption 3**

Under Exemption 3, matters "specifically exempted from disclosure" by certain statutes need not be disclosed. 5 U.S.C. § 552(b)(3). In examining an Exemption 3 claim, a court determines whether the claimed statute is an exemption statute under FOIA and whether the withheld material satisfies the criteria for the exemption statute. *Sims*, 471 U.S. at 167; *Wilner*, 592 F.3d at 72.

As the Second Circuit has explained, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72 (internal quotation marks omitted); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993). Thus, a court should "not closely scrutinize the contents of a withheld document; instead, [it should] determine only whether there is a relevant statute and whether the document falls within that statute." *Krikorian*, 984 F.2d at 465. Significantly, to support its claim that information may be withheld pursuant to Exemption 3, the government need not show that there would be harm to national security from disclosure, only that the withheld information logically or plausibly falls within the purview of the exemption statute. *Wilner*, 592 F.3d at 73; *accord Larson*, 565 F.3d at 868.

Here, in addition to Exemption 1, the classified records responsive to plaintiffs' requests, and details regarding such records, are also protected from public disclosure under Exemption 3, in conjunction with the National Security Act and the CIA Act.

### 1.    The NSA

Section 102A(i)(1) of the National Security Act ("NSA"), as amended, 50 U.S.C. § 403-1(i)(1), provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." It is well settled that section 102A(i)(1) of the NSA is an exempting statute within the meaning of Exemption 3. *See Sims*, 471 U.S. at 167 (discussing prior version of NSA); *Larson*, 565 F.3d at 865 (discussing current version of NSA); *ACLU*, __ F.3d at __, 2012 WL 1829579, at *8.

The declarations provided by the CIA and ODNI, on behalf of DOJ, amply demonstrate

that revealing the nature and number of the classified responsive records and related descriptive information would disclose information pertaining to intelligence sources and methods information, which falls squarely within the scope of section 102A(i)(1) of the NSA.  Bennett Decl. ¶¶ 24, 60; Hackett Decl. ¶ 20; *see ACLU*, __ F.3d at __, 2012 WL 1829579, at *10 (withheld materials protected by Exemption 3 because they "relate to an intelligence method within the meaning of the NSA"); *Halperin*, 629 F.2d at 147 (information properly withheld under Exemption 3 and NSA where release "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods" (internal quotation marks omitted)); *cf. Riquelme*, 453 F. Supp. 2d at 111-12 (affirming CIA's Glomar response pursuant to the NSA and CIA Act regarding certain alleged CIA activities in Paraguay and, *inter alia*, information relating to a foreign national because the fact of the existence or nonexistence of such records "are pertinent to the Agency's intelligence sources and methods").

As established above, to enumerate and describe records specific to the individuals named in the FOIA requests would reveal information pertaining to intelligence sources and methods.  The Bennett Declaration explains that disclosure of such information can reasonably be expected to lead to unauthorized disclosure of CIA intelligence sources and methods.  *See* Bennett Decl. ¶¶ 24, 39-54.  The Hackett Declaration establishes the same with respect to the records and information withheld by DOJ.  Hackett Decl. ¶¶ 21-23.  Accordingly, the number of records responsive to the FOIA requests, and details about such records, are protected by the NSA.

### 2.    The CIA Act

The existence or nonexistence of records concerning any alleged CIA role in targeted

24

lethal operations is also protected by section 6 of the CIA Act, 50 U.S.C. § 403g.  This statute

protects information concerning the "functions" of the CIA, including but not limited to,

intelligence sources and methods.  *See, e.g.*, *ACLU*, __ F.3d at __, 2012 WL 1829579, at *8

(noting that "functions" under section 6 of CIA Act "include the collection of intelligence

through human sources").  Section 6 of the CIA Act is an exempting statute within the meaning

of Exemption 3.  *Baker v. CIA*, 580 F.2d 664, 667 (D.C. Cir. 1978); *see also Goland v. CIA*, 607

F.2d 339, 351 (D.C. Cir. 1978) (holding that intelligence sources and methods are "functions" of

the CIA within the meaning of the CIA Act, and thus exempt from disclosure under Exemption

3); *Riquelme*, 453 F. Supp. 2d at 111-12 (same).

As explained above, to enumerate and describe the records responsive to the FOIA

requests here would tend to reveal whether or not the CIA is authorized to and does or does not

in fact directly participate in lethal operations against terrorists, including U.S. citizens, and

whether or not the CIA possesses specific intelligence information about particular individuals.

Such disclosures "would reveal information about the core functions of the CIA, an outcome the

CIA Act expressly prohibits."  *Id.* ¶ 26; *see ACLU v. DOJ*, 808 F. Supp. 2d 280, 288-89 (D.D.C.

2011) (alleged CIA involvement in drone strikes in any capacity would be a "function" of the

CIA), *appeal docketed*, No. 11-5320 (D.C. Cir. Nov. 9, 2011).

