**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY, et al., | |
| Plaintiffs, | |
| v. | Case No. 11-cv-9336 (CM) |
| DEPARTMENT OF JUSTICE, | |
| Defendant. | |
| AMERICAN CIVIL LIBERTIES UNION, et al., | |
| Plaintiffs, | |
| v. | Case No. 12-cv-794 (CM) |
| DEPARTMENT OF JUSTICE, et al., | |
| Defendants. | |

**DECLARATION OF JOHN BENNETT
DIRECTOR, NATIONAL CLANDESTINE SERVICE
CENTRAL INTELLIGENCE AGENCY**

## I.  INTRODUCTION

I, JOHN BENNETT, hereby declare and state:

1.   I am the Director of the National Clandestine Service
("NCS") of the Central Intelligence Agency ("CIA" or "Agency").
I was appointed to this position in July 2010.  I joined the
Agency in 1981 and have over twenty-five years of experience as
a CIA officer.  Over the course of my career, I have held a

variety of leadership positions with the Agency, including Chief
of the Special Activities Division and Deputy Chief of the
Africa Division. Most of my career with the CIA has been spent
in overseas operational positions, including my four tours as
the Chief of overseas CIA stations.

2.     The NCS is the organization within the CIA responsible
for conducting the CIA's foreign intelligence and
counterintelligence activities. As Director of the NCS, it is
my responsibility to oversee its mission of strengthening the
national security and foreign policy objectives of the United
States through the clandestine collection of human intelligence,
technical collection, and covert action. One of the additional
responsibilities that comes with this position is the authority
to assess the current, proper classification of CIA information
based on the classification criteria of Executive Order 13526.
Pursuant to the original TOP SECRET classification authority
that has been delegated to me, I am authorized to make original
classification and declassification decisions. When called upon
to exercise this authority, I ensure that any determinations
regarding the classification of CIA information are proper and
that the public release of such information does not jeopardize
the national security by disclosing classified intelligence
activities, methods, or operational targets, or endanger United
States government personnel, facilities, or sources.

3.    I am submitting this declaration in support of the
Government's motion for summary judgment in these consolidated
proceedings.   Through the exercise of my official duties, I have
become familiar with these civil actions and the underlying FOIA
requests.   I make the following statements based upon my
personal knowledge and information made available to me in my
official capacity.

4.    This declaration will explain, to the greatest extent
possible on the public record,[1] the basis for the Government's
responses to Plaintiffs' FOIA requests pertaining to the CIA and
will identify the applicable FOIA exemptions that support these
responses in this case.   In particular, as an original
classification authority for the CIA, I have determined that
although the CIA can acknowledge the fact that it possesses
records responsive to the American Civil Liberties Union's
(ACLU's) FOIA  request, it cannot reveal the number or nature of
responsive records because such information is currently and
properly classified and therefore exempt from release under FOIA
exemption (b)(1).   As explained below, this response - referred
to as a "no number, no list" response[2] - is required because
official CIA acknowledgement of the number and nature of

---

[1] I am also submitting a classified declaration for the Court's *ex
parte, in camera* review that contains additional information justifying the
CIA's response that cannot be filed on the public record.
[2] The validity of the "no number, no list" response has been recognized
in court cases, including in the Seventh Circuit's decision in *Bassiouni v.
Central Intelligence Agency*, 392 F.3d 244 (7th Cir. 2004).

3

responsive records would reveal information that concerns intelligence activities, intelligences sources and methods, and U.S. foreign relations and foreign activities, the disclosure of which reasonably could be expected to harm the national security of the United States.

5. Additionally, and separately, I have determined that disclosing the number and nature of responsive CIA records would reveal information concerning intelligence sources and methods, as well as core functions of the CIA. The Director of the Central Intelligence Agency is authorized by the National Security Act of 1947, as well as the CIA Act of 1949, to protect intelligence sources and methods, as well as core functions of the CIA, from disclosure. The CIA therefore asserts FOIA exemption (b)(3) as an additional basis for withholding the number and nature of responsive records.

6. Finally, with respect to the New York Times' separate FOIA requests in the consolidated case, the CIA has determined that the existence or non-existence of responsive Office of Legal Counsel ("OLC") opinions pertaining to potential CIA lethal operations against terrorists (including U.S. citizens) is exempt from disclosure under FOIA exemptions (b)(1) and

(b)(3), and therefore the CIA has asked the Department of Justice ("DOJ") to issue a Glomar response[3] on its behalf.

7. For the Court's convenience, I have divided the substance of this declaration into five parts. Part II provides an overview of Plaintiffs' FOIA requests, as well as developments that have occurred subsequent to the issuance of these requests. Part III describes the applicable FOIA exemptions. Part IV describes the application of these exemptions to the CIA's response to the ACLU's FOIA request and includes a detailed discussion of the damage to U.S. national security that reasonably could be expected to result if the CIA were to reveal the number and nature of responsive records. Part V provides a similar discussion concerning the New York Times' requests as they pertain to the CIA. Finally, Part VI discusses the absence of prior official public disclosures that would invalidate the CIA's responses to these FOIA requests.

## II. PLAINTIFFS' FOIA REQUESTS & SUBSEQUENT DEVELOPMENTS

### A. ACLU's REQUEST

8. In a letter to the CIA's Information and Privacy Coordinator dated 19 October 2011, the ACLU submitted a FOIA request seeking several categories of records pertaining to the

---

[3] The origins of the Glomar response trace back to the D.C. Circuit's decision in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), which affirmed CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning CIA's reported contacts with the media regarding Howard Hughes' ship, the "Hughes Glomar Explorer."

legality and related processes concerning the U.S. Government's potential use of lethal force against U.S. citizens. It also sought records about the deaths of Anwar al-Awlaki, Samir Khan, and Abdulrahman al-Awlaki, Anwar al-Awlaki's son. According to the ACLU's Complaint, it submitted identical FOIA requests to the Department of Defense ("DOD"), including the U.S. Special Operations Command, and the Department of Justice, including the Office of Legal Counsel. A true and correct copy of the ACLU's 19 October 2011 letter is attached as Exhibit A.

