**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------X

American Civil Liberties Union and The
American Civil Liberties Union
Foundation

        Plaintiffs,

    -v-

U.S. Department of Justice, including its
component the Office of Legal Counsel,
U.S. Department of Defense, including its
component U.S. Special Operations
Command, and Central Intelligence
Agency

        Defendants.

------------------------------------------------X

12-cv-00794-CM

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS THE AMERICAN CIVIL
LIBERTIES UNION AND THE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

I.      Preliminary Statement................................................................................1

II.     Statement of Facts.....................................................................................3

III.    Argument ...................................................................................................7

        A.      Standard of Review on Summary Judgment....................................7

        B.      The Government's Glomar and No Number, No List Responses Are
                Unlawful Because It Has Officially Acknowledged the Information
                Plaintiffs Seek. .................................................................................9

                1.      Glomar and No Number, No List Responses Are Permitted Only In
                        Exceptional Circumstances.......................................................10

                2.      Agencies' Glomar and No Number, No List Responses Are
                        Unlawful When Information Has Been Officially and Specifically
                        Disclosed...................................................................................13

                3.      Government Officials Have Officially Acknowledged the
                        Existence of the Targeted Killing Program, the Legal Analysis
                        Supporting its Use Against U.S. Citizens, and the Killing of Anwar
                        al-Awlaki..................................................................................14

                4.      Other Senior Officials Have Acknowledged the Same Information. ........26

        C.      The Government's Search for Records Was Inadequate. ......................32

                1.      The CIA, DOD, and DOJ Have Not Sufficiently Described Their
                        Searches for Responsive Records. ...........................................33

                2.      DOJ Did Not Conduct An Adequate Search................................36

        D.      The Government's Glomar and No Number, No List Responses Pursuant
                to Exemptions 1, 3, and 5 Are Improper.............................................39

                1.      Targeted Killing of U.S. Citizens is Not an "Intelligence Source or
                        Method" Protected by Exemptions 1 or 3...................................39

                2.      The Glomar and No Number, No List Responses Are Not Justified
                        Under Exemption 1 Because Confirming the Existence of
                        Responsive Documents Could Not Reasonably Be Expected To
                        Result in Harm to National Security............................................42

                3.      The Legal Memoranda In the Possession of DOD, OLC and CIA
                        Are Not Subject to Exemption 5.................................................48

IV.     The Court Should Conduct Appropriate *In Camera* Review..............................................49

V.      Conclusion .................................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. U.S. Dep't of Def.*,
  389 F. Supp. 2d 547 (S.D.N.Y. 2005)...........................................................................11, 12, 40

*ACLU v. Office of the Dir. of Nat'l Intelligence*,
  No. 10 Civ. 4419, 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ...........................................49

*Adamowicz v. IRS*,
  672 F. Supp. 2d 454 (S.D.N.Y. 2009).....................................................................................32

*Al-Adahi v. Obama*,
  613 F.3d 1102 (D.C. Cir. 2010) .............................................................................................24

*Allen v. CIA*,
  636 F.2d 1287 (D.C. Cir. 1980) ...............................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................................7

*Arthur Andersen & Co. v. IRS*,
  679 F.2d 254 (D.C. Cir. 1982) ...............................................................................................39

*Bassiouni v. CIA*,
  392 F.3d 244 (7th Cir. 2004) .............................................................................10, 12, 13, 14

*Boyd v. U.S. Dep't of Justice*,
  475 F.3d 381 (D.C. Cir. 2007) ...............................................................................................13

*Campbell v. U.S. Dep't of Justice*,
  164 F.3d 20 (D.C. Cir. 1998) ...................................................................................................9

*Carney v. U.S. Dep't of Justice*,
  19 F.3d 807 (2d Cir. 1994)................................................................................................8, 32

*CIA v. Sims*,
  471 U.S. 159 (1985)..........................................................................................................40, 41

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) .........................................................................................13, 25

*Founding Church of Scientology of Wash., D.C. v. Nat'l Sec. Agency*,
  610 F.2d 824 (D.C. Cir. 1979) ...............................................................................................33

*Frugone v. CIA*,
   169 F.3d 772 (D.C. Cir. 1999) ........................................................................25

*Garcia v. U.S. Dep't of Justice*,
   181 F. Supp. 2d 356 (S.D.N.Y. 2002) ...........................................................32

*Gardels v. CIA*,
   689 F.2d 1100 (D.C. Cir. 1982) ....................................................................11

*Goldberg v. U.S. Dep't of State*,
   818 F.2d 71 (D.C. Cir. 1987) ..........................................................................9

*Ground Saucer Watch, Inc. v. CIA*,
   692 F.2d 770 (D.C. Cir. 1981) ......................................................................32

*Halperin v. CIA*,
   629 F.2d 144 (D.C. Cir. 1980) ......................................................................11

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ....................................................................39, 47

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
   116 F.3d 28 (2d Cir. 1997) ..............................................................................8

*Jarvik v. CIA*,
   741 F. Supp. 2d 106 (D.D.C. 2010) ..............................................................14

*Jefferson v. U.S. Dep't of Justice*,
   284 F.3d 172 (D.C. Cir. 2002) ......................................................................12

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ......................................................................................39

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   579 F. Supp. 2d 182 (D.D.C. 2008) ..............................................................12

*King v. U.S. Dep't of Justice*,
   830 F.2d 210 (D.C. Cir. 1987) ....................................................................8, 9

*Lamont v. U.S. Dep't of Justice*,
   475 F. Supp. 761 (S.D.N.Y. 1979) ................................................................43

*Larson v. U.S. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ........................................................................9

*Local 3, Int'l Brotherhood. of Elec. Workers v. NLRB*,
   845 F.2d 1177 (2d Cir. 1988) ........................................................................39

*Maynard v. CIA,*
    986 F.2d 547 (1st Cir. 1993) ...........................................................................40

*Military Audit Project v. Casey,*
    656 F.2d 724 (D.C. Cir. 1981) ........................................................................12

*Moore v. CIA,*
    666 F.3d 1330 (D.C. Cir. 2011) ......................................................................25

*Morley v. CIA,*
    508 F.3d 1108 (D.C. Cir. 2007) ......................................................................12

*Nat'l Ass'n of Home Builders v. Norton,*
    309 F.3d 26 (D.C. Cir. 2002) ............................................................................8

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ...........................................................................................8

*Navasky v. CIA,*
    499 F. Supp. 269 (S.D.N.Y. 1980) ..................................................................41

*Negley v. FBI,*
    658 F. Supp. 2d 50 (D.D.C. 2009) ...................................................................33

*Nova Cas. Co. v. Liberty Mut. Ins. Co.,*
    540 F. Supp. 2d 476 (S.D.N.Y. 2008) ...............................................................7

*Nuclear Control Inst. v. U.S. Nuclear Regulatory Comm'n,*
    563 F. Supp. 768 (D.D.C. 1983) ......................................................................13

*Oglesby v. U.S. Dep't of the Army,*
    920 F.2d 57 (D.C. Cir. 1990) ..........................................................................33

*Perlman v. U.S. Dep't of Justice,*
    312 F.3d 100 (2d Cir. 2002) ............................................................................39

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C. Cir. 1976) ............................................................10, 11, 40

*Phillippi v. CIA,*
    655 F.2d 1325 (D.C. Cir. 1981) ...............................................................11, 12

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n,*
    533 F.3d 810 (D.C. Cir. 2008) ..........................................................................8

*Public Citizen v. U.S. Dep't of State,*
    11 F.3d 198 (D.C. Cir. 1993) ..........................................................................25

*Roth v. U.S. Dep't of Justice*,
   642 F.3d 1161 (D.C. Cir. 2011) ........................................................................11, 12

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ..............................................................................32

*Salahi v. Obama*,
   625 F.3d 745 (D.C. Cir. 2010) ................................................................................24

*Subh v. CIA*,
   760 F. Supp. 2d 66 (D.D.C. 2011) ..........................................................................14

*U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ....................................................................................................39

*U.S. Dep't of Justice v. Tax Analysts*,
   492 U.S. 136 (1989) ............................................................................................8, 39

*Vaughn v. Rosen*,
   484 F.2d 820 (D.C. Cir. 1973) ................................................................................10

*Wash. Post v. U.S. Dep't of Defense*,
   766 F. Supp. 1 (D.D.C. 1991) ..........................................................................43, 44

*Watts v. Indiana*,
   338 U.S. 49 (1949) ..................................................................................................29

*Weissman v. CIA*,
   565 F.2d 692 (D.C. Cir. 1977) ................................................................................41

*Wilner v. Nat'l Sec. Agency*,
   592 F.3d 60 (2d Cir. 2009) ..............................................................10, 11, 43, 47

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ..........................................................................11, 13

**STATUTES**

5 U.S.C. § 552 ....................................................................................8, 39, 40, 42, 49

50 U.S.C. § 403-1 ......................................................................................................40

50 U.S.C. § 403g ........................................................................................................40

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ....................................................................................................7

Exec. Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ..............................40, 42, 46

Nat'l Defense Establishment: Hearings on S. 758 Before the S. Comm. on Armed Servs.,
  80th Cong. 497 (1947) ..........................................................................................................41

Republican Policy Committee Statement on Freedom of Information Legislation,
  S. 1160, 112 Cong. Rec. 13020 (1966), *reprinted in* Subcomm. on Admin. Practice,
  S. Comm. on the Judiciary, 93rd Cong., Freedom of Information Act Source Book:
  Legislative Materials, Cases, Articles, at 59 (1974) ..............................................................31

Statement of Rep. Donald Rumsfeld
  S. 1160, 112 Cong. Rec. 13020 (1966), *reprinted in* Subcomm. on Admin. Practice,
  S. Comm. on the Judiciary, 93rd Cong., Freedom of Information Act Source Book:
  Legislative Materials, Cases, Articles, at 70 (1974) ..............................................................31

# I.        Preliminary Statement

This case concerns a Freedom of Information Act ("FOIA") request for basic information about the most extreme authority our government can claim:  the authority to kill its own citizens without charge or trial.  The FOIA request also seeks information about the government's actual killings of three U.S. citizens in Yemen last year.  The government's claimed authority has generated immense public concern and debate, a debate that the President, members of his cabinet, and other senior officials have joined.  Top government officials have acknowledged that the government operates a targeted killing program.  Officials have confirmed both that the government claims the authority to target U.S. citizens and that it has actually targeted them. Top government lawyers have discussed the purported legal basis for the targeted killing program, the President has acknowledged the killing of a U.S. citizen in an American drone strike in Yemen last year, and former Central Intelligence Agency ("CIA") Director and current Secretary of Defense Leon Panetta has discussed both agencies' roles in targeting U.S. citizens.

Yet, in response to the FOIA request and to this Court, Defendants Department of Justice ("DOJ"), Department of Defense ("DOD"), and the CIA claim that they cannot even confirm or deny the existence of the CIA's targeted killing program, nor release any information about the DOD's program.  All agencies have gone so far as to deny the American public access to records setting out the government's purported legal basis for targeting American citizens for death.

Because of the government's official disclosures, the issues before this Court are clear-cut and this case requires only the straightforward application of well-settled law.  Senior officials have already acknowledged the very information at issue in this suit to the public and the press, and the government cannot therefore invoke the Glomar doctrine or the No Number, No List response to avoid its statutory obligation to release records.  There is no occasion for the Court to defer to the government's argument that harm would result from disclosing that the CIA

and the military have the authority to conduct and do in fact conduct targeted killings of U.S. citizens when top executive branch officials have already made those disclosures.  President Obama, for example, took credit for the killing of U.S. citizen Anwar al-Awlaki ("al-Awlaki")[1] within hours of his death, calling it a "tribute to our intelligence community," (Normand Dec., Ex. H), and further stated on the Tonight Show with Jay Leno that "we were able to remove [al-Awlaki] from the field."  (Wicker Dec., Ex. 5.)

As a legal matter, the government's acknowledgments dispose of its arguments in support of summary judgment.  But even if they did not, the Glomar and No Number, No List responses would be improper because the targeted killing of individuals is not an *intelligence* source or method.  The targeted killing program is concerned with *killing* of individuals, not with gathering intelligence, and therefore the government's concern that intelligence sources and methods will be revealed by its mere acknowledgment of the program is without force.  Of course, the targeted killing program might rely on undisclosed, and therefore protectable, intelligence sources and methods.  But those intelligence details can be protected on a document-by-document basis, and do not warrant the sweeping non-response the government offers here.

For these reasons, the Court should deny the government's motion for summary judgment, grant the American Civil Liberties Union's and The American Civil Liberties Union Foundation's (together, "the ACLU") cross-motion for partial summary judgment, and order the government to produce records responsive to the ACLU's request.

---

[1] Al-Awlaki's name is sometimes also transliterated as "al-Aulaqi."