### C.   The Agencies Properly Provided a Glomar Response to Requests for OLC Opinions Pertaining to Agencies Other Than DOD, Pursuant to Exemptions 1 and 3

The *New York Times* requests both seek copies of OLC opinions pertaining to targeted

lethal operations.  The ACLU Request similarly requests OLC opinions, as well as other legal

analysis.  To the extent plaintiffs' requests seek OLC opinions pertaining to alleged targeted

lethal operations by the CIA, for the reasons set forth above with regard to the withholding of

classified records and related descriptive information under Exemptions 1 and 3, the CIA and

OLC properly provided a "Glomar" response, refusing to confirm or deny the existence or

nonexistence of OLC opinions pertaining to potential CIA operations.[9]

A Glomar response is appropriate when "to confirm or deny the existence of records . . .

would cause harm cognizable under a FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103

(D.C. Cir. 1982). As the Second Circuit recently explained, "to properly employ the Glomar

response to a FOIA request, an agency must tether its refusal to respond to one of the nine FOIA

exemptions – in other words, a government agency may . . . refuse to confirm or deny the

existence of certain records . . . if the FOIA exemption would itself preclude the *acknowledgment*

of such documents." *Wilner*, 592 F.3d at 68 (citation and internal quotation marks omitted).

"[W]hen the Agency's position is that it can neither confirm nor deny the existence of the

requested records, there are no relevant documents for the court to examine other than the

affidavits which explain the Agency's refusal." *Wolf*, 473 F.3d at 374 n.4 (internal quotation

marks omitted); *see also Larson,* 565 F.3d at 861.

Here, the Agencies' declarations amply establish that the existence or nonexistence of

OLC opinions pertaining to potential CIA operations is a classified and statutorily protected fact

that is exempt from disclosure under Exemptions 1 and 3, in conjunction with the NSA and CIA

Act. OLC opinions have a unique role within the U.S. government, and acknowledging the

existence of an OLC opinion can reveal a great deal of information about the interests, priorities

---

[9] This type of response to a FOIA request is called a "Glomar response" after the CIA's refusal
to confirm or deny the existence of records regarding a ship named the Glomar Explorer in
*Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976).

26

and capabilities of the subject agencies that is not revealed by the existence of other types of

records.  Bennett Decl. ¶ 62.  In this case, if it were revealed that responsive OLC opinions

pertaining to CIA operations existed, it would tend to reveal that the CIA had sought opinions

regarding whether it has the authority to be directly involved in targeted lethal operations against

terrorists,[10] including U.S. citizens.  *Id.*  Conversely, if OLC opinions did not exist on these

subjects, it would tend to reveal that the CIA had not sought such opinions.  *Id.*; *see also id.* ¶ 33

("If the CIA had been granted the extraordinary authority to be directly involved in targeted lethal

operations against U.S. citizens, one would logically expect that the legal issues related thereto

be carefully and extensively documented by the Department of Justice and the CIA's Office of

General Counsel.").  In either case, confirming or denying the existence or nonexistence of such

authorities would reveal information pertaining to CIA intelligence activities, methods and

functions, as well as foreign activities of the United States, the disclosure of which reasonably

could be expected to harm national security for the reasons discussed above.  *Id.* ¶¶ 62-65.  The

CIA and OLC therefore properly provided a Glomar response pursuant to Exemptions 1 and 3.

D.     **The Executive Branch Has Not Officially Acknowledged Any Records or Information Withheld by the Agencies in These Cases**

Although the *New York Times* and ACLU complaints cite various media reports or

government statements addressing the topic of targeted lethal operations, or discussing the death

of Aulaki, *see New York Times* Complaint ¶¶ 23, 32, 33, 35-36; ACLU Complaint ¶¶ 3-4, 19, 22-

---

[10]  As explained in the Bennett Declaration, there is one acknowledged lethal operation conducted by the CIA: the operation against Usama Bin Laden.  Accordingly, with respect to the Shane Request, the CIA has acknowledged that there are no responsive OLC opinions related to that particular operation.  Outside the context of that particular operation, however, the fact of whether or not the CIA has the authority or the practice of engaging in lethal operations against terrorists is a currently and properly classified fact.  Bennett Decl. ¶ 64.

23, none of those reports or statements constitutes an official disclosure that could vitiate the agencies' ability to protect the classified and protected information described above.

### 1.      The Strict Test for Waiver Through Official Disclosure

An agency's refusal to release classified information "is generally unaffected by whether the information has entered the realm of public knowledge." *Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999). This rule is subject to a "limited exception" "where the government has *officially* disclosed the *specific* information the requester seeks." *Id.* (emphasis added); *accord Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989). The Second Circuit has instructed that claims of official disclosure must meet "[a] strict test." *Wilson*, 586 F.3d at 186; *see also Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 2003) (noting "stringen[t]" test for waiver through official disclosure). "Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Wilson*, 586 F.3d at 186 (quoting *Wolf*, 473 F.3d at 378; *Hudson River Sloop*, 891 F.2d at 421) (quotation marks and alterations omitted). This test is applied with "exactitude" out of deference to " 'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf*, 473 F.3d at 378 (citation omitted).

With regard to the requirement of "official and documented disclosure," moreover, the Second Circuit has recognized "'a critical difference between official and unofficial disclosures.'" *Wilson*, 586 F.3d at 186 (quoting *Fitzgibbon*, 911 F.2d at 765). "[T]he law will not infer official disclosure of [classified information] from (1) widespread public discussion of a

28

classified matter; (2) statements made by a person not authorized to speak for the agency; (3)

release of information by another agency, or even by Congress." *Id.* at 186-87 (citations

omitted); *see also Fitzgibbon*, 911 F.2d at 766 (courts have "unequivocally recognized that the

fact that information resides in the public domain does not eliminate the possibility that further

disclosures can cause harm to intelligence sources, methods and operations"); *accord Wolf*, 473

F.3d at 378.