9. By letter dated 25 October 2011, the CIA acknowledged receipt of the ACLU's FOIA request. A true and correct copy of the CIA's 25 October 2011 letter is attached as Exhibit B.

10. By letter dated 17 November 2011, the CIA issued a final response to the ACLU's request stating that "[i]n accordance with section 3.6(a) of Executive Order 13526, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to [the ACLU's] request," citing FOIA exemptions (b)(1) and (b)(3) and "[t]he fact of the existence or nonexistence of requested records is currently and properly classified and is intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(1) of the National Security Act of 1947, as amended." The CIA informed the ACLU that it had a right to appeal the finding to the Agency

6

Release Panel, the body within the CIA that considers FOIA appeals. A true and correct copy of the CIA's 17 October 2011 letter is attached as Exhibit C.

11. By letter dated 6 December 2011, the ACLU appealed the CIA's final response. A true and correct copy of the CIA's 6 December 2011 letter is attached as Exhibit D.

12. By letter dated 16 January 2012, the CIA acknowledged receipt of the ACLU's letter challenging the CIA's Glomar response. The CIA accepted the ACLU's appeal and noted that arrangements would be made for its consideration by the appropriate members of the Agency Release Panel. A true and correct copy of the CIA's 16 January 2012 letter is attached as Exhibit E.

13. While this appeal was pending, the ACLU filed a Complaint in this matter on 1 February 2012. As a result of the filing of the Complaint, and pursuant to its FOIA regulations at 32 C.F.R. § 1900.42(c), the CIA terminated the administrative appeal proceedings on 2 February 2012. A true and correct copy of the CIA's 2 February 2012 termination letter is attached as Exhibit F.

**B.  NEW YORK TIMES' REQUESTS**

14. The CIA is not a defendant in the separate FOIA litigation brought by the New York Times and its reporters against the Department of Justice, which the Court has

7

consolidated with the ACLU case. However, given the overlapping subject-matter and the nature of the requests, the CIA has an equity in DOJ's response to the New York Times' requests, and therefore those requests will be addressed as well.

15. I understand that on or about 11 June 2010, New York Times reporter Scott Shane issued a FOIA request to DOJ seeking "[a]ll Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killing, assassination, or killing of people suspected of ties to Al Qaeda or other terrorist groups by employees or contractors of the United States government. This would include legal advice on these topics to the military, the Central Intelligence Agency, or other intelligence agencies. It would include the legal status of killing with missiles fired from drone aircraft or any other means." I further understand that in response DOJ acknowledged the existence of a "classified legal memorandum addressing the subject of targeted killing that pertains to the Department of Defense," but it refused to confirm or deny the existence of any additional responsive opinions.

16. I also understand that on or about 7 October 2011, New York Times reporter Charlie Savage issued a FOIA request to DOJ for "[a]ll Office of Legal Counsel memorandums analyzing the circumstances under which it would be lawful for the United States armed forces or intelligence community assets to target

for killing a United States citizen who is deemed a terrorist."
I further understand that DOJ initially issued a Glomar response
to this request.

## C.  SUBSEQUENT DEVELOPMENTS

17.  Several developments have occurred subsequent to the
issuance of Plaintiffs' FOIA requests and the filing of these
lawsuits that have caused the CIA to reconsider its response, as
described further below.  Those events include several speeches
by senior U.S. officials that address significant legal and
policy issues pertaining to U.S. counterterrorism operations and
the potential use of lethal force by the U.S. government against
senior operational leaders of al-Qa'ida or associated forces who
have U.S. citizenship.  In light of these recent speeches and
the official disclosures contained therein, the CIA decided to
conduct a reasonable search for records responsive to the ACLU's
request.  Based on that search, it has determined that it can
now publicly acknowledge that it possesses records responsive to
the ACLU's FOIA request.  As described below, however, the CIA
cannot provide the number, nature, or a categorization of these
responsive records without disclosing information that continues
to be protected from disclosure by FOIA exemptions (b)(1) and
(b)(3).

### III. APPLICABLE FOIA EXEMPTIONS

#### A.    FOIA Exemption (b)(1)

18.    FOIA exemption (b)(1) provides that FOIA does not require the production of records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).

19.    Section 1.1(a) of Executive Order 13526 provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

20.    Consistent with Executive Order 13526, and as described below, I have determined that the number and nature of responsive CIA records - as well as whether or not these records

10

are responsive to specific aspects of the ACLU's FOIA request –
are currently and properly classified facts that concern
"intelligence activities (including covert action) [and]
intelligence sources or methods" and the "foreign relations or
foreign activities of the United States" under Section 1.4 of
the Executive Order.  With respect to the New York Times' FOIA
requests, the CIA has determined that the existence or non-
existence of responsive OLC opinions pertaining to potential CIA
lethal operations against terrorists (including U.S. citizens)
constitutes classified information that falls within these same
categories, and therefore the CIA has asked DOJ to issue a
Glomar response on its behalf – a response that is specifically
authorized by Section 3.6(a) of the Executive Order.[4]  These
facts constitute information that is owned by and under the
control of the U.S. Government, the unauthorized disclosure of
which reasonably could be expected to harm U.S. national
security.

21.   Section 1.2(a) of Executive Order 13526 provides that
information shall be classified at one of three levels if the
unauthorized disclosure of the information reasonably could be
expected to cause damage to the national security and the

---

[4] That provision states that "[a]n agency may refuse to confirm or deny
the existence or nonexistence of requested records whenever the fact of their
existence or nonexistence is itself classified under this order or its
predecessors."

original classification authority is able to identify or
describe the damage.  Information shall be classified TOP SECRET
if its unauthorized disclosure reasonably could be expected to
result in *exceptionally grave damage* to the national security;
SECRET if its unauthorized disclosure reasonably could be
expected to result in *serious damage* to the national security;
and CONFIDENTIAL if its unauthorized disclosure reasonably could
be expected to result in *damage* to the national security.  As
described in detail below, I have determined that publicly
revealing the information being protected by the CIA's responses
to these FOIA requests reasonably could be expected to cause
damage to U.S. national security, up to and including
exceptionally grave damage.