## II.      Statement of Facts

The CIA and the military's Joint Special Operations Command ("JSOC") are actively engaged in a program of targeted killings using unmanned aerial vehicles—"drones"—and other means, in countries around the world, including Yemen.  Over the last three years, the frequency of these agencies' targeted killings has increased dramatically, and there has been a commensurate increase in public interest and debate over the legal and evidentiary basis for the executive branch's decisions to kill individuals, including U.S. citizens, without traditional due process protections.

In early 2010, the press began reporting that U.S. citizen al-Awlaki had been placed on "kill lists" maintained by the CIA and JSOC.[2]  On September 30, 2011, a joint CIA-JSOC drone strike killed al-Awlaki and another U.S. citizen, Samir Khan ("Khan") in Yemen.  Two weeks later, a U.S. drone strike elsewhere in Yemen killed Abdulrahman al-Awlaki, the 16-year-old son of al-Awlaki and a Denver native.[3]

Shortly after al-Awlaki's death, media reports described a 50-page legal memorandum prepared by the DOJ's Office of Legal Counsel ("OLC") containing the legal rationales for

---

[2] *See* Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/01/26/AR2010012604239.html; Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of Those CIA Is Allowed To Kill*, Wash. Post, Apr. 7, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/04/06/AR2010040604121.html.

[3] Lisa Daniel, *Panetta: Awlaki Airstrike Shows U.S.-Yemeni Cooperation*, American Forces Press Service, Sept. 30, 2011, http://www.defense.gov/news/newsarticle.aspx?id=65512; Tim Mak, *U.S. Calls Kin of American Al Qaeda*, Politico, Oct. 12, 2011, http://www.politico.com/news/stories/1011/65737.html; Peter Finn and Greg Miller, *Anwar al-Awlaki's Family Speaks Out Against His Son's Death in Airstrike*, Wash. Post., Oct. 17, 2011, http://www.washingtonpost.com/world/national-security/anwar-al-awlakis-family-speaks-out-against-his-sons-deaths/2011/10/17/gIQA8kFssL_story.html.

targeting al-Awlaki.[4]  The killings and the media descriptions of the OLC memorandum generated significant public debate and repeated calls for greater transparency about the government's legal justification and secretive process for authorizing and directing the extrajudicial killing of Americans.

In order to help the public better assess the wisdom and lawfulness of the targeted killing program and its use against American citizens, on October 19, 2011 the ACLU submitted a FOIA request ("Request") for records concerning the "legal authority and factual basis for the targeted killing" of al-Awlaki, Khan, and Abdulrahman al-Awlaki, as well as the evidence underlying the government's decision to target these individuals.  (Declaration of Colin Wicker,[5] Ex. 1.)[6]  The Request was submitted to the designated FOIA offices of the DOJ, DOD, and CIA, including the DOJ's Office of Information Policy ("OIP"), DOJ's component, the Office of Legal Counsel, and DOD's component, the United States Special Operations Command.  (Bies Dec., Ex. E.)

---

[4] Charlie Savage, *Secret U.S. Memo Made Legal Case to Kill a Citizen*, N. Y. Times, October 8, 2011, http://www.nytimes.com/2011/10/09/world/middleeast/secret-us-memo-made-legal-case-to-kill-a-citizen.htm.

[5] The ACLU submits the Declaration of Colin Wicker in Support of Its Motion for Partial Summary Judgment and Opposition to Defendants' Motion for Summary Judgment.  All other declarations referenced herein refer to declarations filed by Defendants in support of their Motion for Summary Judgment.

[6] The New York Times also submitted two FOIA requests to the OLC.  (Bies Dec., Exs. A, C.) One request sought legal memoranda and opinions addressing the legal status of the targeted killing of persons suspected of ties to al-Qaeda or other terrorist groups.  (Bies Dec., Ex. A.)  The other sought memoranda analyzing the circumstances in which it would be lawful for the U.S. armed forces or intelligence community to target for killing a U.S. citizen deemed to be a terrorist.  (Bies. Dec., Ex. C.)  The two New York Times requests are, therefore, narrower in scope than the ACLU's request and were both only addressed to the OLC.

DOD did not provide any substantive response to the ACLU's Request.  The OLC and the CIA initially provided a "Glomar response" by refusing to admit or deny the existence of responsive records. (Bies Dec., Ex. F; Bennett Dec., Ex. C.)  The ACLU appealed those determinations.  After the OLC and the CIA failed to respond timely to the appeals and the DOD failed to respond substantively at all, the ACLU filed this action.

By agreement of the parties and an order of the Court, the government's motion for summary judgment in response to the ACLU and *New York Times* lawsuits was originally due on April 13, 2012.  However, the government sought two month-long extensions of this deadline on the basis that "the Government's position is being deliberated at the highest level of the Executive Branch."  (Wicker Dec., Exs. 2-3, 24.)  Those deliberations did not result in any meaningful change to the government's position.

In its summary judgment motion filed on June 20, 2012, approximately eight months after the ACLU submitted its Request, the DOJ, CIA, and DOD produced the texts of two public speeches by senior government officials, a single set of talking points, and three limited indices describing only a small subset of the documents that are being withheld by the agencies.  (Bies Dec., Ex. I; Neller Dec., Exs. I, J; Hibbard Dec., Exs. C, E, F.)  The DOD admitted the existence of a responsive memorandum prepared by the OLC but has withheld the document on the basis that it is classified and privileged.  (Neller Dec., ¶¶ 17-18.)  The OLC and CIA asserted a Glomar response regarding the existence of an OLC-prepared memorandum.  (Gov't Mem. at 25-26.)  All agencies issued a "No Number, No List" response regarding remaining records, including evidentiary records related to the targeting and killing of al-Awlaki, Khan, and Abdulrahman al-Awlaki.  (Bies Dec., ¶ 38; Neller Dec., ¶¶ 25-26; Bennett Dec., ¶¶ 27-37; Hibbard Dec., ¶ 8.)  That is, the agencies admitted that there were responsive documents in their possession but

would not provide any information about the number or nature of those records, arguing that disclosure of this basic information would reveal whether the CIA and JSOC do conduct or have the authority to conduct targeted killings or were involved in the specific killings of al-Awlaki, Khan, and Abdulrahman al-Awlaki.  (Bennett Dec., ¶ 29; Neller Dec., ¶¶ 26–27.)

Both before and since the filing of this lawsuit, the President, the former head of the CIA and current Secretary of Defense Leon Panetta, and other officials from the CIA, DOD and DOJ have repeatedly publicly discussed the targeted killing program in general, the purported legal basis for targeting U.S. citizens in particular, the process by which citizens may be added to government kill lists, and facts surrounding the targeted killing of al-Awlaki.  (Wicker Dec., Exs. 4, 5, 12, 13, ¶ 25; Normand Dec., Ex. H.)[7]  During a January 30, 2012 online town-hall forum hosted by Google+ and YouTube, President Obama defended the targeted killing program's accuracy, legality, and strategic wisdom, described part of its geographic scope, and stated that targeted killing strikes "have not caused a huge number of civilian casualties."  (Wicker Dec.,

---

[7] Leon E. Panetta, Director's Remarks at the Pacific Council on International Policy (May 18, 2009), https://www.cia.gov/news-information/speeches-testimony/directors-remarks-at-pacific-council.html; Peter Finn & Joby Warrick, *CIA Director Says Secret Attacks in Pakistan Have Hobbled al-Qaeda*, Wash. Post, Mar. 18, 2010, http://wapo.st/ypsAAt; Siobhan Gorman & Jonathan Weisman, *Drone Kills Suspect in CIA Suicide Bombing*, Wall. St. J., Mar. 18, 2010, http://online.wsj.com/article/SB10001424052748704059004575128123449551524.html; *Jake Tapper Interviews CIA Director Leon Panetta*, ABC News, June 27, 2010, http://abcn.ws/xgWHFk; 60 Minutes, *The Killing of Anwar al-Awlaki*, CBS, Jan. 29, 2012, http://www.cbsnews.com/video/watch/?id=7396830n; *President Obama Hangs Out With America*, White House Blog, Jan. Jan. 30, 2012, http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america (relevant statements begin at minute 26:30 of video); Interview by Jay Leno with President Barack Obama, The Tonight Show, Oct. 25, 2011, http://www.washingtonpost.com/blogs/44/post/obama-on-tonight-show-with-jay-leno-full-video-and-transcript/2011/10/26/gIQAHXJjIM_blog.html; President Barack Obama, Remarks by the President at the "Change of Office" Chairman of the Joint Chiefs of Staff Ceremony (Sept. 30, 2011), http://1.usa.gov/o0mLpT.

¶ 26.)[8]  The President has also publicly acknowledged U.S. responsibility for the killing of al-Awlaki, saying it was "a tribute to our intelligence community" (Normand Dec., Ex. H.), and that "working with the Yemenis, we were able to remove him from the field."  (Wicker Dec., Ex. 5.)  Other high-ranking government officials have also discussed the targeted killing of al-Awlaki and the OLC memorandum providing the putative legal justification for the killing. (Wicker Dec., Exs. 15, 18, 22.)[9]  Most recently, White House Counterterrorism Advisor John Brennan publicly and specifically acknowledged that the United States uses drones for targeted killing, elaborated on the legal justification for targeted killing strikes, and acknowledged that innocent civilians had been injured or died in these strikes.  (Normand Dec., Ex. G.)

## III.    Argument

### A.    Standard of Review on Summary Judgment.

Summary judgment is only warranted when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether summary judgment is appropriate, all ambiguities and reasonable inferences are resolved against the moving party. *Nova Cas. Co. v. Liberty Mut. Ins. Co.*, 540 F. Supp. 2d 476, 481 (S.D.N.Y. 2008).  Thus, if

---

[8] *President Obama Hangs Out With America*, White House Blog, Jan. 30, 2012, http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america (relevant statements begin at minute 26:30 of video).

[9] Charlie Savage, *A Not-Quite Confirmation of a Memo Approving Killing*, N.Y. Times, Mar. 8, 2012,  http://www.nytimes.com/2012/03/09/us/a-not-quite-confirmation-of-a-memo-approving-killing.html; *Senate Appropriations Subcommittee on Commerce, Justice and Science, and Related Agencies Holds Hearing on the Proposed Fiscal 2013 Appropriations for the Justice Department*, March 8, 2012, as retrieved from the Congressional Quarterly website on July 13, 2012, http://www.cq.com/doc/congressionaltranscripts-4042882?print=true; Remarks by Secretary Panetta and Canadian Minister Mackay, U.S. Dep't of Defense News Transcript, Sept. 30, 2011, http://www.defense.gov/transcripts/transcript.aspx?transcriptid=4890.

there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-movant on a material issue of fact, summary judgment is improper.  *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'"  *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). "Accordingly, FOIA's exemptions are to be narrowly construed."  *Id.*

Under FOIA, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not agency records or have not been improperly withheld" pursuant to FOIA's nine enumerated exemptions. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) (internal quotations omitted).  Accordingly, a FOIA plaintiff is entitled to summary judgment where the agency fails to justify its withholdings.  *Id.* at 142; 5 U.S.C. § 552(a)(4)(B). In supporting its withholding decisions, the agency must provide "reasonably detailed explanations why any withheld documents fall within an exemption."  *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).  "The significance of agency affidavits in a FOIA case cannot be underestimated.  As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected."  *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987).  "Affidavits submitted by a governmental agency

in justification for its exemption claims must therefore strive to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation." *Id.* "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

The agency's burden—and the Court's obligation to conduct a *de novo* review to determine if that burden is met—applies with equal force in cases involving national security-related concerns. *See Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987) (even in the national-security context, courts must not "relinquish[] their independent responsibility" to review an agency's withholdings); *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) ("[D]eference is not equivalent to acquiescence . . . ."). "To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation under FOIA to conduct a *de novo* review.'" *King*, 830 F.2d at 219 (quoting *Allen v. CIA*, 636 F.2d 1287, 1293 (D.C. Cir. 1980)).

B.     **The Government's Glomar and No Number, No List Responses Are Unlawful Because It Has Officially Acknowledged the Information Plaintiffs Seek.**

The CIA and DOJ provided Glomar responses refusing to acknowledge the existence or non-existence of certain documents responsive to the ACLU's Request, including the OLC memo, and all agencies provided a No Number, No List response for other requested documents, including records regarding facts surrounding the addition of al-Awlaki to CIA and JSOC kill lists, and the killing of al-Awlaki, Khan, and Abdulrahman al-Awlaki.[10]

---

[10] The government has also provided three limited *Vaughn* indices, mostly identifying email conversations and draft documents over which the government makes a claim of privilege. (Bies

The sweeping Glomar responses from the CIA and OLC are unlawful because government officials have repeatedly officially acknowledged the targeted killing program and the strike on al-Awlaki.  Likewise, the categorical No Number, No List responses from all the responding agencies are unwarranted because of the government's official disclosures, including disclosures made in this litigation regarding the quantity of documents.  This Court should reject both the Glomar and No Number, No List responses and require each agency to process the ACLU's Request and produce a *Vaughn* index.