### 2.     Plaintiffs Cannot Demonstrate Any Waiver Through Official Disclosure

The Agencies' declarations, which are entitled to a presumption of good faith, *Carney*, 19

F.3d at 812, establish that the records and information withheld from disclosure in these cases

have not been officially disclosed.  *See* Bennett Decl. ¶¶ 66-68; Neller Decl. ¶ 27.

As plaintiffs and the Court have noted, in recent months there have been a number of

public statements by high-ranking Executive Branch officials – including Attorney General

Holder and Assistant to the President for Homeland Security and Counterterrorism Brennan –

addressing the subject of targeted lethal operations.  Through these statements, the Executive

Branch has endeavored to provide the public with information about the legal basis and process

for such operations in a manner that is as open and transparent as possible, while still ensuring

our nation's security.  *See* Normand Decl., Exh. E at 7-8.  Each of these public statements,

however, was carefully crafted to avoid disclosing information about particular operations.  *See*

Normand Decl., Exh. D at 3 (Attorney General statement that he could not "discuss or confirm

any particular program or operation"), Exh. E at 8 (statement by Mr. Brennan that he would not

"discuss the sensitive details of any specific operation" or "publicly divulge sensitive intelligence

sources and methods"). Such statements, therefore, plainly did not waive the government's

ability to protect such information from public disclosure under FOIA.

Nor did any of the asserted disclosures identified in plaintiffs' complaints satisfy the

"strict test" for waiver through official disclosure. First, plaintiffs rely on statements by the

President and others concerning the general subject of targeted lethal operations. *See* ACLU

Complaint ¶ 4 (alleging that "President Barack Obama, referring to the use of drones by the

United States to carry out targeted killings, said that 'this is a targeted, focused effort at people

who are on a list of active terrorists'"); *New York Times* Complaint ¶ 32 (citing speech delivered

by State Department Legal Adviser Harold Koh concerning "U.S. targeting practices" generally);

*id.* ¶ 33 (citing speech by John Brennan on September 16, 2011). These statements did not

address the targeting of U.S. citizens or any alleged CIA role in such operations, *see*

http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america; Normand

Decl., Exhs. F & G, and thus could not constitute an official statement concerning the alleged

targeting of specific U.S. citizen individuals or the CIA's alleged role in such operations. *See*

*Wilson*, 586 F.3d at 186 (officially disclosed information must be "as specific as" and "match"

information withheld).

Second, plaintiffs cite statements by Executive Branch officials that referred to the

potential targeting of U.S. citizens, but these statements – like the recent speeches by the

Attorney General, the Department of Defense General Counsel, and Mr. Brennan – did not

address any specific lethal operations or whether the CIA could or would play a role. *See* ACLU

Complaint ¶ 4 (alleging that "Secretary of Defense Leon Panetta, when asked to describe how the

decision was made to order the targeted killing of a U.S. citizen, said that 'the President of the

30

United States obviously reviews these cases and reviews the legal justification, and in the end says go or no go'")[11]; *New York Times* Complaint ¶¶ 23, 33 (citing statement by then-Director of National Intelligence Dennis C. Blair that "we take direct actions against terrorists in the intelligence community.  If we think that direct action will involve killing an American citizen, we get specific permission to do that.").  Such statements therefore cannot constitute official disclosures of the information withheld in this case.  *See Wilner*, 592 F.3d at 70.

Third, the ACLU cites selected excerpts of statements by President Obama regarding the death of Aulaki.  *See* ACLU Complaint ¶ 22.  Contrary to the ACLU's assertions, however, the President plainly did not acknowledge whether the United States was *responsible* for his death.

On September 30, 2011, President Obama confirmed that "[e]arlier this morning, Anwar al-Awlaki – a leader of al Qaeda in the Arabian Peninsula [AQAP] – was killed in Yemen." Normand Decl., Exh. H at 1.  The President stated that "[t]he death of al-Awlaki is a major blow to al Qaeda's most active operational affiliate."  *Id.*  After describing al-Awlaki's role as the leader for external operations for AQAP, President Obama stated: "The death of Awlaki marks another significant milestone in the broader effort to defeat al Qaeda and its affiliates. Furthermore, this success is a tribute to our intelligence community, and to the efforts of Yemen and its security forces, who have worked closely with the United States over the course of several years."  *Id.*  Thus, while President Obama called Aulaki's death "a tribute to our intelligence

---

[11]  Although Secretary Panetta was *asked* about the alleged targeted killing of Aulaki, he limited his response to the more generic context of targeting U.S. citizens who are engaged in terrorism against Americans.  *See* http://www.cbsnews.com/video/watch/?id=7396830n (response by Secretary Panetta that, "Well, you know, without getting into the specifics of the operation, if, if someone is a citizen of the United States and is a terrorist who wants to attack our people and kill Americans, in my book that person is a terrorist.").

community," he did not identify or explain what role the intelligence community may have played, and in the same breath, the President acknowledged "the efforts of Yemen and its security forces."  The President then went on to state that Aulaki "met his demise because the government and the people of Yemen have joined the international community in a common effort against Al Qaeda."  *Id.*  Read in their entirety, therefore, the President's comments on September 30, 2011, neither confirmed nor denied that the United States engaged in a targeted lethal operation against Aulaki.