22.  In accordance with section 1.7 of the Executive Order,
I hereby certify that these determinations have not been made to
conceal violations of law, inefficiency, or administrative
error; to prevent embarrassment to a person, organization, or
agency; to restrain competition; or to prevent or delay the
release of information that does not require protection in the
interests of national security.

**B.   FOIA Exemption (b)(3)**

23.  FOIA exemption (b)(3) provides that FOIA does not apply
to matters that are: specifically exempted from disclosure by
statute (other than section 552b of this title), provided that

12

such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . . 5 U.S.C. § 552(b)(3).

24. Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute that "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Under the direction of the DNI pursuant to Section 102A, and consistent with Section 1.6(d) of Executive Order 12333, the CIA is authorized to protect CIA sources and methods from unauthorized disclosure.[5] As described in detail below, acknowledging the number and nature of CIA records responsive to the ACLU request, as well as the existence or non-existence of OLC opinions responsive to the New York Times requests (to the

---

[5] Section 1.6(d) of Executive Order 12333, as amended, 3 C.F.R. 200 (1981), reprinted in 50 U.S.C.A. § 401 note at 25 (West Supp. 2009), and as amended by Executive Order 13470, 73 Fed. Reg. 45,323 (July 30, 2008) requires the Director of the Central Intelligence Agency to "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI]."

13

extent they pertain to CIA operations) would reveal information that concerns intelligence sources and methods, which the National Security Act is designed to protect.

25. Additionally, and separately, Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403g (the "CIA Act"), provides that the CIA shall be exempted from the provisions of "any other law" (in this case, FOIA) which requires the publication or disclosure of, *inter alia*, the "functions" of the CIA. Accordingly, under Section 6, the CIA is exempt from disclosing information relating to its core functions – which plainly include clandestine intelligence activities, intelligence sources and methods and foreign liaison relationships. The CIA Act therefore constitutes a federal statute that "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). As explained in detail below, acknowledging the number and nature of CIA records responsive to the ACLU request, as well as the existence or non-existence of OLC opinions responsive to the New York Times requests (to the extent they pertain to CIA operations) would reveal information about the core functions of the CIA, an outcome the CIA Act expressly prohibits.

26. In contrast to Executive Order 13526, the statutes described above do not require the CIA to identify and describe

14

the damage to the national security that reasonably could be expected to result from the unauthorized disclosure of these sources, methods, or functions. Nonetheless, I refer the Court below to the description of the damage to the national security that reasonably could be expected to result should the CIA be required to respond in a different manner. FOIA exemptions (b)(1) and (b)(3) thus apply independently and co-extensively to Plaintiffs' requests.

**IV. THE CIA'S "NO NUMBER, NO LIST" RESPONSE TO THE ACLU REQUEST**

27. As noted above, in the light of the U.S. Government's recent official disclosures concerning these matters and the important role the CIA plays on the President's National Security team, the CIA has determined that it can confirm the existence of records responsive to ACLU's request without harming national security. From the outset it should be emphasized that the ACLU's request is quite broad in many respects. As an example, one category of the ACLU's FOIA request seeks records concerning "the legal basis . . . upon which U.S. citizens can be subjected to targeted killing," and another seeks records pertaining to "the process by which U.S. citizens can be designated for targeted killing." The CIA initially refused to confirm or deny the existence of records responsive to these two closely related categories. However, the CIA has since determined that it can acknowledge the

15

existence of responsive records reflecting a general interest in these broad topics without harming national security. These records include, for example, the speech that the Attorney General gave at Northwestern University Law School on 5 March 2012 in which he discussed a wide variety of issues pertaining to U.S. counterterrorism operations, including legal issues pertaining to the potential use of lethal force against senior operational leaders of al-Qa'ida or associated forces who have U.S. citizenship. The Attorney General explained that under certain circumstances, the use of lethal force against such persons in a foreign country would be lawful when, among other things, "the U.S. government . . . determined, after a thorough and careful review, that the individual pose[d] an imminent threat of violent attack against the United States." These records also include the speech that the Assistant to the President for Homeland Security and Counterterrorism gave on 30 April 2012, in which he addressed similar legal and policy issues related to the U.S. Government's counterterrorism operations. Because the CIA is a critical component of the national security apparatus of the United States and because these speeches covered a wide variety of issues relating to U.S. counterterrorism efforts, it does not harm national security to reveal that copies of the speeches exist in the CIA's files. And because these speeches refer to both the "legal basis" for

16

the potential use of lethal force against U.S. citizens and a review "process" related thereto, the speeches are responsive to these two categories.

28. Notwithstanding these acknowledgements, however, the CIA cannot further describe or even enumerate on the public record the number, types, dates, or other descriptive information about these responsive records because to do so would reveal classified information about the nature and extent of the CIA's interest in these broad topics. In other words, although the CIA can acknowledge a generalized interest in these matters given the Agency's role in U.S. counterterrorism activities, it cannot respond in a manner that would reveal information about the nature, depth, and breadth of this interest. Nor can the CIA provide a breakdown and categorization that identifies whether or not these responsive records correlate to the specific sub-parts of the ACLU's request concerning the deaths of Anwar al-Awlaki, Samir Khan, and Awlaki's son. Providing the number, dates, and a categorization of responsive record would reveal precisely this information, and therefore a "no number, no list" response is appropriate pursuant to FOIA exemptions (b)(1) and (b)(3).

29. There are several underlying equities protected by the CIA's "no number, no list" response. Among other things, disclosing the number and dates of responsive records would tend

17

to reveal whether or not the CIA has been granted the authority

to directly participate in lethal operations that could

potentially target senior operational leaders of al-Qa'ida who

have U.S. citizenship (based on the framework discussed in the

Attorney General's speech). A response other than a "no number,

no list" response would also tend to reveal the significance of

the CIA's intelligence interest in and the depth and breadth of

the CIA's intelligence collection activities directed against

such terrorists. Finally, being required to provide a

categorization that confirms whether or not the CIA possesses

responsive records specifically about Anwar al-Awlaki, Samir

Khan, and Awlaki's son would tend to reveal whether or not the

CIA was involved in the events that led to their deaths (e.g.,

by providing supporting intelligence or technical assistance).