### 1.    Glomar and No Number, No List Responses Are Permitted Only In Exceptional Circumstances.

Normally, when responding to a FOIA request, the responding governmental agency searches for responsive records, releases non-exempt records, and then provides a detailed justification for any withholding of individual records.  *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).  In narrow circumstances, the government may refuse to confirm or deny the existence of responsive records: where a "FOIA exemption would itself preclude . . . *acknowledgment*" that the agency possesses or does not possess records.  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (emphasis in original).  Such a response is known as a Glomar response, after the Hughes Glomar Explorer, an oceanic research vessel at issue in the case that established the doctrine.  *Phillippi v. CIA* ("*Phillippi I*"), 546 F.2d 1009 (D.C. Cir. 1976).  In similarly narrow circumstances, the government may acknowledge that it possesses responsive records but refuse to provide a *Vaughn* index identifying, listing, or enumerating them if doing so would reveal information protected by a FOIA exemption.  This is known as a "No Number, No List" response.  *See Bassiouni v. CIA*, 392 F.3d 244 (7th Cir. 2004).

---

Dec., Ex. 1; Neller Dec., Ex. J; Hibbard Dec., Ex. F.)

As this Court has cautioned, "[t]he danger of Glomar responses is that they encourage an unfortunate tendency of government officials to over-classify information, frequently keeping secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods." *ACLU v. U.S. Dep't of Def.*, 389 F. Supp. 2d 547, 561 (S.D.N.Y. 2005). "Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)) (internal quotation marks and citation omitted); *see also Wilner*, 592 F.3d at 68. In analyzing a Glomar response, courts apply the same burden and standard of review applicable to traditional claims of exemption. *Wilner*, 592 F.3d at 68. Although courts typically accord "substantial weight" to government declarations in national security-related FOIA cases, that deference is due only when the government's affidavits "contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record . . . ." *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) (quoting *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980)).

Courts carefully scrutinize Glomar responses and do not hesitate to reject them when appropriate. In the first case that recognized the possibility of a Glomar response, the D.C. Circuit actually rejected the CIA's response and remanded the matter with instructions that the CIA substantiate its response with a detailed public declaration. *Phillippi I*, 546 F.2d at 1015. On remand, the CIA changed its position and produced records. *See Phillippi v. CIA* ("*Phillippi*

*II"*), 655 F.2d 1325, 1328 (D.C. Cir. 1981); *Military Audit Project v. Casey*, 656 F.2d 724, 734-35 & n.27 (D.C. Cir. 1981).  Similarly, in *Morley v. CIA*, the court held that the CIA had not explained why confirming the existence or non-existence of records regarding operations by a particular CIA officer would reveal intelligence sources and methods under Exemption 3 and remanded the matter with instructions that the CIA substantiate its response.  508 F.3d 1108, 1126 (D.C. Cir. 2007).

In other cases, courts have rejected Glomar responses as unsubstantiated by government affidavits and ordered the government to confirm or deny the existence of responsive records. *See Roth*, 642 F.3d at 1181 (rejecting government's justifications for Glomar response under law enforcement exemptions); *Jefferson v. U.S. Dep't of Justice*, 284 F.3d 172, 178-179 (D.C. Cir. 2002); *ACLU*, 389 F. Supp. 2d at 566 (rejecting CIA Glomar response as to one category of requested records because the fact of their existence was not properly classified); *Judicial Watch, Inc. v. U.S. Secret Serv.*, 579 F. Supp. 2d 182, 186 (D.D.C. 2008) (rejecting agency's Glomar response because its "argument that knowledge of the mere existence or absence of [records] poses a security risk does not hold water").

No Number, No List responses are used in those narrow circumstances where the "details that would appear in a *Vaughn* index" are protected by a FOIA exemption.  *Bassiouni*, 393 F.3d at 246.  Although the Second Circuit has not opined on the No Number, No List response, the Seventh Circuit has explained that a Glomar response and a No Number, No List response are "functionally identical" and has even suggested that the verbal distinction between the two types of responses "be eliminated, lest it confuse or mislead requesters and judges into thinking that something depends on the turn of phrase."  *Id.* at 247.  This is because, where an agency "concede[s] . . . that it ha[s] some responsive documents and [makes] what it calls a 'no number,

no list' response, [that] amounts to the same thing [as a Glomar response]: the requester gets no details."  *Id.* at 246.  A No Number, No List response must be justified on the record by the withholding agency to the same extent as a Glomar response and must be tethered to a relevant FOIA exemption.

**2.    Agencies' Glomar and No Number, No List Responses Are Unlawful When Information Has Been Officially and Specifically Disclosed.**

Courts have repeatedly held that a Glomar response is unlawful when the existence of the records sought has already been officially acknowledged.  *Boyd v. U.S. Dep't of Justice*, 475 F.3d 381, 389 (D.C. Cir. 2007) (rejecting agencies' Glomar responses as deficient because the agencies had already acknowledged the existence of records about the subjects of the plaintiffs' requests); *Wolf*, 473 F.3d at 378 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."); *Nuclear Control Inst. v. U.S. Nuclear Regulatory Comm'n*, 563 F. Supp. 768, 772 (D.D.C. 1983) (rejecting Glomar response because the existence of the requested document had already been acknowledged by the agency).  A FOIA requester challenging a withholding on the basis of official acknowledgment must satisfy three criteria:

> "First, the information requested must be as specific as the information previously released.  Second, the information requested must match the information previously disclosed . . . .   Third, . . . the information requested must already have been made public through an official and documented disclosure.

*Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)) (ellipses in original).

No Number, No List responses are also defeated if the government has officially acknowledged the existence or scope of responsive records, or has disclosed details about the subject of the request.  *See Bassiouni*, 392 F.3d at 246-47 (analyzing plaintiff's claim of official

-13-

acknowledgment and concluding that the government had not officially disclosed information concealed by its No Number, No List response).[11]

### 3. Government Officials Have Officially Acknowledged the Existence of the Targeted Killing Program, the Legal Analysis Supporting its Use Against U.S. Citizens, and the Killing of al-Awlaki.

The core information the government seeks to keep categorically secret in this litigation has already been confirmed publicly.  The OLC and CIA base their decision to invoke a Glomar response regarding an OLC memorandum or other records providing legal justification for targeting U.S. citizens in general and al-Awlaki in particular on the theory that disclosing the existence of the memorandum and other legal analyses would disclose whether the CIA has been granted the authority to be directly involved in targeted lethal operations against suspected terrorists, including U.S. citizens, and actually participates in such operations.  (Gov't Mem. at 27; Bennett Dec., ¶¶ 62, 64.)  The DOJ, CIA, and DOD have each invoked a No Number, No List response to deny the public information about, let alone access to, the lion's share of responsive records.  Each agency claims that disclosing any information about records held by the agency would reveal the existence of authority to target U.S. citizens or the depth of the agency's interest in a particular individual, or would "indicate that an entity of the U.S. Government was involved in the lethal targeting activities that are the subject of the [ACLU's]

---

[11] Indeed, No Number, No List responses have been invoked (and upheld) only when the government's disclosure of the quantity of records it holds will reveal what is actually a secret. *See, e.g., Bassiouni*, 392 F.3d 244 (government sought to withhold information about the depth of its interest in a DePaul Law School human rights professor); *Jarvik v. CIA*, 741 F. Supp. 2d 106 (D.D.C. 2010) (government sought to withhold information about the depth of its interest in violence that occurred in Andijan, Uzbekistan in May 2005); *Subh v. CIA*, 760 F. Supp. 2d 66 (D.D.C. 2011) (government sought to withhold information about the depth of its interest in an individual denied employment because of information in his FBI and CIA files).

request."[12]  (Hackett Dec., ¶ 24; *see also* Neller Dec., ¶ 26; Bennett Dec., ¶ 29.)  DOD justifies

its No Number, No List response on the basis that producing an index of withheld records could

"suggest that DoD had information about particular operations, events or individuals."  (Neller

Dec., ¶ 26.)  The CIA, likewise, asserts that producing an index would disclose whether the

agency has authority to target U.S. citizens (or participate in operations that do so), and whether

it was involved in events leading to al-Awlaki's, Khan's, and Abdulrahman al-Awlaki's deaths.

(Bennett Dec., ¶ 29.)  DOJ asserts its No Number, No List response on the basis that producing

an index would reveal "that an entity of the U.S. Government was involved in the lethal targeting

activities that are the subject of the request" or that the CIA had contemplated or carried out

lethal "operations against U.S. citizens."  (Hackett Dec., ¶¶ 23–24.)  These explanations fail

because the government has specifically and officially acknowledged that the CIA and DOD

have been granted authority to conduct targeted killings, including of U.S. citizens, that they

carry out targeted killings, and that they have targeted and killed U.S. citizen al-Awlaki.  These

acknowledgments defeat the government's ability to maintain its Glomar and No Number, No

List responses.

---

[12] To the extent the government claims that revealing the *number* of responsive records would
reveal new information, the government has already acknowledged in *this* litigation that there are
a large number of responsive documents.  When the government sought its initial extension to
the summary judgment filing deadline on April 9, 2012, it claimed that it was still processing
ACLU's request and that the agencies were still reviewing responsive documents, "many" of
which it claimed were classified.  (Wicker Dec., Ex. 2.)  Thus, in this litigation the government
simultaneously claims both (1) it has so many responsive documents, many of which are
classified, that it was unable to respond to the ACLU's FOIA request after more than five
months even though it was actively engaged in reviewing and processing documents, and (2) any
information regarding the quantity of classified documents in its possession would endanger
national security were it released publicly.  Having revealed that there are a large quantity of
responsive documents, the government cannot now pretend that that fact should be concealed.

Acknowledgments of the CIA's operational role in the targeted killing program began early in the Obama administration and have continued to the present. On May 18, 2009, then-CIA Director Leon Panetta was asked about targeted killing strikes in Pakistan during an appearance at the Pacific Council on International Policy. (Wicker Dec., Ex. 4.) Mr. Panetta responded:

> On the first issue, obviously because these are covert and secret *operations* I can't go into particulars. I think it does suffice to say that these *operations* have been very effective because they have been very precise in terms of the *targeting* and it involved a minimum of *collateral damage*. I know that some of the—sometimes criticisms kind of sweep into other areas from either plane attacks or attacks from F16s and others that go into these areas, which do involve a tremendous amount of collateral damage. And sometimes I've found in discussing this that all of this is kind of mixed together. But I can assure you that in terms of that particular area, it is very precise and it is limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.

(Wicker Dec., Ex. 4.) (emphasis added). There is no doubt that Mr. Panetta's answer here relates to the targeted killing program because Mr. Panetta was directly responding to a question about targeted killing strikes. Nor is there any doubt that Mr. Panetta was discussing targeted killings by the CIA rather than the DOD: At the time of the discussion, Mr. Panetta was the Director of the CIA. The government cannot argue in this litigation that the precise nature of the CIA's authority and role remains a secret when the Agency's then-Director told the public that the CIA is conducting "operations" that involve "targeting" and have resulted in "collateral damage."

Mr. Panetta continued to acknowledge the CIA's targeted killing authority and operational role throughout his tenure as CIA Director. In an interview with the Washington Post in March 2010, he described the targeted killing strikes in Pakistan as "the most aggressive operation that CIA has been involved in in our history," saying that "[t]hose operations are seriously disrupting al-Qaida" and that "we really do have them on the run." (Wicker Dec., Ex. 10.) Mr. Panetta has even gone so far as to acknowledge the targeted killing of particular

individuals.  When asked about the March 8, 2010 killing of Hussein al-Yemeni in a "drone strike," in Pakistan, Mr. Panetta commented that "We now believe that al-Yemeni, who was one of the top 20 [al Qaeda leaders], was one of those who was hit."  (Wicker Dec., Ex. 11.)  He elaborated, stating:  "Anytime we get a high value target that is in the top leadership of al Qaeda, it seriously disrupts their operations."  *Id.*  In June of 2010, Mr. Panetta discussed that same targeted killing strike in Pakistan during an interview with ABC News, stating:

> [T]he more we continue to disrupt Al Qaida's operations, and we are engaged in the most aggressive operations in the history of the CIA in that part of the world, and the result is that we are disrupting their leadership.  We've taken down more than half of their Taliban leadership, of their Al Qaida leadership.  We just took down number three in their leadership a few weeks ago.