The same is true of President Obama's statements on *The Tonight Show* on October 25, 2011, also cited in the ACLU's complaint (at ¶ 22).  When asked about Aulaki's death, the President stated that "this was probably the most important al Qaeda threat that was out there after Bin Laden was taken out, and it was important that working with the [Yemenis], we were able to remove him from the field."  Normand Decl., Exh. I at 7.  Again, President Obama's statements did not identify what role the United States played in the events that led to Aulaki's death, and thus could not constitute an official acknowledgment that the U.S. government was responsible.  *See ACLU v. DOD*, 752 F. Supp. 2d 361, 367 (S.D.N.Y. 2010) (noting that although statements of government officials indicated "that the CIA is involved in U.S. activities in Afghanistan, none of the statements specifically disclose the existence or nonexistence of records pertaining to the rendition or transfer of detainees to Bagram . . . or the interrogation and treatment of detainees at Bagram").

Plaintiffs' complaints also cite media reports purporting to describe an OLC opinion that supposedly "provided a legal analysis to support al-Awlaki's killing."  ACLU Complaint ¶ 19; *see also New York Times* Complaint ¶¶ 35-36 (describing newspaper articles purporting to

32

describe a "'secret memorandum authorizing the legal targeting' of al-Awlaki," "including the rough timeframe and bureaucratic background in which it had been produced and an outline of some of its legal reasoning"). An unsourced media report or "leak" by definition cannot constitute the type of "official and documented disclosure" that is required to establish a waiver of an agency's ability to protect classified information. *Wilson*, 586 F.3d at 186; *see, e.g., ACLU v. DOD*, 628 F.3d 612, 621 (D.C. Cir. 2011) (explaining that leaked report could not be considered officially acknowledged); *ACLU*, 808 F. Supp. 2d at 297 ("the statements of journalists, 'experts,' or even unofficial or unidentified sources (even were they CIA personnel) are not 'official' disclosures by the CIA"). Although the newspaper articles cited by plaintiffs purport to describe an OLC memorandum regarding Aulaki, they do not establish that such a document, if it exists, was made public through any "official and documented disclosure." *Wilson*, 586 F.3d at 186; *see id.* at 174 (concluding that "evidence of public disclosure does not deprive information of classified status," even where it was undisputed that document on agency letterhead containing classified information had been published in the Congressional Record).

Plaintiffs also rely on statements by former Executive Branch officials and Members of Congress, *see* ACLU Complaint ¶¶ 25-29, but statements by persons outside the Executive Branch plainly cannot constitute official disclosures. *See Wilson*, 586 F.3d at 186-87, 189; *Hudson River Sloop*, 891 F.2d at 421. And recent media reports purporting to describe presidential decisionmaking in connection with targeted lethal operations – including a May 29, 2012, report in the *New York Times*, *see* Normand Decl., Exh. J – are premised largely on reported statements by former government officials, as well as anonymous sources. None of those media reports contains any official acknowledgment by an authorized person either that the

33

United States conducted the operation that killed Aulaki or that the CIA is authorized to or in fact

does directly participate in targeted lethal operations.  Information on these subjects thus remains

exempt from public disclosure under FOIA.

**III.    The Agencies Properly Withheld Privileged Records Pursuant to Exemption 5**

      **A.    Exemption 5 and Applicable Privileges**

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would

not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  "By

this language, Congress intended to incorporate into the FOIA all the normal civil discovery

privileges."  *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991); *accord Renegotiation Bd. v.*

*Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).  "Stated simply, agency documents

which would not be obtainable by a private litigant in an action against the agency under normal

discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from

disclosure under Exemption 5."  *Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002) (citation omitted).

      **1.    The Deliberative Process Privilege**

In enacting Exemption 5, "[o]ne privilege that Congress specifically had in mind was the

'deliberative process' or 'executive' privilege, which protects the decisionmaking processes of

the executive branch in order to safeguard the quality and integrity of governmental decisions."

*Hopkins*, 929 F.2d at 84; *accord* H.R. Rep. No. 89-1497, at 10 (1966), *reprinted in* 1966

U.S.C.C.A.N. 2418, 2427 ("a full and frank exchange of opinions would be impossible if all

internal communications were made public," and "advice . . . and the exchange of ideas among

agency personnel would not be completely frank if they were forced to 'operate in a fishbowl' ");

*Klamath*, 532 U.S. at 8–9 ("officials will not communicate candidly among themselves if each

remark is a potential item of discovery and front page news"); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) ("those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process" (internal quotation marks omitted)).  Legal advice, no less than other types of advisory opinions, "fits exactly within the deliberative process rationale for Exemption 5." *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980); *accord Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356–57 (2d Cir. 2005).