All of these facts that would tend to be revealed by disclosing

the number, nature, and a categorization of responsive records

constitute currently and properly classified information

concerning CIA intelligence activities, sources, and methods, as

well as the foreign activities of the United States, that is

exempt from disclosure pursuant to FOIA exemptions (b)(1) and

(b)(3).

30. When the CIA can reveal the existence of records

responsive to a FOIA request but cannot describe or even

enumerate on the public record the number, dates, or a

categorization of responsive documents, it issues a "no number no list" response.  The "no number no list" response allows federal agencies to protect classified or otherwise exempt information pertaining to intelligence activities, sources, or methods by withholding the number of responsive documents in addition to descriptive information, such as the nature of the record, its date, author, and subject matter, as well as the specific part of the request to which the record is responsive. In this case, being required to disclose the volume, nature, and a categorization of responsive records would reveal information about intelligence activities (including foreign activities), intelligence methods, and CIA functions.  Revealing these classified facts reasonably could be expected to harm the national security of the United States, and therefore this information must be withheld under FOIA exemption (b)(1). Additionally, and separately, responding in any other manner would reveal intelligence sources, intelligence methods, and core functions of the CIA.  The CIA's response is therefore independently supported by FOIA exemption (b)(3).

31.  To illustrate, if the CIA publicly acknowledged that it possessed several hundred records responsive to the ACLU's request, that fact would indicate that the CIA had a significant interest in either actual or contemplated operations against senior operational leaders of al-Qa'ida who have U.S.

citizenship, which in turn would tend to reveal that the Agency was actively involved in these activities or that the CIA itself has the authority to directly participate in the use of lethal force against such individuals. At minimum, it would tend to reveal a substantial intelligence interest in the more limited subset of terrorists who might meet the criteria discussed in the Attorney General's speech, as well as the relative success of the CIA's intelligence collection efforts directed against them. Conversely, if the CIA possessed only a handful of documents responsive to the ACLU's request, that would indicate that the CIA had only a minimal interest, which in turn would tend to reveal that the Agency was not actively involved in these actual or contemplated activities, that it did not have the authority to carry them out, and/or that it had been able to collect only a small amount of intelligence about this more limited number of individuals. Under either scenario, the number of responsive records that the CIA possesses is itself a classified fact that must be protected from disclosure, thereby necessitating the CIA's "no number, no list" response.

32.  This concern would be magnified if the CIA were required to also reveal the nature, dates, and other descriptive information about the records that are responsive to this request - the information typically required in a *Vaughn* index. For instance, when juxtaposed with the number of responsive

20

documents, disclosure of the dates of these records would provide a timeline of the existence and nature of the CIA's involvement, authority, and/or intelligence interest and collection activities (or lack thereof) between 11 September 2001 and the present - the timeframe of the ACLU's request.

33. For similar reasons, the CIA cannot reveal whether or not any of these records are specific types of records, such as OLC opinions or other formal legal analyses, as that too would tend to reveal whether the CIA was operationally involved in these activities or had the authority to carry them out itself. If the CIA had been granted the extraordinary authority to be directly involved in targeted lethal operations against U.S. citizens, one would logically expect that the legal issues related thereto be carefully and extensively documented by the Department of Justice and the CIA's Office of General Counsel. On the other hand, if the CIA did not possess this authority, then one would logically expect these issues to receive significantly less, if any, documentation by Department of Justice and CIA attorneys.

34. Similarly, the CIA also cannot provide a categorization of its responsive records that reveals whether or not the Agency possesses documents specifically responsive to the portion of the FOIA request seeking documents about the factual and legal basis for the alleged targeted killing of

21

Anwar al-Awlaki, Samir Khan, and Awlaki's son. Hypothetically, if the CIA were to respond by admitting that it possessed these specific records, that response would tend to reveal (among other things) that the CIA was involved, in some manner, in the events that led to their deaths (e.g., by providing supporting intelligence or technical assistance). Such a hypothetical response would reveal specific intelligence activities, sources, methods, and functions of the CIA, as well as specific foreign activities of the United States, all of which are protected from disclosure by Executive Order 13526, the National Security Act, and the CIA Act.

35. On the other hand, if the CIA were to respond by admitting that it did not possess any responsive records about these specific events, it would indicate that the CIA had no involvement in the circumstances leading to their deaths. Such a response would reveal damaging information about potential "gaps" or weaknesses in the CIA's authorities, operational capabilities, intelligence interests, and resources that is protected from disclosure by Executive Order 13526 and statute.

36. Information revealing the depth and breadth of the CIA's interest in the U.S. Government's efforts to counter the threat posed by senior operational leaders of al-Qa'ida who have U.S. citizenship, as well as public confirmation of whether or not the CIA was involved in the circumstances that led to the

deaths of Anwar al-Awlaki, Samir Khan, and Awlaki's son,

constitutes information concerning CIA intelligence activities,

methods, and functions, as well as the foreign activities of the

United States. It would greatly benefit hostile groups,

including terrorist organizations such as al-Qa'ida, to know

with certainty the specific intelligence activities in which the

CIA is (or is not) directly involved. It would also benefit

them to know the depth, breadth, and chronology of the CIA's

intelligence collection efforts against senior operational

leaders of al-Qai'da who have U.S. citizenship. To reveal such

information would provide valuable insight into the CIA's

authorities, capabilities, and intelligence interests that our

enemies could use to reduce the effectiveness of the CIA's

intelligence operations.

37. As illustrated by the example of Anwar al-Awlaki, it

is no secret that terrorist organizations such as al-Qa'ida have

made it a priority to recruit U.S. citizens into their

leadership, based on the assumption that the cloak of U.S.

citizenship will make these individuals less susceptible to

being targeted by U.S. military and intelligence operations.