(Wicker Dec., Ex. 12.)[13]

Mr. Panetta's acknowledgments of the CIA targeted killing program do not stand alone. President Obama, too, has acknowledged the program. On January 30, 2012, the President took questions on a live internet video forum organized by the social media site Google+ and the internet video forum YouTube. The President acknowledged that the United States carries out targeted killings in Pakistan and made representations about the number of civilian casualties caused by targeted killing strikes and the quality of oversight of the program.  (Wicker Dec., ¶ 26, Ex. 16.)

Two participants in the event asked questions about targeted killing drone strikes.  The President responded to the first question by stating:

---

[13] After he had become the Secretary of Defense, Mr. Panetta continued to reference the CIA's targeted killing program.  In a speech at the Allied Joint Force Command Headquarters in Sigonella, Italy, he said:  "Having moved from the CIA to the Pentagon, obviously I have a hell of a lot more weapons available to me in this job than I had in the CIA, although Predators aren't bad."  (Wicker Dec., Ex. 6.)  Later that same day, when speaking to troops at Naval Air Station in Sicily, Mr. Panetta noted that the operations in Libya had involved "the use of Predators, which is something I was very familiar with in my past job."  (Wicker Dec., Ex. 8.)  Predator drones are used by the CIA to conduct targeted killings.

I want to make sure that people understand actually drones have not caused a huge number of civilian casualties. For the most part, they have been very precise precision strikes against al Qaeda and their affiliates. . . . This is a targeted, focused effort at people who are on a list of active terrorists who are trying to go in and harm Americans, hit American facilities, American bases, and so on. It is important for everybody to understand that this thing is kept on a very tight leash. It's not a bunch of folks in a room somewhere just making decisions. And it is also part and parcel of our overall authority when it comes to battling al Qaeda.

He responded to the second question with similar detail about the targeted killing program:

Well, I think that we have to be judicious in how we use drones. But understand that probably our ability to respect the sovereignty of other countries and to limit our incursions into somebody else's territory is enhanced by the fact that we are able to pinpoint-strike an al Qaeda operative in a place where the capacities of that military in that country may not be able to get them. So obviously a lot of these strikes have been in the [Federally Administered Tribal Areas of Pakistan], and going after al Qaeda suspects who are up in very tough terrain along the border between Afghanistan and Pakistan.

*Id.* (emphasis added).

The President's statements were a clear acknowledgment not simply of the government's targeted killing program, but of the CIA's targeted killing program in particular, because the government has made clear that the DOD does not conduct targeted killing drone strikes in Pakistan.[14] The President's statements also acknowledged that the CIA conducts targeted killings of people placed on kill lists, that it places on those kill lists suspected members of al Qaeda, and that the CIA has an internal process for authorizing and overseeing the addition of names to kill lists as well as the orders that those individuals be killed. *Id.*

Moreover, Mr. Panetta has publicly acknowledged the CIA's and DOD's role in targeting and killing al-Awlaki. In the context of a discussion about targeted killing, Mr. Panetta stated in

---

[14] *See 'US Drone' Hits Pakistan Funeral*, Al Jazeera, June 24, 2009, http://aje.me/yKZJWO ("Questioned about the reported attacks, a US defense department official said: 'There are no US military strike operations being conducted in Pakistan.'"); *see also* Karen DeYoung, *U.S. Launches Airstrike Against al-Qaeda Affiliate in Yemen*, Wash. Post, Jan. 31, 2012, http://wapo.st/zSgzxq ("Unlike in Pakistan, where the CIA has had sole responsibility for hundreds of drone strikes against alleged insurgent safe havens in the tribal regions along the Afghan border, both the CIA and the military have participated in the Yemen strikes.").

March 2010 (before the U.S. government killed al-Awlaki) that al-Awlaki is "someone that

we're looking for" and that "there isn't any question that he's one of the individuals that we're

focusing on." (Wicker Dec., Ex. 21.)[15] Mr. Panetta was at that time the Director of the CIA, and

so his use of the first-person plural unambiguously refers to the CIA.[16]

On September 30, 2011, the day al-Awlaki was killed, the Armed Forces Press Service, a

component of the DOD, stated in an item published on the DOD website that, "[a] U.S. air strike

that killed Yemeni-based terrorist Anwar al-Awlaki early this morning is a testament to the close

cooperation between the United States and Yemen, Defense Secretary Leon E. Panetta said

today." (Wicker Dec., Ex. 14.)[17] The Armed Forces Press Service story referenced remarks

given earlier that day by Mr. Panetta during an appearance with Canadian Defense Minister Peter

MacKay. CNN's Barbara Starr asked Mr. Panetta "about the role of the U.S. military in tracking

and killing Anwar al-Awlaki." (Wicker Dec., Ex. 22.) He responded:

> Well, this has been a bad year for terrorists. You know, we—we just have seen a
> major blow—another major blow to al-Qaida, someone who was truly an
> operational arm of al-Qaida in this node of Yemen. And, you know, we had
> always had tremendous concern that after getting bin Laden, that someone like
> Awlaki was a primary target because of his continuing efforts to plan attacks
> against the United States . . . .

---

[15] Keith Johnson, *U.S. Seeks Cleric Backing Jihad*, Wall St. J., Mar. 26, 2010,
http://on.wsj.com/b6kbP3.

[16] The government's interest in al-Awlaki (as well as in Khan) and its belief that they were
associated with a terrorist organization has been reiterated since their deaths. On February 10,
2012, for example, the DOJ released additional information about al-Awlaki and Khan in a
sentencing memorandum it filed in *United States v. Umar Farouk Abdulmutallab*. Gov't
Sentencing Mem., *United States v. Abdulmutallab*, No. 2:10-cr-20005 (E.D. Mich. Feb. 10,
2012) (Wicker Dec., Ex. 9.) The government alleged that Abdulmutallab (the defendant in that
matter, who had pleaded guilty to attempting to detonate a bomb on a U.S.-bound airliner on
December 25, 2009), was instructed and enabled by al-Awlaki to carry out the terrorist attack.
*Id.* at 13. According to the same memorandum, Abdulmutallab met Khan in Yemen. *Id.*

[17] Lisa Daniel, *Panetta: Awlaki Airstrike shows U.S. – Yemeni Cooperation*, American Forces
Press Service, Sept. 30, 2011, http://www.defense.gov/news/newsarticle.aspx?id=65512.

> As far as the operational elements here, I'm not going to speak to those except to
> say that we've been working with the Yemenis over a long period of time to be
> able to target Awlaki, and I want to congratulate them on their efforts, their
> intelligence assistance, their operational assistance to get this job done.

(Wicker Dec., Ex. 22.)  Mr. Panetta thus confirmed that al-Awlaki was a "primary target" of the

United States, and that he was killed in a U.S. strike with the "assistance" of the Yemeni

government.  Mr. Panetta's position as Secretary of Defense makes clear that he was confirming

DOD's role in targeting al-Awlaki.

Speaking the same day, President Obama also addressed the al-Awlaki killing.  The

President characterized the killing of al-Awlaki as a "significant milestone" and "a tribute to our

intelligence community."  (Normand Dec., Ex. H.)  On October 25, 2011, the President again

discussed al-Awlaki, this time on *The Tonight Show With Jay Leno.*  The President said that al-

Awlaki "was probably the most important al Qaeda threat that was out there after bin Laden was

taken out, and it was important that, working with the Yemenis, **we were able to remove him

from the field**."  (Wicker Dec., Ex. 5.) (emphasis added).  The government claims that the

President has not acknowledged U.S. responsibility for al-Awlaki's death, (Gov't Mem. at 32),

but the contention is absurd.  How could his death be a tribute to the U.S. intelligence

community if that community was not in some way responsible?  Why would the President say

"we were able to remove him from the field" if the United States had no responsiblity?  Why did

Mr. Panetta thank Yemen for its "operational assistance" if the United States had not taken at

least a substantial role?

In January 2012, Mr. Panetta discussed al-Awlaki's killing and the legal basis for it in an

interview broadcast on CBS's *60 Minutes.*  (Wicker Dec., ¶ 14.)[18]  The interviewer, Scott Pelley,

---

[18] The Killing of Anwar al-Awlaki, CBS News, Jan. 29, 2012,
http://www.cbsnews.com/video/watch/?id=7396830n.

said to Mr. Panetta, "You killed al-Awlaki," and Mr. Panetta responded by nodding

affirmatively.  *Id.*  Mr. Pelley then asked Mr. Panetta about the legal authority to kill U.S.

citizens suspected of being terrorists.  Mr. Panetta and Mr. Pelley had the following exchange

regarding the decision to kill a U.S. citizen:

> Mr. Pelley:  So it's the requirement of the administration under the current legal
> understanding that the President has to make that declaration?
>
> Mr. Panetta:  That is correct.
>
> Mr. Pelley:  Not you?
>
> Mr. Panetta:  That's correct.
>
> Mr. Pelley:  Only the President can decide?
>
> Mr. Panetta:  Well, it's a recommendation we make, it's a recommendation the
> CIA director makes in my prior role, but in the end when it comes to going after
> someone like that, the President of the United States has to sign off.

*Id.*  The most plausible, indeed the only way to interpret this exchange is as an acknowledgment

that the United States, including DOD, killed al-Awlaki, and that both DOD and CIA are

empowered to, and do in fact, carry out targeted killings of U.S. citizens.

The President and Mr. Panetta are not the only high-ranking officials who have disclosed

the existence of the CIA and DOD targeted killing programs or the OLC memorandum and other

documents providing legal rationales for the targeted killing of U.S. citizens in general and of al-

Awlaki in particular.  Attorney General Eric Holder, appearing before the Senate Judiciary

Committee in March 2012, was asked by Senator Patrick Leahy about the release of the OLC

memorandum.  (Wicker Dec., Ex. 15.)  Senator Leahy observed that the memorandum's release

was "a matter of some debate within the administration."  The Attorney General responded, "that

would be true," thereby acknowledging the existence of that memo.  A month later, during a

House Judiciary Committee hearing, Congressman Jerrold Nadler asked Mr. Holder whether he

would provide a copy of the OLC memorandum to the Committee.  Far from refusing to confirm

or deny the existence of the memo, the Attorney General responded that he would "certainly look at that request."  (Wicker Dec., Ex. 20.)[19]

Senior officials in DOJ, DOD, CIA, and elsewhere in the Executive Branch have also acknowledged both that those agencies believe they have legal authority to target U.S. citizens, and that they have conducted legal analyses leading to that conclusion.  On March 5, 2012, Attorney General Holder delivered remarks at Northwestern University Law School outlining the purported legal authority to target U.S. citizens for killing.  (Hibbard Dec., Ex. E.)[20]  The Attorney General stated that legal precedent dictates that "United States citizenship alone does not make such individuals immune from being targeted.  But it does mean that the government must take into account all relevant constitutional considerations with respect to United States citizens."  *Id.*  He discussed the government's view of Due Process Clause constraints on the power to target a U.S. citizen who is believed to be a "leader of al Qaeda or associated forces": "First, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles."  *Id.*

Jeh Johnson, the General Counsel of the Department of Defense, also discussed the government's legal rationale for targeted killings in a speech given on February 22, 2012 at Yale Law School.  (Neller Dec., Ex. I.)  Mr. Johnson defended the legality of targeted killing, and opined that the use of lethal force against "known, individual members of the enemy is a long-

---

[19] Transcript of House Judiciary Committee Hearing on Oversight of the Justice Dep't,  June 7, 2012, http://www.cq.com/doc/congressionaltranscripts-4101328?print=true.

[20] Attorney General Eric Holder, Attorney General Eric Holder Speaks at Northwestern University School of Law (Mar. 5, 2012), http://1.usa.gov/y8SorL.

standing and long-legal practice." *Id.*  Mr. Johnson stated that "belligerents who also happen to be U.S. citizens do not enjoy immunity where non-citizen belligerents are valid military objectives," and further opined that targeting decisions are appropriately made by the executive branch. *Id.*  He also confirmed that agencies' targeted killing operations were based on executive branch legal analysis:  "within the Executive Branch the views and opinions of the lawyers on the President's national security team are debated and heavily scrutinized, and a legal review of the application of lethal force is the weightiest judgment a lawyer can make." *Id.*

On April 10, 2012, Stephen W. Preston, the CIA's General Counsel, discussed the purported justification for a targeted killing program.  (Wicker Dec., Ex. 7.)  In a speech given at Harvard Law School, Mr. Preston discussed a "hypothetical case" involving a program in which the CIA is directed to engage in covert action involving the use of force, including lethal force. *Id.*  He explained how such a program would be structured and noted that the CIA and the National Security Council may, when warranted by circumstances, refer a legal issue to DOJ or solicit input from colleagues at the State Department, DOD, or the Office of the Director of National Intelligence. *Id.*

John Brennan, the Assistant to the President for Homeland Security and Counterterrorism, has also spoken at length about the legal basis for the targeted killing program, including relevant considerations "[w]hen that person [targeted] is a U.S. citizen." (Normand Dec., Ex. E.)  State Department Legal Advisor Harold Koh has similarly outlined the administration's legal rationales for targeted killing.  (Wicker Dec., Exs. 19, 23.)[21]

---

[21] Legal Advisor, U.S. Dep't of State Harold Hongju Koh, Speech at Annual Meeting of the American Society of International Law (Mar. 25, 2010), http://www.state.gov/s/l/releases/remarks/139119.htm.  Director of National Intelligence James Clapper has made clear that Mr. Koh's statements about the government's claimed legal

Thus, the President and officials at all three defendant agencies have acknowledged the targeted killing program and the supposed legal basis for that program, including its application to U.S. citizens.  The Attorney General even acknowledged the existence of the OLC memorandum itself.