An agency record must satisfy two criteria to qualify for the deliberative process privilege: it "must be both 'predecisional' and 'deliberative.'" *Grand Cent. P'ship*, 166 F.3d at 482 (citations omitted); *accord Tigue*, 312 F.3d at 76–77; *Hopkins*, 929 F.2d at 84.  A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd.*, 421 U.S. at 184 (*quoted in Tigue*, 312 F.3d at 77; *Grand Cent. P'ship*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84).  While a document is predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates," *Grand Cent. P'ship*, 166 F.3d at 482, the government need not "identify a specific decision" made by the agency to establish the predecisional nature of a particular record.  *Sears*, 421 U.S. at 151 n.18; *accord Tigue*, 312 F.3d at 80.  Rather, so long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional.  *Tigue*, 312 F.3d at 80.  "Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process."  *Sears*, 421 U.S. at 151 n.18.

"A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted; alteration in original).  In determining whether a document is deliberative, courts inquire as to whether it "formed an important, if not essential, link in [the agency's] consultative process," *Grand Cent. P'ship*, 166 F.3d at 483, whether it reflects the opinions of the author rather than the policy of the agency, *id.* at 483; *Hopkins*, 929 F.2d at 84, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," *Grand Cent. P'ship*, 166 F.3d at 483.  Predecisional deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue*, 312 F.3d at 80 (internal quotation marks omitted); *Grand Cent. P'ship*, 166 F.3d at 482.  Thus, the privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Hopkins*, 929 F.2d at 84–85 (quoting *Sears*, 421 U.S. at 150).

## 2.        The Attorney-Client Privilege

Exemption 5 also incorporates the attorney-client privilege.  *Sears*, 421 U.S. at 154; *Nat'l Council of La Raza*, 411 F.3d at 360; *In re Grand Jury Investigation*, 399 F.3d 527, 533 (2d Cir. 2005).  "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance.  Its purpose is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting *Upjohn v. United States*, 449 U.S. 383, 389

36

(1981)) (citation omitted).  The privilege operates in the government context as it does between private attorneys and their clients, "protect[ing] most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance."  *Id.*  To invoke the attorney-client privilege, a party must demonstrate that there was: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."  *Id.* at 419.

### 3.      The Presidential Communications Privilege

The presidential communications privilege is "closely affiliated" with the deliberative process privilege.  *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997).  However, unlike the deliberative process privilege, which applies to decisionmaking of executive officials generally, the presidential communications privilege applies specifically to decisionmaking of the President.  *Id.* at 745.  In particular, it applies "to communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1997) (internal quotation marks, citation and formatting omitted).

Although the presidential communications privilege is in this sense more narrow than the deliberative process privilege, the protection afforded by the presidential communications privilege is broader.  Documents subject to the presidential communications privilege are shielded in their entirety.  *See In re Sealed Case*, 121 F.3d at 745 ("Even though the presidential privilege is based on the need to preserve the President's access to candid advice, none of the cases suggest that it encompasses only the deliberative or advice portions of documents.").  The

privilege covers final and post-decisional materials as well as deliberative ones. *Id.*; *Amnesty Int'l*, 728 F. Supp. 2d at 522.

> **B.    Legal Analysis by OLC, Including an Opinion Pertaining to DOD, and Interagency Deliberations Regarding Such Analysis**

The declaration of John Bies of the Office of Legal Counsel describes the unclassified documents that are responsive to the ACLU Request.  Bies Decl. ¶¶ 28, 30-37.  OLC also located classified records responsive to the ACLU Request.  *Id.* ¶ 38.[12]  These records include one OLC opinion marked classified pertaining to DOD operations that is also responsive to the *New York Times* requests.  *Id.*  Except as noted in the classified declarations, all of the documents located by OLC are also protected by the deliberative process privilege and are inter- or intra-agency, and are therefore exempt from disclosure under Exemption 5.

The Bies Declaration explains why the responsive legal analysis, and deliberations regarding the same, meet the criteria for the deliberative process privilege:

> As legal deliberations or legal advice, these documents are (a) pre-decisional, *i.e.*, were prepared in advance of Executive Branch decisions; and (b) deliberative, *i.e.*, reflect advice, the preparation of advice, or other deliberations by OLC attorneys or other Executive Branch officials in connection with those decisions. Consequently, these documents fall squarely within the deliberative process privilege.  Compelled disclosure of these documents would undermine the deliberative processes of the Government and chill the candid and frank communications necessary for effective governmental decision-making.

Bies Decl. ¶ 39.  Moreover, although the ACLU excluded draft legal analyses from its request, it explicitly included other internal communications.  *Id.* ¶ 17 & Exh. G.  As a result, the responsive documents include internal communications related to draft legal analyses.  *Id.* ¶ 40.

---

[12]  OLC is submitting a classified declaration and *Vaughn* index, further describing the responsive material marked classified and explaining why it is subject to Exemption 5.  *See* Supplemental Classified Declaration of John Bies dated June 20, 2012.