Although it has been acknowledged in the Attorney General's

speech and elsewhere that, as a legal matter, a terrorist's

status as a citizen does not make him or her immune from being

targeted by the U.S. military, there has been no acknowledgement

23

with respect to whether or not the CIA (with its unique and distinct roles, capabilities, and authorities as compared to the U.S. military) has been granted similar authority to be directly involved in or carry out such operations. Nor has there been any official acknowledgement concerning whether or not the CIA was involved in the circumstances leading to the deaths of Awlaki, Samir Khan, and Awlaki's son. Revealing these facts would provide valuable insight to al-Qa'ida and other hostile groups as they continue to recruit U.S. citizens into their ranks and use them to plot attacks against the United States. For these reasons and others, the CIA has determined that it must issue a "no number, no list" response to the ACLU's request.

\*      \*      \*

38.  By way of background, the CIA is charged with carrying out a number of important functions on behalf of the United States, which include, among other activities, collecting and analyzing foreign intelligence and counterintelligence (particularly intelligence provided by human sources, called human intelligence or HUMINT), as well as conducting other activities at the direction of the President, including covert action. A defining characteristic of the CIA's intelligence activities is that they are typically carried out clandestinely, and therefore they must remain secret in order to be effective.

In the context of FOIA, this means that the CIA must carefully evaluate whether its response to a particular FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal previously undisclosed information about its sources, capabilities, authorities, interests, strengths, weaknesses, resources, and other factors important to hostile intelligence services and terrorist groups.

39.    In this case, although the CIA has determined that it can publicly acknowledge that it possesses records responsive to the ACLU's FOIA request, further disclosure of the number, nature, and a categorization of responsive records reasonably could be expected to damage to U.S. national security.    In particular, disclosure of this information would tend to expose or otherwise damages one or more of the following: (a) intelligence sources, (b) intelligence methods, (c) intelligence activities, and (d) the foreign relations and foreign activities of the United States.

## A.    Intelligence Sources

40.    One of the core functions of the CIA is to collect foreign intelligence from around the world for the President and other United States Government officials to use in formulating policy decisions.    To accomplish this function, the CIA must rely on information from knowledgeable sources that the CIA can obtain only under an arrangement of absolute secrecy.

Intelligence sources will rarely furnish information unless they are confident that they are protected from retribution or embarrassment by the absolute secrecy surrounding the source-CIA relationship. In other words, intelligence sources must be certain that the CIA can and will do everything in its power to prevent the public disclosure of their association with the CIA. Intelligence sources include clandestine human intelligence sources and foreign intelligence services.

41. The CIA relies on clandestine human sources - often called "assets" - to collect foreign intelligence, and it does so with the promise that the CIA will keep their identities and their relationships with the CIA secret. This is because the revelation of this secret relationship could harm the individual and inhibit the CIA's ability to collect foreign intelligence from that individual and others in the future. When a foreign national abroad cooperates with the CIA, for example, it is often without the knowledge of his or her government or organization, and the consequences of the disclosure of this relationship can be swift and far-ranging, from economic reprisals to harassment, imprisonment, or death. In addition, such disclosure may place in jeopardy the lives of every individual with whom the foreign national has had contact, including his or her family and associates.

26

42. In many cases, the very nature of the information that
the source communicates necessarily tends to reveal the identity
of the human source because of the limited number of individuals
with access to the information. In other words, revealing the
information provided by the source is tantamount to identifying
the source itself. Furthermore, disclosing information that
would or could identify a human source could seriously damage
the CIA's credibility with all other current intelligence
sources and thereby undermine the CIA's ability to recruit
future sources. As stated previously, most individuals will not
cooperate with the CIA unless they have confidence that their
identities will remain secret. The CIA therefore has a primary
interest in keeping these identities secret, not only to protect
the sources, but also to demonstrate to other sources and future
sources that these sources can trust the CIA to preserve the
secrecy of the relationship.

43. On the other hand, it is equally damaging to reveal
that the CIA does not possess intelligence regarding a
particular topic, which in turn reveals that the CIA has been
unsuccessful in recruiting a human source to provide
intelligence regarding that topic. If terrorist organizations
and other hostile entities were to learn that the CIA is
essentially "blind" in a particular part of the world or
otherwise has limited ability to collect human intelligence

27

regarding a particular topic, they would use this information to their advantage (*e.g.*, by enhancing their operational efforts in that part of the world, knowing that the CIA's ability to monitor those operations is limited). This reasonably could be expected to harm U.S. national security.

44. Another type of CIA source is a "liaison relationship." A liaison relationship is a cooperative and secret relationship between the CIA and an entity of a foreign government. Most CIA liaison relationships involve a foreign country's intelligence or security service. A liaison relationship is a working and information-sharing agreement. Liaison relationships between the CIA and other foreign intelligence services or government entities are initiated and continued only on the basis of a mutual trust and understanding that the existence and details of such liaison arrangements will be kept in the utmost secrecy. A liaison relationship constitutes both an intelligence source and an intelligence method. The CIA's liaison relationships are critical and extremely sensitive. Accordingly, officially acknowledging foreign liaison information – or even the existence of a particular liaison relationship - can undermine a foreign government's trust in the CIA's ability to protect their sensitive intelligence information.

45. Additionally, in many foreign countries, cooperation with the CIA is not a popular concept. If a foreign liaison service's cooperation with the CIA were to be officially confirmed by the CIA, then that service and government could face a popular backlash that reasonably could be expected to reduce or eliminate the information-sharing relationship with the CIA. This, in turn, reasonably could be expected to damage U.S. national security.

46. As described above with respect to human sources, it is equally damaging to reveal information about the existence and nature of CIA intelligence regarding a particular topic, which in turn would tend to confirm the absence of a liaison relationship (and thus the absence of a CIA intelligence-collection capability) in a particular location.

47. Several aspects of the ACLU's FOIA request implicate intelligence sources directly. For example, one category asks the CIA to disclose whether and to what degree it possesses intelligence regarding the imminence of Awlaki's threat to U.S. national security (No. 4(A)); intelligence regarding Awlaki's location at a particular time and place (No. 4 generally), as well as the security conditions under which he was living and the individuals with whom he was associating at a particular time and place, i.e., hypothetical facts related to Awlaki's feasibility of capture (No. 4(B)). Additionally, other

categories would require the CIA to disclose whether and to what degree it possesses intelligence regarding Samir Khan and Abulrahman al-Awlaki, including whether the CIA was aware of their location at a particular time and place (Nos. 5 and 6).