Each of the statements cited above is sufficient individually to establish official acknowledgment of one or more of:  the existence of the CIA and JSOC targeted killing programs, the government's articulation of its legal authority to kill U.S. citizens, and the targeted killing of al-Awlaki.  But even if these statements were insufficient individually, when considered collectively they make clear that the government has officially acknowledged the information at issue in the Request.  *Cf. Salahi v. Obama*, 625 F.3d 745, 753 (D.C. Cir. 2010) ("Merely because a particular piece of evidence is insufficient, standing alone, to prove a particular point does not mean that the evidence 'may be tossed aside and the next [piece of evidence] may be evaluated as if the first did not exist.' The evidence must be considered in its entirety in determining whether the government has satisfied its burden of proof.") (quoting *Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) (alteration in original)).  The volume of interlocking acknowledgments distinguishes this case from the other cases in which "official acknowledgment" has been at issue.  "Official acknowledgment" cases, in both the Glomar/No Number, No List and traditional FOIA contexts, have generally involved an assessment of small numbers of statements reasonably susceptible to diverse interpretations, often made by officials with no connection to the relevant agency.  Earlier cases have not involved a veritable avalanche of clear and consistent acknowledgments accumulating over the course of many months.

---

authority to conduct targeted killings apply equally to the nation's intelligence agencies as to the military.  *Senate Select Intelligence Committee Holds Hearing on Worldwide Threats*, http://www.dia.mil/public-affairs/testimonies/2012-01-31.html.

In *Moore v. C.I.A.*, for example, the plaintiff sought historical records from the CIA and FBI about a particular person.  666 F.3d 1330 (D.C. Cir. 2011).  The FBI released a partially redacted report and the CIA provided a Glomar response.  *Id.* at 1331-32.  In its declaration submitted to the district court, the CIA stated that it had asked the FBI to withhold certain of the redacted sections of the report, but it did not reveal the subject matter of those redacted sections.  *Id.* at 1332.  The plaintiff argued that the CIA's declaration alone constituted an official acknowledgment that it possessed information responsive to the request.  Unsurprisingly, the court held that the CIA's solitary statement lacked the requisite specificity because there was no indication that the information redacted at the CIA's behest even related to the relevant person.  *Id.* at 1334.

In *Frugone v. CIA*, the plaintiff sought CIA records about his own employment with the agency, which the CIA refused to confirm or deny existed.  169 F.3d 772, 773 (D.C. Cir. 1999).  The Plaintiff identified several letters from the Office of Personnel Management that referred to the CIA, but no statements from the CIA itself.  *Id.*  The court upheld the agency's Glomar response on the basis that only the CIA, and not another government agency, could officially acknowledge information in its control.  *Id.* at 774.  The lack of *any* CIA statement doomed the claim.[22]

––––––––––––––––––––

[22] Non-Glomar cases discussing official disclosures are in accord.  In *Fitzgibbon v. CIA*, for example, the plaintiff pointed to a single congressional committee report as containing an official disclosure of information subject to the request. 911 F.2d at 765.  The court upheld the agency's withholding on the basis that Congress could not officially acknowledge information on behalf of an executive agency.  *Id.* at 766.  In *Public Citizen v. U.S. Dep't of State*, the plaintiff identified two congressional hearings at which an agency official had testified, but then conceded that the testimony neither was "as specific as" the requested documents, nor "matche[d]" the information in the documents.  11 F.3d 198, 200, 203 (D.C. Cir. 1993).

Unlike these earlier cases, which involved minimal and ambiguous statements, often made by officials outside the relevant agency or even outside the executive branch, this case involves many statements, proudly made in the course of scores of interviews and speeches, by the President and the relevant agency head.  Each disclosure is sufficient, on its own, to invalidate a Glomar or No Number, No List response, and the combination of them equates to an even more powerful disclosure.

It is not possible to read this collection of statements and come to any conclusion except that the CIA and JSOC have targeted killing programs, that they have conducted legal analyses and concluded that they have authority to target U.S. citizens, that they have targeted and killed at least one citizen, and that they have specifically and officially acknowledged as much.

### 4.    Other Senior Officials Have Acknowledged the Same Information.

The above statements establish that government officials have provided specific, documented, and official acknowledgments, on the record, that overcome Defendants' Glomar and No Number, No List responses.  That the information at issue in this case has been acknowledged is further underlined by the many statements about the targeted killing program made, anonymously or not for attribution, by officials other than those quoted above.  For example, former CIA Acting General Counsel John A. Rizzo,[23] former Director of Intelligence Dennis Blair,[24] and White House counterterrorism advisor John Brennan[25] have each

---

[23] Tara McKelvey, *Inside the Killing Machine*, Newsweek, Feb. 13, 2011, http://www.thedailybeast.com/newsweek/2011/02/13/inside-the-killing-machine.html ("'It's basically a hit list,' he said. Then he pointed a finger at my forehead and pretended to pull a trigger.  'The Predator is the weapon of choice, but it could also be someone putting a bullet in your head.'")

[24] Josh Gerstein, *Ex-DNI Dennis Blair: Get CIA Out of Long-Term Drone Campaigns*, Politico, Nov. 30, 2011, http://politi.co/rp90Cm ("Former Director of National Intelligence Dennis Blair, who previously proposed scaling back the armed drone operation run in Pakistan by the Central

acknowledged the existence of the CIA's targeted killing program.  Dozens of news articles have

quoted current CIA officials, former intelligence officials, senior administration officials, and

other "officials" discussing the CIA targeted killing program on the condition that they not be

identified by name.[26]  Officials have also specifically acknowledged that the CIA and JSOC

---

Intelligence Agency, is now urging that program be publicly acknowledged and placed in the
hands of the U.S. military."); Josh Gerstein, *Dennis Blair Rips Obama White House*, Politico,
July 29, 2011, http://politi.co/qtu6zn ("Blair . . . said the administration should curtail U.S.-led
drone strikes on suspected terrorists in Pakistan, Yemen and Somalia . . . .").

[25] Ken Dilanian, *U.S. Counter-Terrorism Strategy to Rely on Surgical Strikes, Unmanned
Drones*, L.A. Times, June 29, 2011, http://lat.ms/qYd6Ot; see also Greg Miller, *Brennan Speech
Is First Obama Acknowledgment of Use of Armed Drones*, Washington Post, Apr. 30, 2012,
http://www.washingtonpost.com/world/national-security/brennan-speech-is-first-obama-
acknowledgement-of-use-of-armed-drones/2012/04/30/gIQAq7B4rT_story.html.

[26] *See e.g.,* Munir Ahmed, *Pakistan Drone Strike Kills 9 Suspected Militants*, Huffington Post,
July 6, 2012, http://www.huffingtonpost.com/2012/07/06/pakistan-drone-
strike_n_1654571.html; Adam Entous, Siobhan Gorman, and Julian E. Barnes, *New Drone Rules
Give CIA and Military More Leeway to Fight Al Qaeda in Yemen*, Wall St. J., Apr. 26, 2012,
http://online.wsj.com/article/SB10001424052702304723304577366251852418174.html ("The
Obama administration has given the Central Intelligence Agency and U.S. military greater
leeway to target suspected al Qaeda militants in Yemen with drones, responding to worries a new
haven is being established from which to mount attacks on the West. The policy shift, as
described by senior U.S. officials, includes targeting fighters whose names aren't known but who
are deemed to be high-value terrorism targets or threats to the U.S."); Greg Miller, *CIA Seeks
New Authority to Expand Yemen Drone Campaign*, Wash. Post, Apr. 18, 2012,
http://www.washingtonpost.com/world/national-security/cia-seeks-new-authority-to-expand-
yemen-drone-campaign/2012/04/18/gIQAsaumRT_story.html; Karen DeYoung, *Secrecy Defines
Obama's Drone War*, Wash. Post, Dec. 19, 2011,
ttp://www.washingtonpost.com/world/national-security/secrecy-defines-obamas-drone-
war/2011/10/28/gIQAPKNR5O_story.html ("'Everybody knows we're using drones,' said a
senior U.S. official familiar with the program . . . ."); Adam Entous, Siobhan Gorman & Julian
E. Barnes, *U.S. Tightens Drone Rules*, Wall St. J., Nov. 4, 2011,
http://online.wsj.com/article/SB10001424052970204621904577013982672973836.html ("The
[White House] review ultimately affirmed support for the underlying CIA [targeted killing]
program. But a senior official said: 'The bar has been raised. Inside CIA, there is a recognition
you need to be damn sure it's worth it.'");  Peter Finn, *Secret US Memo Sanctioned Killing of
Aulaqi*, Wash. Post, Sept. 30, 2011, http://www.washingtonpost.com/world/national-
security/aulaqi-killing-reignites-debate-on-limits-of-executive-
power/2011/09/30/gIQAx1bUAL_story.html ("The operation to kill Aulaqi involved CIA and
military assets under CIA control. A former senior intelligence official said that the CIA would

placed al-Awlaki on kill lists and then killed him in a joint operation, and that they killed Khan

and Abdulrahman in targeted killing strikes as well.[27]  The *New York Times* has gone so far as to

---

not have killed an American without such a written opinion."); Greg Miller and Julie Tate, *CIA Shifts Focus to Killing Targets*, Wash. Post, Sept. 1, 2011, http://www.washingtonpost.com/world/national-security/cia-shifts-focus-to-killing-targets/2011/08/30/gIQA7MZGvJ_story.html ("CIA officials insist that drone strikes are among the least common outcomes in its counterterrorism campaign. 'Of all the intelligence work on counterterrorism, only a sliver goes into Predator operations,' a senior U.S. official said."); Greg Miller, *CIA Sees Increased Threat in Yemen*, Wash. Post, Aug. 25, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/08/24/AR2010082406763.html ("The sober new assessment of al-Qaeda's affiliate in Yemen has helped prompt senior Obama administration officials to call for an escalation of U.S. operations there - including a proposal to add armed CIA drones to a clandestine campaign of U.S. military strikes, the officials said. 'We are looking to draw on all of the capabilities at our disposal,' said a senior Obama administration official, who described plans for 'a ramp-up over a period of months.'"); David S. Cloud, *CIA Drones Have Broader List of Targets*, L.A. Times, May 5, 2010, http://articles.latimes.com/2010/may/05/world/la-fg-drone-targets-20100506 ("As a matter of policy, CIA officials refuse to comment on the covert drone program. Those who are willing to discuss it on condition of anonymity refuse to describe in detail the standards of evidence they use for drone strikes, saying only that strict procedures are in place to ensure that militants are being targeted."); Peter Finn & Joby Warrick, *Under Panetta, A More Aggressive CIA*, Wash. Post, Mar. 21, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/03/20/AR2010032003343.html ("[CIA Director] Panetta authorizes every strike, sometimes reversing his decision or reauthorizing a target if the situation on the ground changes, according to current and former senior intelligence officials.").