OLC attorneys use discussions of drafts to refine and focus their legal analysis, and "[c]ompelled disclosure of such preliminary analysis would seriously inhibit the candor and effectiveness of the advisers engaged in this highly deliberative process, and the quality and integrity of the final result would inevitably suffer." *Id.*

OLC also located documents reflecting interagency deliberations about legal analysis.  As the Bies Declaration explains, "OLC depends upon these submissions and input by officials of the client agencies with knowledge or expertise in relevant subject matters," and "the confidentiality of this input also is integral to the deliberative processes of the Office." *Id.* ¶ 41. Responsive legal analyses and internal and interagency deliberations about those analyses therefore fall squarely within the deliberative process privilege. *See Sears*, 421 U.S. at 150; *Hopkins*, 929 F.2d at 84–85.

The *New York Times* erroneously asserts in its complaint that "[m]emoranda containing legal analysis relied upon by the government constitute a final determination of policy by the government and therefore are not deliberative materials and not properly subject to Exemption 5." Normand Decl., Exh. A ¶ 54.  This misstates the law.  The Supreme Court has made clear that deliberative materials lose their privileged status only if "an agency chooses *expressly* to adopt" such materials or incorporate them and does so by express reference in the agency's public statement of its decision or policy.  *Sears*, 421 U.S. at 161; *see, e.g.*, *Wood v. FBI*, 432 F.3d 78, 84 (2d Cir. 2005) (explaining that the Second Circuit in *National Council of La Raza* held that "DOJ had expressly adopted [a deliberative OLC] memorandum into its new policy regarding state and local enforcement of civil immigration laws" on the basis of repeated public references to the OLC memorandum by the Attorney General and his high-ranking advisors, the

substance of those public comments, and the manner in which the comments were used, "that is, to assure third parties as to the legality of the actions the third parties were being urged to take"); *Nat'l Council of La Raza*, 411 F.3d at 357-60.  No Executive Branch official has publicly invoked, much less expressly adopted or incorporated as a statement of agency policy, any OLC opinion or other deliberative memorandum containing legal analysis.

In addition, certain of the unclassified documents, and most of the responsive documents marked classified, are also protected by the attorney-client privilege.  Bies Decl. ¶ 42.  These documents "either (a) are confidential legal advice provided to OLC's Executive Branch clients; (b) reflect confidential communications between OLC and Executive Branch clients made for the purpose of providing legal advice; and/or (c) are internal drafts by OLC attorneys that contain confidences OLC received from its Executive Branch clients for the purpose of providing legal advice."  *Id.*; *see also id.* (noting that the considerations regarding the need for confidential deliberations are particularly compelling in the context of the provision of legal advice by OLC).  Such documents easily fall within the realm of the privilege.  *See Nat'l Council of La Raza*, 411 F.3d at 360; *In re Cnty. of Erie*, 473 F.3d at 418.

### C.      Internal DOD Legal Memoranda

DOD's Office of the Legal Counsel to the Chairman of the Joint Chiefs of Staff also located and withheld pursuant to Exemption 5 two legal memoranda responsive to the ACLU's request.  Neller Decl. ¶ 16.  These inter-agency documents, prepared by counsel and intended for the National Security Council Legal Advisor, address the legal basis for conducting military operations against U.S. citizens in general.  *Id.*  They are predecisional and deliberative, as they contain opinions, advice (including legal advice), and deliberations as part of the consultative

process.  *Id.*  Their disclosure "could chill full, frank and open discussions on matters of policy between subordinates and superiors."  *Id*. ¶ 14.  The memoranda are therefore protected by the deliberative process privilege.  *See Tigue*, 312 F.3d at 76–77; *Grand Cent. P'ship*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84-85.

> ### D.    Deliberations Leading up to Public Statements by Executive Branch Officials

DOJ (both OLC and OIP) and DOD also withheld under Exemption 5 documents pertaining to intra- and inter-agency deliberations leading up to the address presented by the Attorney General on March 5, 2012, on the subject of national security.  Hibbard Decl. ¶¶ 38-39, 43; Bies Decl. ¶ 37; Neller Decl. ¶ 14.  As noted, the Attorney General's remarks addressed several aspects of counterterrorism policy, and included a discussion of the legal principles applicable to the United States' use of targeted lethal force against specific senior operational leaders of al-Qaida or associated forces.  Normand Decl., Exh. D at 3-4.

The documents withheld by OIP, OLC and DOD consist of intra- or inter- agency messages discussing and commenting upon drafts of the Attorney General's remarks and precursors to those remarks.  Hibbard Decl. ¶ 43; Bies Decl. ¶ 37; Neller Decl. ¶ 14.  These documents are exempt from disclosure under Exemption 5 because they are protected by the deliberative process privilege.

First, the documents are predecisional.  They were "prepared to assist an agency decisionmaker" – the Attorney General – "in arriving at his decision" regarding the nature, scope and content of a major public address on the topic of national security.  Hibbard Decl. ¶ 43; Neller Decl. ¶ 14; *see Renegotiation Bd.*, 421 U.S. at 184 (*quoted in Tigue*, 312 F.3d at 77; *Grand Cent. P'ship*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84).  That decisionmaking process

included, among other things, determinations about what details to include in the Attorney General's public remarks. Hibbard Decl. ¶ 43. The process of preparing the Attorney General's address involved the preparation by senior advisors to the Attorney General of draft documents containing proposed language for discussion. *Id.* These draft documents were circulated for consideration and comment both within the Department of Justice and to agency stakeholders within the Executive Branch with an interest in the subject matter. *Id.* Relevant DOJ and agency officials in turn provided comments on the draft documents, which resulted in further deliberations. Many of these deliberations took place through email communications, in which suggestions and recommendations were offered, discussed and responded to, before the Attorney General finalized and delivered his address on March 5, 2012. *Id.*; *see Grand Cent. P'ship*, 166 F.3d at 482 (document is predecisional if it "precedes, in temporal sequence, the 'decision' to which it relates").