48.  As described above, however, if the CIA were to confirm the existence, volume, and nature of documents responsive to these specific categories of the ACLU's request, it could potentially reveal information about the existence and identity of particular intelligence sources.  This, in turn, would provide terrorist groups and other adversarial organizations with valuable information regarding the degree to which the CIA possessed intelligence regarding these individuals and their environs, as well as information that could be used to identify the sources of that intelligence, if it exists. Conversely, if the CIA were to acknowledge that it possessed no records responsive to these specific categories, it would tend to reveal the absence of such sources, thereby providing terrorist organizations and other adversaries with information regarding about potential weaknesses in the CIA's intelligence collection efforts.  In either scenario, disclosure of the existence or nonexistence of intelligence sources relating to these events reasonably could be expected to harm national security.

## B.     Intelligence Methods

49.    The ACLU's request also implicates CIA intelligence methods.   Intelligence methods are the means by which an intelligence agency accomplishes its objectives.   Intelligence methods must be protected in situations where a certain capability or technique or the application thereof is unknown to others, such as a foreign intelligence service or terrorist organization, which could take countermeasures.   Secret information collection techniques are valuable from an intelligence-gathering perspective only so long as they remain unknown and unsuspected.   Once the nature of an intelligence method or the fact of its use in a certain situation is discovered, its usefulness in that situation is neutralized and the CIA's ability to apply that method in other situations is significantly degraded.

50.    The CIA must do more than prevent explicit references to intelligence methods; it must also prevent indirect references that would tend to reveal the existence (or non-existence) of such methods.   One vehicle for gathering information about the CIA capabilities is by reviewing officially released information.   We know that terrorist organizations and other hostile groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details in order to

31

defeat the CIA's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence method could have significant adverse effects when juxtaposed with other publicly available data.

51. Intelligence methods include the use of human assets and liaison relationships, described above. Intelligence methods also include the CIA's selection of targets for intelligence collection or operational activities. When a foreign intelligence service or adversary nation learns that a particular foreign national or group has been targeted for intelligence collection by the CIA, it will seek to glean from the CIA's interest what information the CIA has received, why the CIA is focused on that type of information, and how the CIA will seek to use that information for further intelligence collection efforts and clandestine intelligence activities. If terrorist groups such as al-Qa'ida, foreign intelligence services, or other hostile entities were to discover what the CIA has or has not learned about certain individuals or groups, this information could be used against the CIA to thwart future intelligence operations, jeopardize ongoing human sources, and otherwise derail the CIA's intelligence collection efforts. Finally, intelligence methods include specific CIA technical capabilities and the financial resources to effectively implement those capabilities.

52. In this case, the ACLU FOIA request implicates
intelligence methods in several ways. As noted above, the use
of intelligence sources (or lack thereof) also constitutes an
intelligence method, and therefore this request implicates both
sources and methods to the same degree. In addition, whether or
not the CIA was involved circumstances that led to the deaths of
Awlaki and/or the other referenced individuals (e.g., by
providing supporting intelligence or technical assistance) is
another fact that pertains to CIA intelligence-gathering methods
and activities. More generally, disclosing the degree to which
the CIA is interested in in the U.S. Government's efforts to
counter the threat posed by certain senior-level terrorists who
have U.S. citizenship would tend to reveal the level of the
CIA's intelligence interest in this group of individuals and the
relative success (or lack thereof) of the CIA's intelligence
collection efforts directed against them - information that
squarely implicates intelligence-gathering methods and
operational activities.

53. Finally, the ACLU alleges that Awlaki and Khan were
killed "by a missile or missiles fired from one or more unmanned
aerial vehicles (UAVs)." If Awlaki and Khan were in fact killed
via a missile fired from an unmanned aerial vehicle as alleged,
then the acknowledgment of a CIA connection to their deaths
would tend to reveal the CIA's involvement in the use of this

33

advanced technological platform (of lack of involvement, if the response revealed no CIA connection).[6]

54. In any of these scenarios, the CIA's official confirmation or denial that it does or does not possess responsive records reasonably could be expected to harm the national security by revealing CIA intelligence methods. It would greatly benefit hostile groups, including terrorist organizations such as al-Qa'ida, to know with certainty which intelligence methods the CIA has at its disposal. To reveal such information would provide valuable insight into the CIA's capabilities, interests, and resources that our enemies could use to reduce the effectiveness of CIA's intelligence operations.

## C. Intelligence Activities

55. Clandestine intelligence activities lie at the heart of the CIA's mission. Intelligence activities refer to the actual implementation of intelligence sources and methods in the operational context. Accordingly, the discussion above of the harm to national security stemming from the disclosure of "sources and methods" applies with equal force to the disclosure of "intelligence activities." As defined in Section 6.1 of E.O.

---

[6] Thus, by admitting that it possesses records responsive to the ACLU FOIA request generally, the CIA is not confirming or denying that it possesses records specifically about the actual use of UAVs in targeted lethal operations - so-called "drone strikes."

13526, "intelligence activities" means all activities that elements of the Intelligence Community are authorized to conduct pursuant to law or Executive Order 12333, as amended.  Section 1.4(c) of Executive Order 13526 also provides that these intelligence activities can include "covert action" in additional to more traditional intelligence-gathering activities.  An acknowledgment of information regarding specific intelligence activities can reveal the CIA's specific intelligence capabilities, authorities, interests, and resources.  Terrorist organizations, foreign intelligence services, and other hostile groups use this information to thwart CIA activities and attack the United States and its interests.  These parties search continually for information regarding the activities of the CIA and are able to gather information from myriad sources, analyze this information, and devise ways to defeat the CIA activities from seemingly disparate pieces of information.