[27] Craig Whitlock, *U.S. Airstrike that Killed American Teen in Yemen Raises Legal, Ethical Questions*, Wash. Post, Oct. 22, 2011, http://www.washingtonpost.com/world/national-security/us-airstrike-that-killed-american-teen-in-yemen-raises-legal-ethical-questions/2011/10/20/gIQAdvUY7L_story.html ("In the case of Awlaki's son, however, U.S. officials have been willing to talk only on the condition of anonymity because they were not authorized to speak publicly about the matter. Two U.S. officials said the intended target of the Oct. 14 airstrike was Ibrahim al-Banna, an Egyptian who was a senior operative in Yemen's al-Qaeda affiliate."); Jackie Calmes, *Success Battling Terrorists Seems to Mean Little*, N.Y. Times, Oct. 2, 2011, http://www.nytimes.com/2011/10/03/us/politics/for-obama-success-battling-terrorists-seems-to-mean-little.html?_r=1&pagewanted=all ("Also killed in the strike [that killed al-Awlaki], according to American officials, was Samir Khan, the editor of Al Qaeda's magazine."); *Al Qaeda's Anwar al-Awlaki Killed in Yemen*, CBS News World, Sept. 30, 2011, http://www.cbsnews.com/2100-202_162-20113732.html ("U.S. armed drones and fighter jets shadowed the al Qaeda convoy before armed drones launched their lethal strike early Friday. The strike killed four operatives in all, officials said. All U.S. officials spoke on condition of anonymity to discuss matters of intelligence.").

publish a detailed description, based on statements of unnamed officials, of the OLC

memorandum.  The *Times* explained that the memo "provided the justification for acting despite

an executive order banning assassinations, a federal law against murder, protections in the Bill of

Rights and various strictures of the international laws of war, according to people familiar with

the analysis."  The *Times* also described the memo's explicit reference to the CIA's targeted

killing program:

> [The memo] raised another pressing question: would it comply with the laws of
> war if the drone operator who fired the missile was a Central Intelligence Agency
> official, who, unlike a soldier, wore no uniform? The memorandum concluded
> that such a case would not be a war crime, although the operator might be in
> theoretical jeopardy of being prosecuted in a Yemeni court for violating Yemen's
> domestic laws against murder, a highly unlikely possibility.[28]

The ACLU does not contend that statements by former or unnamed officials are

sufficient, taken alone, to establish official acknowledgment.  But they form part of the

background against which the government's Glomar and No Number, No List invocations

should be assessed.  *Cf. Watts v. Indiana*, 338 U.S. 49, 52 (1949) (plurality opinion of

Frankfurter, J.) ("[T]here comes a point where this Court should not be ignorant as judges of

what we know as men.").  It is pellucid that the CIA and JSOC have authority to and do conduct

targeted killings, including of U.S. citizens, and these statements make all the more clear that the

existence of the targeted killing program has been disclosed.

Moreover, at least some of the leaked statements of unnamed officials appear to have

been authorized by the White House and CIA.  A recently published book by investigative

reporter Daniel Klaidman includes this passage:

Though the [targeted killing] program was covert, [former White House Chief of

---

[28] Charlie Savage, *Secret U.S. Memo Made Legal Case to Kill a Citizen*, New York Times,
October 8, 2011, http://www.nytimes.com/2011/10/09/world/middleeast/secret-us-memo-made-
legal-case-to-kill-a-citizen.htm.

> Staff Rahm] Emanuel pushed the CIA to publicize its kinetic successes. When
> [Pakistani Taliban leader Baitullah] Mehsud was killed, agency public affairs
> officers anonymously trumpeted their triumph, leaking colorful tidbits to trusted
> reporters on the intelligence beat. Newspapers described the hit in cinematic
> detail, including the fact that Mehsud was blown up on the roof of his father-in-
> law's compound while his wife was massaging his legs.

(Wicker Dec., Ex. 17.)[29]

The executive branch's selective disclosure of information about the CIA and JSOC

targeted killing programs raises questions that go to the heart of FOIA.  Plainly, the White

House, CIA, and DOD are free to decide that previously classified information should no longer

be classified, and to release once-classified information to the public and the press.  (Indeed, the

ACLU filed its Request in service of this goal.)  But the executive cannot lawfully release

selected information about the targeted killing program to the media, both on the record and off,

while insisting to the courts that the release of *any* information about the program would

jeopardize national security.

Indeed, the Congress that enacted FOIA in 1966 was deeply troubled not only by the

government's withholding of information but by its selective disclosure of information, which

was seen as particularly insidious. The House Republican Policy Committee's statement

supporting FOIA spoke forcefully about the need to address this problem:

> In this period of selective disclosures, managed news, half-truths, and admitted
> distortions, the need for this legislation is abundantly clear. High officials have
> warned that our Government is in grave danger of losing the public's confidence
> both at home and abroad. The credibility gap that has affected the Administration
> pronouncements on domestic affairs and Vietnam has spread to other parts of the
> world. The on-again, off-again, obviously less-than-truthful manner in which the
> reduction of American forces in Europe has been handled has made this country

---

[29] Daniel Klaidman, *Kill or Capture* 122 (2012). Klaidman's book is based on interviews "with
more than two hundred sources, most of whom are current or former Obama administration
officials."  *Id.* at xiii.  It also explains the CIA's role in al-Awlaki's killing:  "the Awlaki hit job
was turned over to the CIA, for a highly pragmatic reason:  the United States had built a new
drone base in a strategically located Persian Gulf country.  It was a regime with which the CIA
had far better ties than the military."  *Id.* at 261-62.

the subject of ridicule and jokes. "Would you believe?" has now become more than a clever saying. It is a legitimate inquiry.

Americans have always taken great pride in their individual and national credibility. We have recognized that men and nations can be no better than their word. This legislation will help to blaze a trail of truthfulness and accurate disclosure in what has become a jungle of falsification, unjustified secrecy, and misstatement by statistic. The Republican Policy Committee urges the prompt enactment of S. 1160.

Republican Policy Committee Statement on Freedom of Information Legislation, S. 1160, 112 Cong. Rec. 13020 (1966), *reprinted in* Subcomm. on Admin. Practice, S. Comm. on the Judiciary, 93rd Cong., Freedom of Information Act Source Book: Legislative Materials, Cases, Articles, at 59 (1974) (hereinafter "FOIA Source Book").

Individual members of Congress, including one of the strongest proponents of the law, then-Congressman Donald Rumsfeld, expressed similar concerns:

Certainly it has been the nature of Government to play down mistakes and to promote successes. This has been the case in the past administrations. Very likely this will be true in the future.

There is no question but that S. 1160 will not change this phenomenon. Rather, the bill will make it considerably more difficult for secrecy-minded bureaucrats to decide arbitrarily that the people should be denied access to information on the conduct of Government or on how an individual Government official is handling his job.

* * *

I consider this bill to be one of the most important measures to be considered by Congress in the past 20 years.

112 Cong. Rec. 13031 (1966) (statement of Rep. Rumsfeld), *reprinted in* FOIA Source Book at 70.

FOIA's particular concern with selective disclosure should inform this Court's analysis here.  The Glomar doctrine and No Number, No List exception cannot be construed so broadly, or the official acknowledgment exception so narrowly, as to license the very "selective disclosures, managed news, half-truths, and admitted distortions" that FOIA was meant to preclude.  Consistently, senior government officials have freely trumpeted information about the

targeted killing program, the targeting of U.S. citizens, and the killing of al-Awlaki, both on the

record and off, while insisting in court that the program cannot be discussed, or even

acknowledged, without jeopardizing national security.  One consequence is that the public's

understanding of the effectiveness, morality, and legality of the government's bureaucratized

killing program comes solely from the government's own selective, self-serving, and

unverifiable representations.  This is not simply lamentable but dangerous, and, again, it is

precisely what FOIA was designed to prevent.

The ACLU knows of no other case—save another ACLU FOIA case about other aspects

of the CIA's targeted killing program, now before the D.C. Circuit—in which agencies have

invoked the Glomar doctrine with respect to a program that government officials have discussed

so extensively, apparently with official approval, in the media.  This Court should not make new

law by sanctioning such government behavior.

### C.      The Government's Search for Records Was Inadequate.

The government has failed to meet its burden to show that the searches it performed in

response to the ACLU's requests were adequate.  *Carney*, 19 F.3d at 812.  To satisfy that burden,

each responding agency must show that it made a good-faith effort to search for the requested

documents, using methods reasonably calculated to locate responsive records.  *Adamowicz v.*

*IRS*, 672 F. Supp. 2d 454, 461-62 (S.D.N.Y. 2009).  The government is required to conduct a

search that is reasonably designed to identify and locate responsive documents.  *Garcia v. U.S.*

*Dep't of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).  The Court may rely on agency

affidavits to assess the the adequacy of a seach, but only if the affidavits are sufficiently detailed,

nonconclusory, and submitted in good faith.  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir.

1981)).  A "reasonably detailed" affidavit should set forth the search terms used, describe the

type of search conducted, and indicate that all files likely containing responsive records were searched.  *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Negley v. FBI*, 658 F. Supp. 2d 50, 60 (D.D.C. 2009) (failure to describe search terms used "plainly violates" *Oglesby*).  Even if the search is adequately described, summary judgment is still not warranted if the sufficiency of an agency's search itself is genuinely at issue.  *Founding Church of Scientology of Wash., D.C. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979).

The declarations submitted by the government do not provide sufficient descriptions of the searches conducted by the defendant agencies.  The government is not, therefore, entitled to summary judgment.  Moreover, despite the paucity of information in the declarations, telling details and inconsistencies in the various declarations demonstrate that the searches themselves were not adequate.

### 1.    The CIA, DOD, and DOJ Have Not Sufficiently Described Their Searches for Responsive Records.

The affidavits of Mr. Bies, General Neller, Mr. Bennett, and Mr. Hibbard provide varying amounts of information regarding the searches conducted by the DOD, DOJ, and CIA.  Mr. Bies's declaration contains more detail than the other declarations.  Mr. Bies provides the search terms used by the OLC, describes the databases that were searched, explains how the OLC conducted its review of paper documents, indicates that e-mail accounts were searched, and notes that the OLC discussed possible locations of responsive documents with attorneys identified as possible custodians.  (Bies Dec., ¶¶ 23-27, Ex. H.)  Mr. Bies' declaration is, however, lacking in one key respect.  Mr. Bies indicates that the OLC used the terms "awlaki" and "aulaqi" in its search, but does not indicate whether those searches would turn up documents containing the transliterations of the name containing the prefix "al-": al-Awlaki and al-Aulaqi.

(Bies Dec., Ex. H.)  In order to adequately describe its search, OLC should indicate whether its search terms would have identified records containing these permutations of the name.

Douglas Hibbard of the DOJ's OIP provided the declaration describing the search conducted in the senior leadership offices of the DOJ, specifically the Offices of the Attorney General, Deputy Attorney General, Associate Attorney General, and the Departmental Executive Secretariat, which serves as a records repository.  Mr. Hibbard notes that the OIP reviewed samples of records obtained from certain officials within the Offices of the Attorney General and Deputy Attorney General.  (Hibbard Dec., ¶¶ 12, 19.)  He does not, however, provide any information regarding the size of the samples or the sampling method used.[30]  Mr. Hibbard provides the search terms used and generally describes the searches conducted in the Office of the Attorney General, the Office of the Deputy Attorney General, and the Departmental Executive Secretariat.  (Hibbard Dec., ¶¶ 12, 19, 29.)  He does not, however, provide similar information with regard to the Office of the Associate Attorney General.  Instead, he simply states that "a search was initiated in the OASG."  (Hibbard Dec., ¶¶ 27-28.)  No search terms are provided and there is no description of how the search was conducted.  The DOJ has not presented sufficient evidence to carry its burden on summary judgment.

General Neller's declaration contains only two cursory paragraphs describing the DOD's search for responsive records.  The declaration indicates which DOD offices were searched, notes that the searches included paper and electronic records, and provides five of the search terms used for electronic searching.  (Neller Dec., ¶¶ 9-10.)  The Neller Declaration does not, however, provide any information on the databases and electronic systems searched or how they

---

[30] Even if the government is not willing to disclose the number of documents reviewed, it could have described the sample size in percentage terms.

were selected, does not list all the search terms used, and does not describe how the DOD determined which paper documents to search.  One of the limited search terms listed in the Neller Declaration is "al-Awlaki," (Neller Dec., ¶ 10), but although General Neller indicates alternate transliterations were used, he does not list those alternate transliterations or the other search terms.  Nor does the Neller Declaration indicate whether the DOD's search would encompass documents that do not use the full form of the last name with the "al-" prefix.[31]  The DOD has not shown that it conducted a reasonable search and is not entitled to summary judgment.

The DOD and the two DOJ components also do not indicate whether they used any code names in searching for responsive records.  Press reports have indicated that the government uses code names for individuals against whom it carries out targeted killing operations.[32]  The U.S. citizens killed in the targeted strikes at issue here similarly may have been assigned code names.  If so, those code names should have been used in searching for responsive records.  Additionally, any code names assigned to the targeted killing program or particular targeted killing operations should have been included as electronic searches.

The CIA has not made public any information describing its search and has provided only its own conclusion that its search was "reasonable."  (Bennett Dec., ¶ 17.)  The CIA may have provided additional information in an *ex parte* declaration, but there is no reason that the

---

[31] In its memorandum of law in this litigation, the government itself uses a form of the last name without the prefix—"Aulaki."  Any reasonable search should, therefore, be designed to locate documents that do not use the "al" prefix, as that is one variation of the last name used by the government.