The documents leading up to the Attorney General's speech are also deliberative. They were "actually . . . related to the process" by which the Attorney General formulated a major policy address, and "formed an important, if not essential, link in [the Attorney General's] consultative process" for determining the nature, scope and content of that address. Hibbard Decl. ¶ 43; Neller Decl. ¶ 14; *Grand Cent. P'ship*, 166 F.3d at 482-83. Because they contain recommendations, comments and suggestions of subordinate advisors to the Attorney General and agency stakeholders, *see* Hibbard Decl. ¶ 43, the documents reflect the opinions of the authors rather than the policy of the agency as ultimately determined and articulated publicly by the Attorney General. *Grand Cent. P'ship*, 166 F.3d at 483; *Hopkins*, 929 F.2d at 84. Disclosure of the intra- and inter-agency discussions leading up to the Attorney General's remarks therefore

42

could "reflect inaccurately upon or prematurely disclose the views of [the agency]." *Grand Cent.*

*P'ship*, 166 F.3d at 483.  These discussions fall squarely within the privilege's protection of

"documents 'reflecting advisory opinions, recommendations and deliberations comprising part of

a process by which governmental decisions and policies are formulated.' " *Hopkins*, 929 F.2d at

84–85 (quoting *Sears*, 421 U.S. at 150).

DOJ and DOD also withheld pursuant to Exemption 5 inter- or intra-agency deliberative

documents pertaining to other potential public statements by Executive Branch officials.  OLC

withheld eight inter-agency email exchanges containing legal deliberations concerning potential

statements by other officials about the legal basis for the use of lethal force.  Bies Decl. ¶ 34.

And DOD withheld certain intra-agency emails reflecting internal deliberations over the content

and scope of the speech delivered by DOD General Counsel Jeh Johnson at Yale Law School on

February 22, 2012, which addressed the subject of targeted lethal operations.  Neller Decl. ¶ 14 &

Exh. I.  These materials are protected by the deliberative process privilege for the same reasons

as the intra- and inter-agency deliberations leading up to the Attorney General's March 5 address.

### E.      Talking Points for the Attorney General in Preparation for a Meeting with the President

DOJ (OIP) properly withheld talking points pursuant to the deliberative process and

presidential communications privileges.  The talking points consist of a one-page paper prepared

for the Attorney General by his staff, and an email exchange concerning the talking points.

Hibbard Decl. ¶¶ 39-40, 42, 44; Bies Decl. ¶ 35.  The talking points were for the Attorney

General's use in an upcoming meeting with the President.  Hibbard Decl. ¶¶ 40, 44.  They

contain legal analysis that the Attorney General's senior staff believed was important to convey

to the President.  *Id.*

These talking points are protected from disclosure by the deliberative process privilege. They contain the advice and recommendations of the Attorney General's staff as to what the Attorney General should communicate to the President in a face-to-face meeting on the subject of lethal targeting.  Hibbard Decl. ¶ 40.  The talking points were predecisional to the Attorney General's meeting on an important matter of public policy, and, like the documents leading up to the Attorney General's speech, they are deliberative because they represent advice provided to Attorney General by his staff, as well as deliberations between officials in ODAG and OLC regarding the content of that advice.  *Id*. ¶¶ 40, 44.

As explained in the Hibbard Declaration, "[a] significant part of the deliberative decisionmaking process is the creation of draft talking points and briefing material designed as preparatory material to aid in briefing senior officials in preparing for high-level meetings and to answer inquiries that may arise from outside sources."  *Id.* ¶ 38.  In drafting such material, "the authors attempt to identify important issues and background," "distill pertinent information from underlying events as they attempt to anticipate questions and concerns that senior Executive Branch leadership, including the Attorney General, may encounter . . . to ensure that they are prepared to respond appropriately," and "provide their own advice" on these points.  *Id.* ¶ 39.

> The Executive Branch's most senior officials rely heavily on the creation of such talking points and briefing material so that they can be fully informed on the substance and the many nuances of issues.  The employees preparing such materials must feel free to create the most thorough and candid documents possible so that the Executive Branch leadership are well-informed as they ultimately decide how to represent the federal government as a whole.

*Id.* ¶ 41.  The talking points therefore satisfy the requirements of the deliberative process

privilege.  *See, e.g.*, *Access Reports v. DOJ*, 926 F.2d 1192, 1196-97 (D.C. Cir. 1991); *ACLU v. DHS*, 738 F. Supp. 2d 93, 112 (D.D.C. 2010); *Sierra Club v. U.S. Dep't of the Interior*, 384 F. Supp. 2d 1, 19 (D.D.C. 2004); *Nat'l Council of La Raza v. DOJ*, 339 F. Supp. 2d 572, 583 (S.D.N.Y. 2004), *aff'd on other grounds*, 411 F.3d 350 (2d Cir. 2005).