56.  In this case, and as described above, responding to the ACLU's FOIA request in a manner other than a "no number, no list" reasonably could be expected to damage the national security by disclosing whether or not the CIA was involved, in some manner, in the circumstances that led to the deaths of Awlaki, Samir Khan, or Awlaki's son (e.g., by providing supporting intelligence or technical assistance).  Officially

35

confirming the existence or nonexistence of these intelligence activities reasonably could be expected to harm U.S. national security, as such confirmation would provide valuable insight into the CIA's authorities, capabilities, and resources that our enemies could use to reduce the effectiveness of CIA's intelligence operations.

## D. Foreign Relations and Foreign Activities of the United States

57. A response other than a "no number, no list" response also would reveal information concerning U.S. foreign relations and foreign activities, the disclosure of which reasonably can be expected to harm the national security. As an initial matter, because CIA's operations are conducted overseas or otherwise concern foreign intelligence matters, they generally are U.S. "foreign" activities by definition. In this case, that means that information concerning the CIA's involvement in the deaths of Anwar al-Awlaki, Samir Khan, Abdulrahman al-Awlaki, if such information existed, would concern a potential foreign activity that would fall within section 1.4(d) of Executive Order 13526.

58. In carrying out its legally authorized intelligence activities, the CIA engages in activities which, if officially confirmed, reasonably could be expected to cause damage to U.S. relations with affected or interested nations. Although it is

36

generally known that the CIA conducts clandestine intelligence operations, identifying an interest in a particular matter or publicly disclosing a particular intelligence activity could cause the affected or interested foreign government to respond in ways that would damage U.S. national interests. An official acknowledgement that the CIA possesses the requested information could be construed by a foreign government, whether friend or foe, to mean that the CIA has operated within that country's borders or has undertaken certain intelligence operations against its residents. Such a perception could adversely affect U.S. foreign relations with that nation.

59. In this case, providing a categorization of the CIA's responsive records reasonably could be expected to cause damage to the national security by negatively impacting U.S. foreign relations. Any response by the CIA that could be seen as a confirmation of its alleged involvement in the deaths of Anwar al-Awlaki, Samir Khan, or Abdulrahman al-Awlaki, for example, could raise questions with other countries and their populaces about whether the CIA is operating clandestinely inside their borders, which in turn could cause those countries to respond in ways that would damage U.S. national interests. Additionally, the CIA typically cannot confirm or deny whether it has had any involvement in any particular foreign activity of the United States; to do so would provide terrorist organizations and

adversarial nations with information about the CIA's
intelligence activities and capabilities (or lack thereof, as
the case may be), in a particular location or region, thereby
diminishing the effectiveness of those activities in the future.

\*    \*    \*

60.   As discussed in Part III above, the CIA's "no number,
no list" response is supported not only by FOIA exemption
(b)(1), but also FOIA exemption (b)(3) (and in particular, the
National Security Act of 1947 and the CIA Act of 1949).  Neither
of those statutes requires a showing of damage; rather, they
merely require the withheld information to be an intelligence
source, intelligence method, or relate to a function of the CIA.
Immediately above I have described at length the specific
intelligence sources, methods, and functions of the CIA
implicated by the ACLU's FOIA request.  Accordingly, the CIA's
"no number, no list" response is independently supported by FOIA
exemption (b)(3), even if the Court believes that a different
response would not harm U.S. national security.

## V.   GLOMAR RESPONSE TO NEW YORK TIMES REQUESTS

61.   Although the CIA is not a defendant in the
consolidated case brought by the New York Times and its
reporters against DOJ, these requests implicate CIA equities for
the same reasons identified above, and therefore the CIA has
asked DOJ to issue a Glomar response on its behalf.  Both of the

38

New York Times requests seek OLC opinions examining the legality
of targeted lethal operations. The Savage request seeks such
OLC opinions as they pertain to the targeting of "a United
States citizens who is deemed a terrorist," whereas the Shane
request seeks such opinions concerning the targeting of "people
suspected of ties to Al Qaeda or other terrorist groups." In
addition, both requests make clear that they are seeking such
opinions as they relate to potential CIA operations, not just
those of the U.S. military; the Shane request specifically
identifies "the Central Intelligence Agency" in its request,
while the Savage request refers to operations by "intelligence
community assets," which would include the CIA. With one
extremely limited exception described below, the CIA has asked
DOJ to issue a Glomar response to these two requests to the
extent they seek OLC opinions about CIA operations. As
contrasted to a "no number, no list" response, this means that
DOJ did not search for and include opinions covered by this
Glomar response (if they existed) when it processed the requests
for the New York Times litigation, nor can it confirm or deny
the existence or nonexistence of such opinions in its response..

62. With one limited exception, the fact of the existence
or nonexistence of OLC opinions concerning targeted lethal
operations conducted by the CIA against terrorists, including
those who are U.S. citizens, is classified information that is

protected from disclosure by Executive Order 13526, the National Security Act, and the CIA Act. OLC opinions are a very unique type of document within the U.S. Government, and acknowledging the mere existence of an OLC opinion can reveal a great deal of information about the interests, priorities, and capabilities of the agencies that are the subjects of those opinions – information that is not revealed by acknowledging the existence of a non-descript record about the same topic. In this case, if it were revealed that responsive OLC opinions pertaining to CIA operations existed, it would tend to reveal that the CIA had the authority to directly participate in targeted lethal operations against terrorists generally, and that this authority may extend more specifically to terrorists who are U.S. citizens. Conversely, if OLC opinions did not exist on these subjects, it would tend to reveal that the CIA did not have these authorities. In either case, confirming the existence or nonexistence of these authorities would reveal information pertaining to CIA intelligence activities, methods, and functions, as well as the foreign activities of the United States.

63. The harm to national security that reasonably could be expected to result from disclosure of whether or not the CIA has the authority to be directly involved in lethal operations specifically against U.S. citizens who are terrorists was

described above. That rationale applies equally to the Savage
request, and therefore I refer the Court to that discussion.