[32] For example, in the operation targeting Osama bin Laden, bin Laden was assigned the code name "Geronimo."  Jake Tapper, et al., *Osama Bin Laden Operation Ended With Coded Message 'Geronimo-E KIA'*, ABC News, May 2, 2011, http://abcnews.go.com/Politics/osama-bin-laden-operation-code-geronimo/story?id=13507836.

description of its search cannot be made public.  The public descriptions of search methods and

lists of terms provided by the other defendant agencies demonstrate that a search can be

described without harm to national security.  A list of the search terms used, for example, would

reveal only that the CIA read the Request and understood the information sought.  The Request

is public, and listing search terms would reveal nothing the public does not already know.

Similarly, a description of the search methodology would reveal nothing about classified

operations or functions of the agency; rather, it would simply demonstrate whether the CIA

applied the search terms in a way reasonably calculated to identify responsive records.  Plaintiffs

ask the Court to order the CIA to provide a public description of its search.  To the extent the

Court is inclined to rely on any classified, *ex parte* declarations discussing the scope of the

search, it should carefully scrutinize the agencies' descriptions in light of the legal principles set

forth above.[33]

### 2. DOJ Did Not Conduct An Adequate Search.

The descriptions of the searches conducted by DOJ components and the documents

described in the DOJ's *Vaughn* indices show that the DOJ components did not conduct

reasonable searches.  The agency did not use adequate search terms and the results of its searches

demonstrate that responsive documents were missed.

As a starting point, DOJ did not search for all variations of the transliteration of al-

Awlaki's name.  In its memorandum of law, the government uses the spelling "Aulaki."  (E.g.,

Gov't Mem. at 6.)  Therefore, a reasonable search would have used that transliteration.

---

[33] Although the government has stated publicly that it has submitted classified *ex parte*
declarations to the Court, it has not publicly described them.  (Notice of Classified Filing,
Document 32, Case 12-cv-00794-CM.)  Even if the Court is inclined to rely on the government's
*ex parte* declarations, it should order the government at least to disclose the identity of the
declarant and the topic of each declaration.

However, the two DOJ components providing declarations to this Court did not use that transliteration in their searches.  (Bies Dec., Ex. H; Hibbard Dec., ¶¶ 12, 19, 29.)  The ACLU specifically sought records referring to al-Awlaki using any spelling or transliteration of his name.  (Bies Dec., Ex. E at 2, n.2.)

The OIP has provided a *Vaughn* index listing only four documents.[34]  (Hibbard Dec., Ex. F.)  However, the OLC's *Vaughn* index lists at least 48 responsive e-mail chains it located involving the Office of the Attorney General and/or the Office of the Deputy Attorney General.  (Bies Dec., Ex. I.)  The OIP claims to have searched for records from both those offices but did not list any e-mails from those offices on its *Vaughn* index.  (Hibbard Dec., ¶¶ 10-20, Ex. F.)  This failure by the OIP to locate numerous responsive e-mails sent between the offices it searched and the OLC suggests its search terms and methodologies were not adequate.  Indeed, the OIP indicates that it had itself located only one of the two documents provided to it by the OLC for processing.  (Hibbard Dec., ¶ 31.)  In light of the inadequacy of the search for even the small number of documents for which DOJ was willing to provide a *Vaughn* index, there may be numerous other e-mails and other records that the OIP completely failed to locate.

The OIP's failure to locate responsive documents may result from its overly restrictive search terms.  The OIP only searched for documents containing both the names of those killed and the word "target."  (Hibbard Dec., ¶¶ 12, 19, 29.)  The OLC did not include a similar limitation.  (Bies Dec., ¶ 24, Ex. I.)  The ACLU's Request encompassed documents that would likely not be identified by a search for the name "al-Awlaki," "Samir Khan," or "Abdulrahman" <u>and</u> the word "target," including records about "[f]acts supporting a belief that al-Awlaki posed an imminent threat to the United States or United States' interests" and "[f]acts supporting a

---

[34] As described below, the ACLU withdraws its request for disclosure of those four documents.

belief that al-Awlaki could not be captured or brought to justice using nonlethal means."  (Bies

Dec., Ex. E at 6.)  In addition, if, as government officials have indicated, Khan and Abdulrahman

al-Awlaki were not actually the targets of the strikes that killed them,[35] the restrictive use of the

word "target" might have missed responsive documents.  Further, to the extent Abdulrahman al-

Awlaki was not himself a target, searching for his name would not be calculated to produce

records produced prior to the strike that killed him, including information about steps taken to

avoid civilian casualties in the strike.  The OIP also only searched for the plural terms "targeted

killings" and "kill lists."  (Hibbard Dec., ¶¶ 12, 14, 19, 24, 29.)  The OIP's terms could miss

discussions of a particular targeted killing or a particular kill list.  Unlike the OLC, the OIP also

did not use the search terms "drones," "UAV," or "unmanned."  Additionally, the OIP indicates

that some records custodians, including in OAG, conducted searches using even more limited

lists of search terms than those described above.  (Hibbard Dec., ¶ 14.) (describing search in

OAG using only four search terms).  These constrained searches were inadequate.

   The DOJ did not conduct a reasonable search for records responsive to the ACLU's

request.  Therefore, the ACLU, not the DOJ, is entitled to summary judgment, and the Court

should order the DOJ to expand or supplement its searches.[36]

---

[35] *See* David S. Cloud, Jeffrey Fleishman & Brian Bennett, *U.S. Drone Strike in Yemen Kills U.S.-Born Al Qaeda Figure Awlaki*, L.A. Times, Oct. 1, 2011, http://lat.ms/zFWCR2 ("U.S. counter-terrorism officials said they did not know in advance that Khan was riding in the convoy with Awlaki."); Peter Finn, *Awlaki Family Angered by U.S. Silence*, Wash. Post, Oct. 28, 2011 ("U.S. officials speaking on condition of anonymity have said [Abdulrahman al-Awlaki] was not a target . . . .").

[36] Because the descriptions of the searches conducted by DOD and CIA were so deficient, the ACLU cannot evaluate the sufficiency of those searches.

**D.     The Government's Glomar and No Number, No List Responses Pursuant to Exemptions 1, 3, and 5 Are Improper.**

The purpose of FOIA is "broad disclosure" of government records, *Tax Analysts*, 492 U.S. at 151, and FOIA is grounded in the "fundamental principle of public access to Government documents." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989); *see also Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999) (FOIA "adopts as its most basic premise a policy strongly favoring public disclosure"). Congress included nine exemptions in FOIA, but, consistent with FOIA's purposes, these statutory exemptions are narrowly construed. *See U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). All doubts are resolved in favor of disclosure. *Local 3, Int'l Brotherhood. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988). The government has the burden of showing that any claimed exemption applies. *See Perlman v. U.S. Dep't of Justice*, 312 F.3d 100, 105 (2d Cir. 2002); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982). The government primarily relies on Exemptions 1, 3, and 5 in claiming that it is entitled to summary judgment.[37] The government's response cannot be justified under these exemptions.

**1.     Targeted Killing of U.S. Citizens is Not an "Intelligence Source or Method" Protected by Exemptions 1 or 3.**

The CIA's Glomar and No Number, No List responses under Exemptions 1 and 3 should be rejected because targeting and killing U.S. citizens, and the purported legal authority to do so, are not an "intelligence source or method" within the meaning of the Executive Order on classification, the CIA Act of 1949 ("CIA Act"), or the National Security Act of 1947 ("NSA").

---

[37] The government has also referred to Exemption 6, which exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The ACLU's FOIA Request did not seek personnel files. To the extent the government contends that responsive documents contain personal information subject to Exemption 6, it can address that issue by redacting the information in question.

Exemption 3 applies only to those documents which are "specifically exempted from disclosure by statute, . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to the particular types of matters to be withheld."  5 U.S.C. § 552(b)(3). The government bears the burden of showing (1) that the statute invoked qualifies as an Exemption 3 withholding statute, and (2) that the materials withheld fall within the statutes' scope.  *ACLU*, 389 F. Supp. 2d at 559.  The OLC and the CIA cite to the NSA, 50 U.S.C. § 403-1(i)(1), and the CIA Act, 50 U.S.C. § 403g, as the relevant withholding statutes.  The NSA prohibits the "unauthorized disclosure" of "intelligence sources and methods."[38]  50 U.S.C. § 403-1(1).  Likewise, Section 6 of the CIA Act protects against disclosures that would reveal "intelligence sources and methods" or would provide the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  50 U.S.C. § 403g. The reference in the CIA Act to "functions" does not give the CIA license "to refuse to provide any information at all about anything it does;" rather, it exempts the CIA from providing information regarding its "internal structure."  *Phillippi I*, 546 F.2d at 1015, n.14.

In *CIA v. Sims*, the Supreme Court adopted a common-sense definition of the statutory power to protect "intelligence sources and methods," stating that "Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the

---

[38] Exemption 1 also allows for withholding of "intelligence activities" and "intelligence sources or methods," Exec. Order. No 13526, § 1.4(c), 75 Fed. Reg. 707 (Dec. 29, 2009), if disclosing that information could be expected to cause national security harm. *Id.* § 1.1(a)(4).  Targeted killing is not properly classified as an intelligence activity, source, or method under Exemption 1 for the same reasons it is not properly withheld under Exemption 3. *See Maynard v. CIA*, 986 F.2d 547, 555 (1st Cir. 1993) ("When, as here, Exemptions 1 and 3 are claimed on the basis of potential disclosure of intelligence sources or methods, the standard of reviewing an agency's decision to withhold information is essentially the same.").

Agency needs to perform its statutory duties with respect to foreign intelligence."  471 U.S. 159, 169-70 (1985).  The Court quoted with approval the definition of "foreign intelligence" provided by General Vandenberg, a director of the CIA: "foreign intelligence [gathering] consists of securing all possible data pertaining to foreign governments or the national defense and security of the United States."  *Id.* at 170 (alteration in original) (quoting Nat'l Defense Establishment: Hearings on S. 758 Before the S. Comm. on Armed Servs., 80th Cong. 497 (1947) (Senate Hearings)); *see also Weissman v. CIA*, 565 F.2d 692, 694–96 (D.C. Cir. 1977) (holding that the CIA's authority to protect "intelligence sources and methods" did not extend to domestic law-enforcement functions).  This Court has likewise rejected unbounded constructions of the CIA's withholding authority.  *See, e.g.*, *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (holding that the CIA's book-publishing propaganda was not an "intelligence source or method" that had been "contemplated by Congress").

The logic of *Sims* compels the conclusion that the ACLU's Request does not seek information about "intelligence sources and methods," but rather about a killing program.  The subject of the ACLU's Request is a program of targeted killing, not intelligence gathering.  Placing individuals on kill lists and then killing them is not the same as "securing . . . *data* pertaining to foreign governments or the national defense and security of the United States."  *Sims*, 471 U.S. at 171 (emphasis added) (internal quotation marks omitted).  Moreover, the *legal analysis* of the CIA's authority to conduct targeted killings of U.S. citizens sought by the ACLU is categorically not an intelligence source or method.  Information about the CIA's targeted killing program therefore falls outside the scope of "intelligence sources and methods" as set out in *Sims*.

To the extent that some documents encompassed by the Request would actually reveal "intelligence sources and methods," portions of those particular documents may well be exempt from disclosure and the CIA can segregate those portions while disclosing the rest.  But the protection afforded particular records regarding "intelligence sources and methods" does not justify a blanket Glomar or No Number, No List response and does not permit the CIA and OLC to avoid their obligations to release responsive records (or, alternatively, to explain, using appropriate *Vaughn* indices, why particular documents must be withheld).[39]

> **2.    The Glomar and No Number, No List Responses Are Not Justified Under Exemption 1 Because Confirming the Existence of Responsive Documents Could Not Reasonably Be Expected To Result in Harm to National Security.**

Exemption 1 excludes from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  President Obama issued the Executive Order on Classified National Security Information, No. 13526, on December 29, 2009.  75 Fed. Reg. 707.  To be properly classified, the requested information must satisfy each of four requirements: 1) it must be classified by an original classification authority; 2) it must be under the control of the government; 3) it must meet certain topical criteria; and 4) disclosure must reasonably be expected to result in damage to the national security.  *Id.* at § 1.1.  "Damage to the national security" is defined as "harm to

---

[39] The ability of the government to release responsive information while protecting intelligence sources and methods is demonstrated by DOJ's disclosure of information regarding al-Awlaki and Khan during the sentencing phase of the *United States v. Umar Farouk Abdulmutallab* matter.  Gov't Sentencing Mem., United States v. Umar Farouk Abdulmutallab, No. 2:10-cr-20005 (E.D. Mich. Feb. 10, 2012).  (Wicker Dec., Ex. 9.)  The ACLU presumes that disclosure was made in a manner that avoided revealing intelligence sources and methods.  The contents or existence of similar documents discussing al-Awlaki or Khan's alleged al-Qaeda connections can likewise be disclosed without revealing information shielded by the CIA Act or the NSA.

the national defense or foreign relations of the United States from the unauthorized disclosure of information." *Id.* at § 6.1(*l*). To withhold records under Exemption 1, the government must show a logical or plausible justification for why the disclosure of the information in question is likely to harm national security. *Wilner*, 592 F.3d at 73. The government's affidavits must describe the justification in sufficient detail and not be contradicted by contrary evidence in the record. *Id.* Where, as here, the government seeks to protect information that is already in the public domain in whole or in part, it must explain how *additional* disclosure, beyond what has already been disclosed, could damage the national security. *Wash. Post v. U.S. Dep't of Defense*, 766 F. Supp. 1, 10–12 (D.D.C. 1991).