The talking points also fall within the presidential communications privilege.  They were prepared for a meeting directly between the President and one of his cabinet members, the Attorney General.  Hibbard Decl. ¶ 47.  The talking points reveal presidential decisionmaking because they memorialize information to be conveyed directly to the President in a meeting held for the purpose of giving the President legal advice with respect to possible targeting decisions. *Id.*  It is immaterial whether the President saw the talking points themselves; the privilege applies to the communications contained in the document.  *Citizens for Responsibility & Ethics in Washington ("CREW") v. DHS*, 2008 WL 2872183 at *3 (D.D.C. July 22, 2008); *Amnesty Int'l*, 728 F. Supp. 2d at 522 ("privilege extends to both presidential communications themselves and records memorializing or reflecting such communications."), citing *CREW*, *supra*.  Accordingly, the talking points are within the ambit of the presidential communications privilege in addition to the deliberative process privilege.

### F.    Briefing Materials Prepared for the Attorney General in Preparation for a Congressional Hearing

Finally, DOJ (OIP) has withheld pursuant to Exemption 5 and the deliberative process privilege a two-page document consisting of briefing material prepared to assist the Attorney General in a Congressional hearing.  Hibbard Decl. ¶¶ 38, 41.

This briefing material is protected by the deliberative process privilege for the same

reasons that the talking points were protected by that privilege.  Hibbard Decl. ¶¶ 37-39.  The

briefing material was predecisional to the Attorney General's appearance at a Congressional

hearing, and is deliberative because it was prepared to assist the Attorney General in responding

to possible questions at that hearing.  Hibbard Decl. ¶ 41.  OIP has confirmed, moreover, that the

briefing material was not disclosed during the hearing.  *Id.*  The briefing material therefore is

privileged and exempt from disclosure.  *See, e.g., Judicial Watch, Inc. v. Comm'n on U.S.-Pac.*

*Trade and Inv. Policy*, 1999 WL 33944413, at *6 (D.D.C. Sept. 30, 1999); *Williams v. DOJ*, 556

F. Supp. 63, 65 (D.D.C. 1982).

## IV.     The Agencies Properly Withheld the Names and Other Identifying Information of Intelligence Community Personnel Under Exemption 6

Exemption 6 exempts from disclosure information from personnel, medical, or other

similar files that "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C.

§ 552(b)(6).  Exemption 6 applies not only to "files 'about an individual,'" but to "bits of

personal information, such as names and addresses," contained in otherwise releasable

documents.  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006); *see also, e.g., U.S.*

*Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982).

In determining if personal information is exempt from disclosure under Exemption 6, the

Court must balance the public's need for this information against the individual's privacy

interest.  *Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005).  "The privacy side of the balancing test is

broad and encompasses all interests involving the individual's control of information concerning

his or her person."  *Id.* at 88 (internal quotation marks omitted).  For instance, "individuals,

including government employees and officials, have privacy interests in the dissemination of

46

their names." *Massey v. FBI*, 3 F.3d 620, 624 (2d Cir. 1993), *abrogated on other grounds by*

*Milner v. Dep't of Navy*, 131 S. Ct. 1259 (2011); *see also Associated Press v. DOJ*, 549 F.3d 62,

65 (2d Cir. 2008).  On the other side of the scale, "[t]he *only* relevant public interest in the FOIA

balancing analysis is the extent to which disclosure of the information sought would shed light

on an agency's performance of its statutory duties or otherwise let citizens know what their

government is up to." *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997)

(quotation marks and citations omitted); *Associated Press*, 549 F.3d at 66; *see also Hopkins*, 929

F.2d at 88.

Here, the Agencies properly withheld the names of ODNI and other Intelligence

Community employees pursuant to Exemption 6.  Given the nature of their work, these

employees have a heightened privacy interest that outweighs any minimal public interest in their

identities and email addresses.  Hackett Decl. ¶ 31; Hibbard Decl. ¶ 48; Bies Decl. ¶ 46; *see Davy*

*v. CIA*, 357 F. Supp. 2d 76, 87-88 (D.D.C. 2004) (with regard to the names and identifying

information of CIA personnel, "a balancing of the personal privacy of CIA personnel and a

consideration of public interest weighs in favor of exemption").

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to defendants and dismiss the complaints.

Dated:  June 20, 2012

Respectfully submitted,

| | |
|---|---|
| STUART F. DELERY | PREET BHARARA |
| Acting Assistant Attorney General | United States Attorney for the |
| | Southern District of New York |
| IAN HEATH GERSHENGORN | |
| Deputy Assistant Attorney General | |

By:  */s/ Elizabeth J. Shapiro*      By:   */s/ Sarah S. Normand*

| | |
|---|---|
| ELIZABETH J. SHAPIRO | SARAH S. NORMAND |
| AMY POWELL | Assistant United States Attorney |
| 20 Massachusetts Ave., NW | 86 Chambers Street, Third Floor |
| Washington, D.C. 20530. | New York, New York 10007 |
| Telephone: (202) 514-5302 | Telephone:  (212) 637-2709 |
| Facsimile: (202) 616-8470 | Facsimile:  (212) 637-2702 |
| Elizabeth.Shapiro@usdoj.gov | Sarah.Normand@usdoj.gov |

48