64. The Shane request is broader in that it seeks OLC
opinions about the use of lethal force against not just U.S.
citizens but terrorists generally - namely, "people suspected of
ties to Al Qaeda or other terrorist groups." As with the Savage
request, the CIA has asked DOJ to issue a Glomar response to
this request to the extent it pertains to CIA operations, with
one limited exception. As the Court is well aware, on 1 May
2011, the United States conducted an operation that resulted in
the death of Usama Bin Laden ("UBL"), the leader of al-Qa'ida.
It has been officially acknowledged that the CIA participated in
and oversaw this historic operation. Thus, whether or not there
are any OLC opinions that specifically address the CIA's
involvement in the operation that resulted in UBL's death is not
classified, and the existence of such opinions is not covered by
DOJ's Glomar response (in fact, I understand that there are no
such opinions). What cannot be revealed, however, is whether or
not there are any additional OLC opinions addressing the CIA's
use of lethal force against terrorists outside the specific
context of the UBL operation. To do so would tend to reveal
whether or not the CIA has been granted the authority to
directly participate in lethal operations against members of al-
Qa'ida (or other terrorist groups) beyond UBL. This fact

41

remains classified, and therefore it is appropriate for DOJ to
refuse to confirm or deny the existence of any OLC opinions that
would reveal this fact under FOIA exemptions (b)(1) and (b)(3).

65.  With respect to both requests, it would greatly
benefit terrorist organizations such as al-Qa'ida to know with
certainty the intelligence activities in which the CIA has or
has not been specifically authorized to participate.  To reveal
such information would provide valuable insight into the CIA's
authorities, capabilities, and interests that our enemies could
use to reduce the effectiveness of the CIA's intelligence
operations.  This is particularly true with regard to whether or
not the CIA's intelligence activities against members of al-
Qa'ida and other terrorist groups (other than the UBL operation)
may involve the use of lethal force.  Hypothetically, if it was
revealed that the CIA possesses this authority, it would alert
terrorists to the possibility that they could be targeted by
such activities, which may allow them to take countermeasures to
avoid this possibility.  It would also reveal that the CIA had
been granted authorities against certain terrorists that go
beyond traditional intelligence-gathering activities, which
could lead to suspicion that the CIA was involved in other "non-
traditional" activities in addition to the use of lethal force -
such as, hypothetically, covert influence.  This in turn could
lead to the belief by other governments and their populaces,

42

rightly or wrongly, that the CIA was responsible for certain activities carried out within their countries, which could harm the foreign affairs of the United States and also reduce the effectiveness of future CIA operations. On the other hand, if it was officially confirmed that the CIA did not have this authority, it would allow terrorists to operate more freely and openly, knowing that they could not be targeted by the CIA. For these reasons, it is appropriate for DOJ to Glomar both of the New York Times requests to the extent they pertain to CIA operations.[7]

## VI. THE ABSENCE OF AUTHORIZED OFFICIAL DISCLOSURES

66. In its administrative appeal, the ACLU references a number of purported statements of current and former U.S. Government officials, news reports, and other publicly available information to support its argument that the CIA has officially disclosed the underlying facts being protected by its response to the FOIA request. I am also aware of more recent non-authoritative news reports on similar subjects, which the ACLU has cited in other pending litigation against the CIA. Separately, I am aware that various U.S. Government officials (including the Attorney General) have spoken publicly about the U.S. Government's legal analysis and related procedural

---

[7] For the same reasons, in the course of responding to the aspects of the ACLU request that seek legal analysis, DOJ likewise cannot reveal whether or not there are any responsive OLC opinions pertaining to CIA operations.

43

considerations applicable to the potential targeting of U.S. citizens for lethal force.

67. Contrary to the ACLU's suggestion, however, no authorized CIA or Executive Branch official has officially and publicly confirmed (or denied) whether the CIA had any involvement whatsoever in the deaths of Anwar al-Awlaki, Samir Khan, or Abdulrahman al-Awlaki. Nor has any such official officially and publicly confirmed or denied that the CIA possesses documents responsive to these specific aspects of the ACLU's FOIA request. Many of the referenced news reports, for example, largely amount to media speculation and conjecture by individuals who do not have the ability to make official and documented disclosures on behalf of the CIA. Indeed, many of the statements cited by the ACLU are either unsourced or come from former government officials or anonymous individuals. In addition to being unofficial, one also cannot assume that such anonymous, unsourced, or otherwise non-authoritative reports are accurate. Regardless, these statements do not constitute official disclosures on behalf of the CIA. If the CIA were precluded from issuing a Glomar response to FOIA requests as a result of such non-authoritative statements, then the U.S. Government's ability to protect classified information would be eviscerated, thereby causing significant and far reaching damage to the U.S. national security.

44

68. The same is true with respect to the broader
categories of the ACLU request about targeting U.S. citizens
generally, as well as the New York Times requests. I am unaware
of any official disclosures that would invalidate the CIA's
responses to these requests. In the case of the ACLU request, I
am unaware of any official disclosure that reveals the level of
interest the CIA has in the legality and related procedural
considerations applicable to the targeting of U.S. citizens for
lethal force or the underlying fact being protected by the CIA's
response - whether or not the CIA itself has the authority to be
directly involved in such activities. Nor am I aware of any
official disclosures as to the existence or non-existence of OLC
opinions on this topic, as sought by the New York Times
requests.

## VII. CONCLUSION

69. In this case, the number, nature, and categorization
of CIA records responsive to the ACLU request, and the existence
or nonexistence of OLC opinions responsive to the New York Times
requests (to the extent they pertain to CIA operations), are
properly classified facts and are so intricately intertwined
with intelligence activities, intelligence sources and methods,
and U.S. foreign relations and foreign activities that these
facts must remain classified. Accordingly, I have determined
the only appropriate response is for the CIA to withhold this

information under FOIA exemptions (b)(1).  Additionally, and
separately, responding in any other manner would reveal
intelligence sources and methods and core functions of the CIA.
This response is therefore independently supported by FOIA
exemption (b)(3).

I hereby declare under penalty of perjury that the
foregoing is true and correct.

Executed this 20th day of June, 2012.

John Bennett
Director, National Clandestine Service
Central Intelligence Agency