The DOD, CIA, and DOJ justify their Glomar and No Number, No List responses under Exemption 1 by claiming that acknowledging the existence of responsive records or providing a list or description of responsive records would cause national-security harm.[40] However, as detailed above, these agencies have already officially acknowledged their involvement in targeted killing, including of U.S. citizens, thus disclosing the very information they seek to conceal. As this Court has recognized, if the subject of a plaintiff's FOIA request has "already been specifically revealed to the public . . . , there is no reason such material cannot now be disclosed to [the plaintiff]. The 'sunshine' purposes of the FOIA would be thwarted if information remained classified after it became part of the public domain." *Lamont v. U.S. Dep't of Justice*, 475 F. Supp. 761, 772 (S.D.N.Y. 1979); *see also Wash. Post*, 766 F. Supp. at 9 ("It is

_____

[40] DOD and OLC have also withheld one responsive OLC memorandum pursuant to Exemption 1. The New York Times' brief explains in the section addressing Exemptions 1 and 3 why the legal analysis contained in that memorandum is not properly classified and why release of a *legal analysis*, as opposed to intelligence sources and methods information or foreign relations information, would cause no national-security harm. The ACLU adopts the Times' argument on that issue.

a matter of common sense that the presence of information in the public domain makes the

disclosure of that information less likely to 'cause damage to the national security.' . . .

[S]uppression of 'already well publicized' information would normally 'frustrate the pressing

policies of the Act without even arguably advancing countervailing considerations.'") (citation

omitted)).  The official acknowledgments detailed above also vitiate any harm that might

otherwise have flowed from providing a complete response to the Request.

      The CIA attempts to awe the Court with a parade of horribles. [41]  But each of the harms

the government refers to has either been mitigated by the government's own acknowledgments

or lacks any logical basis (or both).

      Because it is no secret that the CIA and JSOC had legal authorization to kill U.S. citizens,

and specifically al-Awlaki (Neller Dec., Ex. I; Wicker Dec, Exs. 7, 13.), no additional harm

could reasonably be expected to flow from the CIA's confirmation of the existence or

nonexistence of an OLC memo containing that authorization, or from each agency's provision of

an index listing basic information about the records withheld.

      The CIA also asserts that providing an index of records could acknowledge CIA

involvement in the deaths of al-Awlaki, Khan, and Abdulrahman al-Awlaki and thereby

acknowledge the CIA's use of drones to conduct targeted killings.  (Bennett Dec., ¶ 53.)  But the

CIA has *already* disclosed that it uses drones to conduct targeted killings, and so any additional

confirmation of this fact would not cause harm.  (Wicker Exs. 4, 10, 11, 12.)[42]  Moreover, any

---

[41] The Hackett Declaration, which provides justifications for DOJ's No Number, No List
response, incorporates by reference the arguments about harm made by the CIA.  (Hackett Dec.,
¶ 25.)  Therefore, the above argument applies equally to DOJ.

[42] *See* President Obama Hangs Out With America, White House Blog, Jan. 30,
2012, http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america
(relevant statements begin at minute 26:30 of video).

legitimate potential harms raised by the government can be mitigated by withholding specific properly classified records or by redacting and segregating from disclosure specific portions of records. Those potential harms do not justify the proffered categorical Glomar and No Number, No List responses. For example, the CIA's asserted concern that providing an index of records could identify a source of human intelligence or reveal information about secret relationships between the CIA and foreign government entities (Bennett Dec., ¶¶ 42-45) can be addressed by tailoring descriptions of records to avoid disclosing properly classified intelligence sources information and by withholding or redacting specific records containing that particular information. The same is true of intelligence methods and activities information. (*See* Bennett Dec., ¶¶ 51, 56.)

The CIA also vastly overstates the asserted harm to foreign relations and foreign activities of the United States that would result from producing a *Vaughn* index. (Bennett Dec., ¶ 58.) (asserting that indexing records could reveal whether the CIA has operated within a foreign country's borders, which could harm relations with that nation). President Obama has already specifically acknowledged that the CIA killed al-Awlaki and Khan in Yemen, *in cooperation with* the Yemeni government. (Wicker Dec., Exs. 4, 12, ¶ 26.) Relations with Yemen, at least, will not be harmed by revealing the same information again. To the extent the CIA possesses responsive records that could reveal sensitive relationships with other nations, or undisclosed information about relations with Yemen, that information can be redacted from the *Vaughn* index and any responsive records.

Moreover, it has been well documented that Yemen has consented to U.S. targeted killing operations in its territory and that it lacks the military hardware, personnel, and infrastructure to carry out targeted drone strikes itself. *See* Cable from U.S. Embassy Yemen, General Petraeus'

Meeting with Saleh on Security Assistance, AQAP Strikes, Jan. 4, 2010 (originally published by
WikiLeaks Nov. 30, 2010), *available at* http://wikileaks.org/cable/2010/01/10SANAA4.html#
(describing meeting between General David Petraeus, then-Commander of the U.S. Central
Command, and Ali Abdullah Saleh, then-president of Yemen, in which they discussed an
agreement allowing the United States to carry out targeted killing missile strikes in Yemen); Jack
Serle, *Yemen's 'Barely Functional' Air Force Points to US Involvement in Strikes*, Bureau of
Investigative Journalism, Mar. 29, 2012,
http://www.thebureauinvestigates.com/2012/03/29/barely-functional-why-us-is-likely-to-be-
behind-yemens-precision-airstrikes/ ("[L]ocal sources and Western experts describe the Yemeni
air force as decrepit and inadequate . . . .  Yemen's air force does not have much capacity for
precision strikes against al Qaeda . . . .").  And it is beyond question that the United States
carried out the strikes that killed al-Awlaki, Khan, and Abdulrahman al-Awlaki.  (Normand Dec.,
Ex. H; Wicker Dec., Exs., 5, 13; 14.)  Refusing to confirm the U.S. role in targeting al-Awlaki
and killing all three Americans will not save the Yemeni government from embarrassment.  The
only rationale for now denying that the United States killed three of its citizens in Yemen is to
protect *our own government* from embarrassment, but that is an illegitimate aim under the
Executive Order and therefore under FOIA.  *See* Exec. Order 13526 at § 1.7 ("In no case shall
information be classified, continue to be maintained as classified, or fail to be declassified in
order to:   (1) conceal violations of law, inefficiency, or administrative error; [or] (2) prevent
embarrassment to a person, organization, or agency . . . .").   The United States cannot conceal
vital information from the American public in the name of protecting a foreign government from
illusory harms.[43]

---

[43] When it produces records, the government can, of course, redact any properly classified

The absurdities continue:  The CIA concedes that the government has officially acknowledged its claim of authority to conduct targeted killings of U.S. citizens who are believed to be affiliated with terrorist organizations and that such organizations know as much. (Bennett Dec., ¶ 37.)  The CIA  nevertheless attempts to argue that some unique harm would flow from acknowledging that the CIA in particular has authority to participate in or carry out lethal operations against U.S. citizens because that would provide "valuable insight" to hostile groups.  *Id.*  But following the CIA down this rabbit hole of illogic would turn FOIA on its head. The Agency asks the Court to believe that terrorist organizations will give more credence to the CIA's thin veil of denial issued in this litigation than to the CIA's public acknowledgments of its authority to conduct and practice of conducting lethal operations against U.S. citizens, and to the extensive press reporting about the same.  The CIA cannot deny the American public access to crucial information about the legal basis for its asserted power to kill U.S. citizens by making implausible claims about the gullibility of hostile groups.  There is no logical reason why it matters to actual or potential enemies which U.S. government agencies have authority to conduct targeted killings once they know that the general power exists, but even if there were, those groups already know the CIA possesses such authority.

The harms cited by DOD are even less availing.  DOD conclusorily states that providing a *Vaughn* index "could expose the nature, depth, or breadth of DOD's operational activities, which could enable this sophisticated adversary to more effectively thwart our efforts and implicate sensitive foreign relations."  (Neller Dec., ¶ 26.)  DOD fails to substantiate its harm claim with any detail whatsoever, leaving plaintiffs and the Court with no basis to assess the

---

intelligence sources and methods or foreign relations information that derives from communications with foreign governments.

logic or force of its argument.  Because the declaration lacks *any* supporting detail, it is not

entitled to deference.  *Wilner*, 592 F.3d at 73; *Halpern*, 181 F.3d at 295 ("[T]he good faith

presumption that attaches to agency affidavits only applies when accompanied by reasonably

detailed explanations of why material was withheld.  Absent a sufficiently specific explanation

from an agency, a court's *de novo* review is not possible and the adversary process envisioned in

FOIA litigation cannot function.").

Given the disclosures already made, no conceivable harm can result if the CIA provides a

*Vaughn* index, the DOD and DOJ provide supplemental *Vaughn* indices, and at least some

documents are produced, including the legal memoranda.  Because the agency declarations lack

reasonably sufficient detail and are controverted by evidence in the record (the official and

unofficial disclosures about the subject of the ACLU's Request), the agencies' declarations on

harm are not entitled to deference and cannot justify their non-responses under Exemption 1.

### 3.      The Legal Memoranda In the Possession of DOD, OLC and CIA Are Not Subject to Exemption 5.

The ACLU adopts the arguments made by the *New York Times* with respect to Exemption

5 and contends that those arguments also apply to the legal memoranda disclosed by the DOD on

its *Vaughn* index.  (Neller Dec., Ex. J, items 9-10.)[44]  The deliberative process and attorney

client privileges are not applicable to these legal memoranda because the analysis they contain

has been adopted by the defendant agencies.  Moreover, any privilege was waived by the various

---

[44] The DOD also listed eight other documents on its *Vaughn* index, including a presentation and various e-mails.  (Neller Dec., Ex. J., items 1–8.)  Without conceding that those eight documents were properly withheld under Exemption 5, the ACLU states that is not seeking to have those documents disclosed.  The ACLU also does not seek disclosure of the four records identified in DOJ OIP's *Vaughn* index, (Hibbard Dec., Ex. F) or the sixty e-mails listed on the OLC's *Vaughn* index.  (Bies Dec., Ex. I).

disclosures made by the government officials, including the Attorney General and the General Counsels of the CIA and DOD.

**IV.      The Court Should Conduct An Appropriate *In Camera* Review.**

The ACLU adopts the arguments made by the *New York Times* that the Court should conduct an *in camera* review of the OLC DOD memorandum.  Further, if the Court cannot come to a decision about the propriety of the government's No Number, No List responses based on the parties' briefs, the Court should order the defendant agencies to produce *Vaughn* indices and present them for *in camera* review.  As detailed by the *New York Times'* brief, the Court's discretion to conduct *in camera* review granted by FOIA, 5 U.S.C. § 552(a)(4)(B) is undiminished in national-security cases.  The power to conduct *in camera* review extends to classified *ex parte* declarations and, by extension, to classified *Vaughn* indices attached to such declarations.  *See ACLU v. Office of the Dir. of Nat'l Intelligence*, No. 10 Civ. 4419, 2011 WL 5563520, at *12 (S.D.N.Y. Nov. 15, 2011).

## V.      Conclusion

For the foregoing reasons, the Court should deny the Defendants' motions for summary judgment, grant the ACLU's motion, and order the CIA, DOD, and DOJ to produce additional records, information, and indices.


Dated:  July 18, 2012                            By:  /s/Joshua Colangelo-Bryan
                                                     Joshua Colangelo-Bryan

                                             DORSEY & WHITNEY LLP
                                             51 West 52nd Street
                                             New York, NY 10019-6119
                                             212-415-9234

                                             Eric A.O. Ruzicka (*pro hac vice*)
                                             Colin Wicker (*pro hac vice*)
                                             Michael Weinbeck (*pro hac vice*)

                                             50 South Sixth Street
                                             Minneapolis, MN 55402-1498
                                             612-340-2959

                                             AMERICAN CIVIL LIBERTIES UNION
                                             FOUNDATION

                                             Jameel Jaffer
                                             Hina Shamsi
                                             Nathan Freed Wessler

                                             125 Broad Street, 18th Floor
                                             New York, NY 10004
                                             212-549-2500